GREGORY C. LOARIE (CA Bar No. 215859)
MARIE E. LOGAN (CA Bar No. 308228)
EARTHJUSTICE
50 California Street, Suite 500
San Francisco, CA 94111
T: (415) 217-2000 • F: (415) 217-2040
E: gloarie@earthjustice.org
    mlogan@earthjustice.org

*Additional Counsel of Record
Listed in Signature Block*

UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY and CENTER FOR FOOD SAFETY,<br><br>Plaintiffs,<br>vs.<br><br>U.S. BUREAU OF LAND MANAGEMENT; RYAN ZINKE, Secretary of Interior; BRIAN STEED, Acting Director, Bureau of Land Mgmt.; JEROME PEREZ, California Director, Bureau of Land Mgmt.; BETH RANSEL, District Manager, California Desert District Office, Bureau of Land Mgmt.; KATRINA SYMONS, Manger, Barstow Field Office, Bureau of Land Mgmt.,<br><br>Defendants. | Civ. No.<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

**INTRODUCTION**

1. This case challenges an illegal determination by the Trump Administration that enables a for-profit corporation called Cadiz, Inc. to construct a 43-mile pipeline through Mojave Trails National Monument and other public land while circumventing laws enacted to protect human health and the environment. A key component of the so-called "Cadiz Valley Water Conservation, Recovery and Storage Project" (Cadiz Project), the pipeline will allow Cadiz, Inc. to sell billions of gallons of groundwater mined from ancient desert aquifers to urban water districts.

2. The impact that the Cadiz Project pipeline will have on the fragile desert environment cannot be overstated. Not only will construction and maintenance of the pipeline disrupt wildlife and worsen pollution in and around Mojave Trails National Monument, but also the U.S. Geological Survey has warned the pipeline will make it possible for Cadiz, Inc. to extract far more groundwater from the desert aquifers than is replenished naturally. The resulting draw-down of the water table will cause many freshwater springs of critical importance to desert plants and animals to go dry. The retreating aquifer will also desiccate desert "playa" lakebeds, resulting in toxic air pollution from windswept sediments akin to what has plagued the Owens Valley to the north ever since Los Angeles dried Owens Lake a century ago.

3. Making matters worse, the desert aquifers that Cadiz, Inc. intends to drain are high in hexavalent chromium, a powerful carcinogen, and other heavy metals like arsenic and mercury. Health experts have concluded that the Cadiz Project will produce water laced with toxins that could pose a serious risk to consumers.

4. On October 13, 2017, defendants U.S. Bureau of Land Management, *et al.* (collectively, "BLM") improperly concluded the Cadiz Project pipeline "falls within the scope" of an existing right-of-way easement granted to the Arizona California Railroad under the 1875 General Railroad Right-of-Way Act (1875 Act). BLM therefore wrongly determined that Cadiz, Inc. may contract to build and operate its pipeline within the railroad's right-of-way without prior authorization from BLM, which would be contingent legally upon environmental review, an opportunity for public review and comment, and compliance with federal environmental laws.

5. To accommodate Cadiz, Inc., BLM also withdrew a comprehensive legal analysis undertaken by the prior presidential administration, which had reached precisely the opposite conclusion with respect to the Cadiz Project pipeline. In 2011, the Department of Interior analyzed Supreme Court precedent and legislative history and concluded correctly that activities within an 1875 Act right-of-way must "derive from or further a railroad purpose." And in 2015, the Bureau of Land Management

confirmed that the Cadiz Project pipeline "does not derive from or further a railroad purpose" and thus cannot be built on public land without federal review and approval.

6. Plaintiffs Center for Biological Diversity and Center for Food Safety will be directly harmed by BLM's illegal reversal and new determination with regard to the Cadiz Project pipeline. Plaintiffs ask this Court to find and declare that the Cadiz Project pipeline falls outside the scope of the 1875 Act right-of-way at issue, vacate BLM's determination to the contrary, and enjoin BLM from allowing the pipeline to proceed without authorization issued in accordance with all applicable federal laws.

## JURISDICTION AND VENUE

7. This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1346, because defendants are agents of the United States and because Plaintiffs' claims arise under federal law. The Court may issue a declaratory judgment and further relief under 28 U.S.C. §§ 2201-02. An actual justiciable controversy exists between the parties.

8. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e)(1), because a substantial part of the public land that is the subject of this action lies in this District.

9. Assignment to the Western Division of this Court is proper under General Order No. 16-05 I.B.1.a(1)(b).

## PARTIES

10. Plaintiff Center for Biological Diversity (CBD) is a national non-profit conservation organization with over 61,000 members dedicated to the protection of biodiversity and ecosystems throughout the world. CBD works through science, law, and creative media to secure a future for all species, great and small, hovering on the brink of extinction, with a focus on protecting the lands, waters and climate that species need to survive. CBD has offices in California and over 13,000 members across the state. CBD is actively involved in species and habitat protection in the California Desert, including on the federal land at issue in this case.

11. Plaintiff Center for Food Safety (CFS) is a public interest, non-profit membership organization with offices in San Francisco, California; Portland, Oregon;

and Washington, D.C. CFS represents over 900,000 members from every state in the country, including over 100,000 Californians whose economic and personal wellbeing depends upon the equitable distribution of safe and uncontaminated water. CFS's fundamental mission is to protect food, farmers, and the environment from the harms of industrial agriculture. To that end, CFS works to protect our freshwater resources and ensure that access to and use of freshwater is fair and sustainable. CFS advocates for a more equitable and democratic distribution of our shared water resources and seeks to ensure that environmental stewardship is the starting point for any decision affecting the distribution of water resources.

12. Plaintiffs have members who live, work, and recreate in the Mojave Desert region in the vicinity of the Cadiz Project. Plaintiffs' members and supporters enjoy, on a continuing basis, public lands within Mojave Trails National Monument and other public lands that will be affected by the Cadiz Project. In a land where water is scarce and precious, Plaintiffs' members have visited freshwater springs near the Cadiz Project, including Bonanza Springs, to observe rare plants and animals and find solace and renewal, and they intend to continue to do so in the future. Plaintiffs' members derive professional, aesthetic, recreational, and educational enjoyment from the natural ecosystems that these desert springs and other riparian areas support.

13. Plaintiffs have been, are being, and will continue to be adversely affected and irreparably injured by BLM's illegal determination that the Cadiz Project pipeline may proceed without environmental review or authorization by BLM. The interests of Plaintiffs' members described above will be injured not only by the noise, pollution, and adverse impacts to plants and wildlife associated with construction, operation, and maintenance of the Cadiz Project pipeline, but also by the draw-down of the aquifers that will result from operation of the Cadiz Project. The drying of desert springs and riparian areas, as well as the air pollution caused by excessive drying of desert lakebeds, will cause Plaintiffs' and their members to suffer actual injury-in-fact that is both concrete and particularized.

14. Plaintiffs also have members who live in urban areas that would receive water from the Cadiz Project and are justifiably concerned about the health risks associated with using and consuming water that contains hexavalent chromium and other heavy metals. BLM's decision to allow the Cadiz Project pipeline to circumvent federal health and safety laws harms Plaintiffs and their members, because it allows Cadiz, Inc. to profit by privatizing and selling public water resources that are unsafe for urban uses.

15. Plaintiffs are non-profit advocacy organizations whose organizational missions have been, are being, and will continue to be frustrated by BLM's illegal determination regarding the Cadiz Project pipeline. Plaintiffs have been, are being, and will continue to be required to divert their organizational resources to oppose BLM's illegal determination and to ensure that the Cadiz Project pipeline is not allowed to proceed.

16. Plaintiffs' injuries described above would be redressed by the relief sought herein. Plaintiffs have no adequate remedy at law. Plaintiffs have exhausted all available administrative remedies.

17. Defendant U.S. Bureau of Land Management is an administrative agency within the Department of Interior responsible for managing the public land surrounding much of the Cadiz Project and underlying much of the railroad right-of-way through which the Cadiz Project pipeline is proposed to be built.

18. Defendant Ryan Zinke is the Secretary of Interior and sued in his official capacity.

19. Defendant Brian Steed is the Bureau of Land Management's acting director and is sued in his official capacity.

20. Defendant Jerome Perez is the state director for the Bureau of Land Management in California and is sued in his official capacity.

21. Defendant Beth Ransel is the district manager of the Bureau of Land Management's California Desert District Office and is sued in her official capacity.

Complaint for Declaratory and Injunctive Relief

22. Defendant Katrina Symons is the field manager of the Bureau of Land Management's Barstow Field Office and is sued in her official capacity.

## FACTUAL BACKGROUND

**Mojave Trails National Monument**

23. President Obama established Mojave Trails National Monument by presidential proclamation on February 12, 2016. *See* 81 Fed. Reg. 8,371 (Feb. 18, 2016). Stretching from Joshua Tree National Park north to Mojave National Preserve, the Monument encompasses 1.6 million acres of federal land administered by the Bureau of Land Management and has been described as "the connective tissue of the California desert." A BLM map of the Monument is reproduced below:



24. The presidential proclamation describes Mojave Trails National Monument as "a stunning mosaic of rugged mountain ranges, ancient lava flows, and spectacular sand dunes." The proclamation finds that the Monument is "an invaluable treasure and will continue to serve as an irreplaceable national resource for geologists, ecologists, archaeologists, and historians for generations to come." It concludes that "protection of the Mojave Trails area will preserve its cultural, prehistoric, and historic legacy and maintain its diverse array of natural and scientific resources, ensuring that the prehistoric, historic, and scientific values of this area remain for the benefit of all Americans."

25. A complex network of ancient underground aquifers supports a number of ecologically significant springs, seeps and other riparian areas in and near Mojave Trails National Monument. For example, the Bonanza Spring complex rises from the southwest slope of the Clipper Mountains and supports a substantial riparian area with cottonwoods, willows, and other water-dependent vegetation within the Monument. In a region where water is scarce, springs, seeps, and riparian areas provide essential habitat for a variety of desert wildlife, including many imperiled species. The proclamation recognizes the importance of maintaining sufficient water resources to support the plants and animals that inhabit these desert lands, and it requires the Secretary of Interior to "work with appropriate State officials to ensure the availability of water resources, including groundwater resources, needed for monument purposes."

26. Mojave Trails National Monument surrounds both Bristol Dry Lake, located southeast of Amboy, and Cadiz Dry Lake, located south of the Cadiz Dunes Wilderness Area. Although these desert lakebeds, or "playas," are dry for most of the year, evaporation from underground aquifers keeps the lakebeds moist year-round and prevents lakebed sediment from becoming airborne particulate pollution.

**The Cadiz Project**

27. Cadiz, Inc. is a for-profit corporation that has acquired over 34,000 acres of private land in the Mojave Desert, most of which is located within the large

rectangular "donut hole" at the center of Mojave Trails National Monument. Spanning portions of the Fenner, Cadiz, and Bristol Valley watersheds, Cadiz, Inc.'s property sits above portions of the same underground aquifers that feed springs, seeps and riparian areas within the Monument and other nearby public lands, as well as the Bristol and Cadiz Dry Lakes.

28. In 2012, Cadiz, Inc. received approval from the County of San Bernardino to undertake the "Cadiz Valley Water Conservation, Recovery and Storage Project." The Cadiz Project is designed to extract an average of 50,000 acre feet (an amount equivalent to 16.3 billion gallons) of groundwater every year for 50 years from the aquifers underlying Cadiz' property. Cadiz, Inc. intends to profit by selling the extracted groundwater to municipal water districts in San Bernardino, Los Angeles and Orange counties.

29. The Cadiz Project will extract groundwater that would otherwise support springs, seeps, and riparian areas in Mojave Trails National Monument and other public lands and evaporate through Bristol and Cadiz Dry Lakes. Overall, the Project will lower groundwater levels by 80 feet in the aquifer system through unsustainable pumping. Because the Project will extract significantly more groundwater than will be recharged naturally, it could take up to 390 years after the cessation of pumping for the aquifer to return to its natural equilibrium.

30. In 2000, the U.S. Geological Survey (USGS) reviewed hydraulic modeling done by Cadiz, Inc. that purports to show the Fenner, Bristol, and Cadiz watersheds receive 50,000 acre-feet of water each year through natural precipitation run-off. USGS concluded that modeling done by Cadiz, Inc. was "not defensible" and had overestimated the natural recharge rate by 5 to 25 times.

31. The desert aquifers that the Cadiz Project intends to tap contain hexavalent chromium and other naturally occurring heavy metals. Experts have warned that that water produced from the Cadiz Project will contain hexavalent chromium at levels that far exceed state and federal safety guidelines.

Complaint for Declaratory and Injunctive Relief

**The Cadiz Project Pipeline**

32. A critical component of the Cadiz Project is a 43-mile pipeline that will be used to convey groundwater extracted from the property owned by Cadiz, Inc. south to the California River Aqueduct near the town of Rice, where it will be made available for sale to municipal waters districts further west.

33. Cadiz, Inc. intends to build its pipeline within an existing right of way granted to the Arizona and California Railroad (ARZC) under the General Railroad Right-of-Way Act of 1875. A map depicting the ARZC right-of-way in relation to the Cadiz Project and the Colorado River Aqueduct is reproduced below:



34. The Cadiz Project pipeline will be installed underground using open-trench construction methods at a depth of 15 feet below ground. The pipeline will cross several desert washes along the right-of-way.

35. A significant portion of the Cadiz Project pipeline will transect Mojave Trails National Monument near the Cadiz Dunes Wilderness Area. The pipeline will also transect federal land that is subject to the California Desert Conservation Area Management Plan of 1980 (CDCA Plan), as amended by both the Northern and Eastern Colorado Desert Coordinated Management Plan (NECO Plan), and the Desert Renewable Energy Conservation Plan (DRECP). The Cadiz Project pipeline will be constructed outside of the transmission corridors designated in CDCA Plan. Accordingly, BLM would be required to amend the CDCA Plan before it could permit construction and operation of the Cadiz Project pipeline.

## LEGAL BACKGROUND

**The General Railroad Right-of-Way Act of 1875**

36. The General Railroad Right-of-Way Act of 1875 "was designed to permit the construction of railroads through the public lands, and thus enhance their value and hasten their settlement." *Great Northern Railway Co. v. United States*, 315 U.S. 262, 271 (1942). Section 1 of the 1875 Act provides:

> The right of way through the public lands of the United States is granted to any railroad company duly organized under the laws of any State or Territory, except the District of Columbia, or by the Congress of the United States, which shall have filed with the Secretary of the Interior a copy of its articles of incorporation, and due proofs of its organization under the same, to the extent of one hundred feet on each side of the central line of said road; also the right to take, from the public lands adjacent to the line of said road, material, earth, stone, and timber necessary for the construction of said railroad; also ground adjacent to such right of way for station buildings, depots, machine shops, side tracks, turnouts, and water stations, not to exceed in amount twenty acres for each station, to the extent of one station for each ten miles of its road.

43 U.S.C. § 934.

37. Section 4 of the 1875 Act provides that "any railroad desiring to secure the benefits of this act shall . . . file with the register of the land office . . . a profile of its road; and upon approval . . . the same shall be noted upon the plats . . .; and thereafter all such lands over which such right of way shall pass shall be disposed of subject to such right of way." 43 U.S.C. § 937.

38. Construing the plain language and legislative history of the 1875 Act, the U.S. Supreme Court has held that the statute "clearly grants only an easement, not a fee." *Great Northern Railway Co.*, 315 U.S. at 271. Thus, whereas earlier statutes provided "lavish" outright grants of land to railroads, the 1875 Act provides only for limited right-of-way easement. *Id*. at 274.

39. The plain language and legislative history of the 1875 Act also confirm that the statute grants only those property rights necessary for the purpose of constructing and running the railroad itself. Activities that do not further a railroad purpose are beyond the scope of an 1875 Act right-of-way easement.

40. On November 4, 2011, the Department of Interior's Solicitor's Office issued an opinion analyzing the plain language and legislative history of the 1875 Act. The Solicitor's Opinion determined:

> Within an 1875 Act [right-of-way], a railroad's authority to undertake or authorize activities is limited to those activities that derive from or further a railroad purpose, which allows a railroad to undertake, or authorize others to undertake, activities that have both railroad and commercial purposes, but does not permit a railroad to authorize activities that bear no relationship to the construction or operation of a railroad.

**The Federal Land Policy & Management Act of 1976**

41. The Federal Land Policy and Management Act (FLPMA) is a comprehensive statute designed to ensure that public land administered by BLM is "managed in a manner that will protect the quality of scientific, scenic, historic, ecological, environmental, air and atmospheric, water resource, and archeological values." 43 U.S.C. § 1701(a)(8).

42. FLPMA recognizes that the deserts of southeastern California provide a rich and unique environment teaming with "historical, scenic, archeological, environmental, biological, cultural, scientific, educational, recreational, and economic resources." 43 U.S.C. § 1781(a)(2). Though vast, the statute recognizes that these California deserts and their resources are "extremely fragile, easily scarred, and slowly healed." *Id.* Human activities can easily threaten rare and endangered species of wildlife and plants in this sensitive ecosystem. 43 U.S.C. § 1781(a)(3).

43. To protect and conserve California's deserts and their resources, FLPMA designated 25 million acres as the California Desert Conservation Area (CDCA). 43 U.S.C. § 1781(c). About half of the CDCA is public land administered by the Bureau of Land Management. *Id.* Congress mandated that the Secretary of the Interior develop a "comprehensive, long-range plan for the management, use, development, and protection of the public lands within the [CDCA]." 43 U.S.C. § 1781(d).

44. To ensure proper stewardship of federal public land, including land within the CDCA, FLPMA also "replaced a tangled array of laws granting rights-of-way across federal lands, with a single method for establishing a right-of-way over public lands." *W. Watersheds Project v. Matejko*, 468 F.3d 1099, 1104 (9th Cir. 2006). Specifically, FLPMA authorizes the Secretary of Interior "to grant, issue, or renew rights-of-way over, upon, under, or through" land administered by BLM for, among other things, "pipelines . . . for the . . . transportation or distribution of water." 43 U.S.C. § 1761 (a)(1).

45. "Effective on and after October 21, 1976," FLPMA provides that "no right-of-way for the purposes listed in this subchapter shall be granted, issued, or renewed over, upon, under, or through such lands except under and subject to the provision, limitations, and conditions of this subchapter." 43 U.S.C. § 1770(a). Regulations promulgated by the Secretary of Interior under FLPMA and codified in Title 43, Part 2800 of the Code of Federal Regulations make clear: "You must have a grant under this part when you plan to use public lands for systems or facilities over,

under, on, or through public lands. These include, but are not limited to: . . . pipelines . . . and other systems which impound, store, transport, or distribute water." 43 C.F.R. § 2801.9(a)(1).

46. Prior to granting a right-of-way for a water pipeline under FLPMA, the applicant must submit substantial analysis and the Secretary of Interior, acting through BLM, must make a number of findings. For example, "prior to granting or issuing a right-of-way . . . for a new project which may have a significant impact on the environment," BLM "shall require the applicant to submit a plan for construction, operation, and rehabilitation for such right-of-way." 43 U.S.C. § 1764(d).

47. When granting rights-of-way, BLM is authorized to include terms, conditions, and stipulations it determines to be in the public interest, which may include modifying the proposed use or changing the route or location of the proposed facilities. 43 CFR § 2805.10(a)(1). In deciding whether to grant a right-of-way, BLM must also comply with the existing land and resource management plans, including the CDCA Plan, as amended by the NECO Plan and the DRECP.

48. If the granting of a right-of-way under FLPMA may have a significant impact on the environment, BLM must prepare an environmental impact statement in accordance with the National Environmental Policy Act, 42 U.S.C. § 4321 *et seq*. Prior to granting a right-of-way under FLPMA, BLM must also comply with the requirements of the Endangered Species Act, 16 U.S.C. § 1531 *et seq.*

**PROCEDURAL BACKGROUND**

49. In 2015, during the previous presidential administration, the Bureau of Land Management analyzed the Cadiz Project pipeline and issued a 24-page document that determined correctly that the Project "does not derive from or further a railroad purpose." On October 2, 2015, the Bureau of Land Management informed Cadiz, Inc. that it had therefore "reached an administrative determination that the [Cadiz] Project as described cannot be authorized by ARZC because it is outside the scope of ARZC's [right-of-way] grants held under the 1875 Act." "In order to

proceed with the proposed Project," the Bureau stated that "Cadiz, Inc., ARZC, or other parties involved will require . . . authorization for a right-of-way for the Project under regulations set forth in 43 C.F.R. Part 2800."

50. On September 1, 2017, under a new presidential administration, the Department of Interior's Solicitor's Office issued a memorandum that superseded the November 4, 2011 Solicitor's Opinion regarding the scope of an 1875 Act right-of-way easement and instead wrongly concludes:

> [R]ights-of-way granted to railroad companies under the 1875 Act allow railroad companies to lease portions of their easements to third parties without permit or grant from the Bureau of Land Management . . . provided that such leases are limited to the surface, broadly defined, of the easement and do not interfere with the continued use of the easement as a railroad.

51. On October 13, 2017, BLM advised Cadiz, Inc. by letter that it had determined that the Cadiz Project pipeline is "within the scope of rights granted to the Arizona and California Railroad (ARZC) under the General Railroad Right-of-Way Act of March 3, 1875 (1875 Act), and therefore does not require authorization by BLM." The October 13, 2017 letter "concludes that the Cadiz Project would not interfere with the continued use of the easement for railroad operations, nor would the proposed activities extend beyond the surface of the easement, broadly defined." The letter further "concludes in the alternative that the Cadiz Project would further a railroad purpose consistent with the historical understanding of the incidental use doctrine."

52. BLM's October 13, 2017 letter "expressly supersedes" the agency's prior, October 2, 2015, administrative determination regarding the Cadiz Project pipeline. BLM's October 13, 2017 letter constitutes "final agency action" for purposes of the Administrative Procedure Act, 5 U.S.C. § 704, because it determines final rights and legal consequences flow from it. Plaintiffs have exhausted their administrative remedies.

**FIRST CLAIM FOR RELIEF**

**(Illegal Agency Action)**

53. Plaintiffs re-allege, as if fully set forth herein, each and every allegation contained in the preceding paragraphs.

54. FLPMA prohibits BLM from authorizing or otherwise allowing construction or operation of the Cadiz Project pipeline to proceed in the absence of a valid, right-of-way easement across the federal lands at issue.

55. Construction and operation of the Cadiz Project pipeline is beyond the scope of the existing 1875 Act right-of-way easement held by ARZC, because it does not derive from or further a railroad purpose and bears no relationship to the construction or operation of a railroad. Construction and operation of the Cadiz Project pipeline is not incidental to continued railroad operations.

56. BLM's determination that construction and operation of the Cadiz Project pipeline is within the scope of the existing 1875 Act right-of-way easement held by ARZC and does not require a new right-of-way granted in accordance with FLPMA and other applicable laws and regulations is arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law.

**SECOND CLAIM FOR RELIEF**

**(In the Alternative: Failure to Act in Accordance with Law)**

57. Plaintiffs re-allege, as if fully set forth herein, each and every allegation contained in the preceding paragraphs.

58. By allowing construction and operation of the Cadiz Project pipeline to proceed in the absence of a valid, right-of-way easement across the federal lands at issue, BLM has failed to act in accordance with the requirements of FLPMA and the other applicable federal laws and regulations identified herein.

**REQUEST FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court:

A. Find and declare that construction and operation of the Cadiz Project pipeline is beyond the scope of the 1875 Act right-of-way easement held by ARZC;

B. Find and declare that BLM violated FLPMA by determining that construction and operation of the Cadiz Project pipeline may proceed in the absence of a valid, right-of-way easement across the federal lands at issue;

C. Vacate BLM's illegal determination with regard to the Cadiz Project pipeline and enjoin BLM from authorizing or otherwise allowing construction and operation of the Cadiz Project pipeline to proceed in the absence of a valid, right-of-way easement across the federal lands at issue;

D. Award Plaintiffs their costs of litigation, including reasonable attorneys' fees and costs; and

E. Grant Plaintiffs such additional relief as the Court may deem proper.

Respectfully submitted,

Dated: Nov. 28, 2017

/s/ Gregory C. Loarie
GREGORY C. LOARIE (CA Bar No. 215859)
MARIE E. LOGAN (CA Bar No. 308228)
EARTHJUSTICE
50 California Street, Suite 500
San Francisco, CA 94111
T: (415) 217-2000 • F: (415) 217-2040
E: gloarie@earthjustice.org
  mlogan@earthjustice.org

*Lead Counsel for All Plaintiffs*

LISA T. BELENKY (CA Bar No. 203225)
ARUNA M. PRABHALA (CA Bar No. 278865)
CENTER FOR BIOLOGICAL DIVERSITY
1212 Broadway Street, Suite 800
Oakland, CA 94612
T: (510) 844-7100 • F: (510) 844-7150
E: lbelenky@biologicaldiversity.org
  aprabhala@biologicaldiversity.org

*Counsel for Plaintiff*
*Center for Biological Diversity*

ADAM F. KEATS (CA Bar No. 191157)
CENTER FOR FOOD SAFETY
303 Sacramento Street, Floor 2
San Francisco, CA 94111
T: (415) 826-2770 • F: (415) 826-0507
E: akeats@centerforfoodsafety.org

*Counsel for Plaintiff*
*Center for Food Safety*