GREGORY C. LOARIE (CA Bar No. 215859)
MARIE E. LOGAN (CA Bar No. 308228)
EARTHJUSTICE
50 California Street, Suite 500
San Francisco, CA 94111
T: (415) 217-2000 • F: (415) 217-2040
E: gloarie@earthjustice.org
    mlogan@earthjustice.org

*Additional Counsel of Record*
*Listed in Signature Block*

IN UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY and CENTER FOR FOOD SAFETY, <br><br> Plaintiffs, <br><br> vs. <br><br> U.S. BUREAU OF LAND MGMT.; RYAN ZINKE, Secretary of Interior; BRIAN STEED, Deputy Director, Programs and Policy, Bureau of Land Mgmt.; MICHAEL NEDD, Acting Deputy Director, Operations, Bureau of Land Mgmt.; JEROME PEREZ, California Director, Bureau of Land Mgmt.; BETH RANSEL, District Manager, California Desert District Office, Bureau of Land Mgmt.; MICHAEL AHRENS, Manager, Needles Field Office, Bureau of Land Mgmt., <br><br> Defendants. | Civ. No.  2:17-cv-08587-GW-AS <br><br> **FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

## INTRODUCTION

1.      This case challenges an October 13, 2017, determination by the Trump Administration's Bureau of Land Management (BLM) that enables a for-profit corporation called Cadiz, Inc. to construct a 43-mile-long pipeline through Mojave Trails National Monument and other public land in violation of federal laws enacted

to protect human health and the environment.  A key component of the so-called "Cadiz Valley Water Conservation, Recovery and Storage Project" (Cadiz Project), the pipeline will allow Cadiz, Inc. to sell billions of gallons of groundwater mined from ancient desert aquifers to urban water districts.

2.     The impact of BLM's determination on the fragile desert environment cannot be overstated.  Not only will construction and maintenance of the Cadiz Project pipeline harm wildlife and worsen pollution in and around Mojave Trails National Monument, the U.S. Geological Survey has warned the pipeline will make it possible for Cadiz, Inc. to extract far more groundwater from the desert aquifers than is replenished naturally.  The resulting draw-down of the water table will cause many freshwater springs of critical importance to desert plants and animals to go dry.  The retreating aquifer will also desiccate desert "playa" lakebeds, resulting in toxic air pollution from windswept sediments akin to what has plagued the Owens Valley to the north ever since Los Angeles dried Owens Lake a century ago.

3.     Making matters worse, the desert aquifers that Cadiz, Inc. intends to drain are high in hexavalent chromium, a powerful carcinogen, and other heavy metals like arsenic and mercury.  Health experts have concluded that the Cadiz Project will produce water laced with toxins that could pose a serious risk to consumers.

4.     As set forth below, BLM's determination with respect to the Cadiz Project pipeline is illegal.  First, BLM wrongly concluded that the Cadiz Project pipeline "falls within the scope" of grandfathered railroad rights-of-way through federal public land and can proceed in the absence of a right-of-way issued by BLM in accordance with the procedural and substantive safeguards of the Federal Land Policy and Management Act (FLPMA).  Second, BLM failed to analyze the significant environmental impacts that will flow from its determination with respect to the Cadiz Project pipeline, as required by the National Environmental Policy Act (NEPA).

5.     Plaintiffs Center for Biological Diversity and Center for Food Safety ask this Court to set aside BLM's illegal determination regarding the Cadiz Project

pipeline and enjoin BLM from authorizing or otherwise allowing construction and operation of the pipeline pending compliance with all applicable laws and regulations.

## JURISDICTION AND VENUE

6.     This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1346, because defendants are agents of the United States and because Plaintiffs' claims arise under federal law.  The Court may issue a declaratory judgment and further relief under 28 U.S.C. §§ 2201-02.

7.     An actual justiciable controversy exists between the parties.  Plaintiffs have exhausted all available administrative remedies.

8.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e)(1), because a substantial part of the public land that is the subject of this action lies in this District.

9.     Assignment to the Western Division of this Court is proper under General Order No. 16-05 I.B.1.a(1)(b).

## PARTIES

10.     Plaintiff Center for Biological Diversity (CBD) is a national non-profit conservation organization with over 61,000 members dedicated to the protection of biodiversity and ecosystems throughout the world.  CBD works through science, law, and creative media to secure a future for all species, great and small, hovering on the brink of extinction, with a focus on protecting the lands, waters and climate that species need to survive.  CBD has offices in California and over 13,000 members across the state.  CBD is actively involved in species and habitat protection in the California desert, including on the federal land at issue in this case.

11.     Plaintiff Center for Food Safety (CFS) is a public interest, non-profit membership organization with offices in San Francisco, California; Portland, Oregon; and Washington, D.C.  CFS represents over 900,000 members from every state in the country, including over 100,000 Californians whose economic and personal well-being depends upon the equitable distribution of safe and uncontaminated water.  CFS's fundamental mission is to protect food, farmers, and the environment from the

harms of industrial agriculture.  To that end, CFS works to protect our freshwater resources and ensure that access to and use of freshwater is fair and sustainable.  CFS advocates for a more equitable and democratic distribution of our shared water resources and seeks to ensure that environmental stewardship is the starting point for any decision affecting the distribution of water resources.

12.  Plaintiffs have members who live, work, and recreate in the Mojave Desert region in the vicinity of the Cadiz Project.  Plaintiffs' members and supporters enjoy, on a continuing basis, public lands within Mojave Trails National Monument and other public lands that will be affected by the Cadiz Project.  In a land where water is scarce and precious, Plaintiffs' members have visited freshwater springs near the Cadiz Project, including Bonanza Springs, to observe rare plants and animals and find solace and renewal, and they intend to continue to do so in the future.  Plaintiffs' members derive professional, aesthetic, recreational, and educational enjoyment from the natural ecosystems that these desert springs and other riparian areas support.

13.  Plaintiffs have been, are being, and will continue to be adversely affected and irreparably injured by BLM's October 13, 2017, determination with respect to the Cadiz Project pipeline.  The interests of Plaintiffs' members described above will be injured not only by the noise, pollution, and adverse impacts to plants and wildlife associated with construction, operation, and maintenance of the Cadiz Project pipeline, but also by the draw-down of the aquifers that will result from operation of the Cadiz Project.  The drying of desert springs and riparian areas, as well as the air pollution caused by excessive drying of desert lakebeds, will cause Plaintiffs' and their members to suffer actual injury-in-fact that is both concrete and particularized.

14.  Plaintiffs also have members who live in urban areas that will receive water from the Cadiz Project and are justifiably concerned about the health risks associated with using and consuming water that contains hexavalent chromium and other heavy metals.  BLM's decision to allow the Cadiz Project pipeline to circumvent federal health and safety laws harms Plaintiffs and their members, because it allows

Cadiz, Inc. to profit by privatizing and selling public water resources that are unsafe for urban uses.

15.     Plaintiffs are non-profit advocacy organizations whose organizational missions have been, are being, and will continue to be frustrated by BLM's illegal determination regarding the Cadiz Project pipeline.  Plaintiffs have been, are being, and will continue to be required to divert their organizational resources to oppose BLM's illegal determination and to ensure that the Cadiz Project pipeline is not allowed to proceed.

16.     Plaintiffs' injuries described above are caused by BLM's determination with respect to the Cadiz Project pipeline, because BLM's determination authorizes Cadiz, Inc. to undertake harmful activities that would otherwise be illegal or impracticable.  Plaintiffs' injuries would be redressed by the relief sought herein. Plaintiffs have no adequate remedy at law.

17.     Defendant Bureau of Land Management is the administrative agency within the Department of Interior responsible for managing the public land surrounding much of the Cadiz Project and underlying much of the railroad rights-of-way through which the Cadiz Project pipeline is proposed to be built.

18.     Defendant Ryan Zinke is Secretary of the U.S. Department of Interior and sued in his official capacity as such.

19.     Defendant Brian Steed is BLM's Deputy Director for Programs and Policy and sued in his official capacity as such.  According to BLM's website, Mr. Steed is currently "exercising authority of the director."

20.     Defendant Michael Nedd is BLM's Acting Deputy Director for Operations and sued in his official capacity as such.  Mr. Nedd signed BLM's October 13, 2017, determination regarding the Cadiz Project pipeline when he was serving as the agency's Acting Director.

21.     Defendant Jerome Perez is BLM's California State Director and sued in his official capacity as such.

First Amended Complaint for Declaratory & Injunctive Relief – No. 2:17-cv-08587-GW-AS

22.     Defendant Beth Ransel is the District Manager for BLM's California Desert District and sued in her official capacity as such.

23.     Defendant Michael Ahrens is the Field Manager for BLM's Needles Field Office and sued in his official capacity as such.

## FACTUAL BACKGROUND

**Mojave Trails National Monument**

24.     President Obama established Mojave Trails National Monument by presidential proclamation on February 12, 2016.  *See* 81 Fed. Reg. 8,371 (Feb. 18, 2016).  Stretching from Joshua Tree National Park north to Mojave National Preserve, the Monument encompasses 1.6 million acres of federal land administered by the Bureau of Land Management and has been described as "the connective tissue of the California desert."  A BLM map of the Monument is reproduced below:



First Amended Complaint for Declaratory & Injunctive Relief – No. 2:17-cv-08587-GW-AS

25.     The presidential proclamation describes Mojave Trails National Monument as "a stunning mosaic of rugged mountain ranges, ancient lava flows, and spectacular sand dunes."  The proclamation finds that the Monument is "an invaluable treasure and will continue to serve as an irreplaceable national resource for geologists, ecologists, archaeologists, and historians for generations to come."  It concludes that "protection of the Mojave Trails area will preserve its cultural, prehistoric, and historic legacy and maintain its diverse array of natural and scientific resources, ensuring that the prehistoric, historic, and scientific values of this area remain for the benefit of all Americans."

26.     A complex network of ancient underground aquifers supports a number of ecologically significant springs, seeps and other riparian areas in and near Mojave Trails National Monument.  For example, the Bonanza Spring complex rises from the southwest slope of the Clipper Mountains and supports a substantial riparian area with cottonwoods, willows, and other water-dependent vegetation within the Monument. In a region where water is scarce, springs, seeps, and riparian areas provide essential habitat for a variety of desert wildlife, including many imperiled species.  The proclamation recognizes the importance of maintaining sufficient water resources to support the plants and animals that inhabit these desert lands, and it requires the Secretary of Interior to "work with appropriate State officials to ensure the availability of water resources, including groundwater resources, needed for monument purposes."

27.     Mojave Trails National Monument surrounds both Bristol Dry Lake, located southeast of Amboy, and Cadiz Dry Lake, located south of the Cadiz Dunes Wilderness Area.  Although these desert lakebeds, or "playas," are dry for most of the year, evaporation from underground aquifers keeps the lakebeds moist year-round and prevents lakebed sediment from becoming airborne particulate pollution.

**The Cadiz Project**

28.     Cadiz, Inc. is a for-profit corporation that has acquired over 34,000 acres of private land in the Mojave Desert, most of which is located within the large

First Amended Complaint for Declaratory & Injunctive Relief – No. 2:17-cv-08587-GW-AS

1   rectangular "donut hole" at the center of Mojave Trails National Monument.

2   Spanning portions of the Fenner, Cadiz, and Bristol Valley watersheds, Cadiz, Inc.'s

3   property sits above portions of the same underground aquifers that feed springs, seeps

4   and riparian areas within the Monument and other nearby public lands, as well as the

5   Bristol and Cadiz Dry Lakes.

6       29.    Cadiz, Inc. seeks to construct and operate the "Cadiz Valley Water

7   Conservation, Recovery and Storage Project" or "Cadiz Project."  When complete, the

8   Cadiz Project would extract an average of 50,000 acre feet (an amount equivalent to

9   16.3 billion gallons) of groundwater every year for 50 years from the aquifers

10  underlying Cadiz' property.  Cadiz, Inc. seeks to profit by selling the extracted

11  groundwater to municipal water districts in San Bernardino, Los Angeles and Orange

12  counties.

13      30.    The groundwater that Cadiz, Inc. intends to mine and sell would

14  otherwise support springs, seeps, and riparian areas in Mojave Trails National

15  Monument and other public lands and evaporate through Bristol and Cadiz Dry Lakes.

16  Overall, the Cadiz Project would lower groundwater levels by 80 feet in the aquifer

17  system through unsustainable pumping.  Because the Project will extract significantly

18  more groundwater than will be recharged naturally, it could take up to 390 years after

19  the cessation of pumping for the aquifer to return to its natural equilibrium.

20      31.    In 2000, the U.S. Geological Survey (USGS) reviewed hydraulic

21  modeling done by Cadiz, Inc. that purports to show the Fenner, Bristol, and Cadiz

22  watersheds receive 50,000 acre-feet of water each year through natural precipitation

23  run-off.  USGS concluded that modeling done by Cadiz, Inc. was "not defensible" and

24  had overestimated the natural recharge rate by 5 to 25 times.

25      32.    The desert aquifers that the Cadiz Project intends to draw down contain

26  hexavalent chromium and other naturally occurring heavy metals.  Experts have

27  warned that that water produced from the Cadiz Project will contain hexavalent

28  chromium at levels that far exceed state and federal safety guidelines.

First Amended Complaint for Declaratory & Injunctive Relief – No. 2:17-cv-08587-GW-AS

**The Cadiz Project Pipeline**

33.     For the Cadiz Project to proceed, Cadiz, Inc. must have a financially feasible means for transporting the groundwater beneath its property to municipal water districts and other consumers.  Currently, the only practicable option is for Cadiz, Inc. to construct a 43-mile-long pipeline within existing rights-of-way held by the Arizona and California Railroad Company (ARZC), which extend from Cadiz, Inc.'s property south through Mojave Trails National Monument and other public land to the Colorado River Aqueduct near the town of Rice.  A map depicting the ARZC rights-of-way in relation to the Cadiz Project and the Colorado River Aqueduct is reproduced below:



First Amended Complaint for Declaratory & Injunctive Relief – No. 2:17-cv-08587-GW-AS

34.     The United States originally conveyed the rights-of-way at issue to ARZC's predecessor pursuant to the General Railroad Right-of-Way Act of 1875.

35.     The proposed Cadiz Project pipeline would be approximately seven feet in diameter and would be installed 15 feet below ground within the ARZC rights-of-way.  The pipeline will cross many desert washes that occur along the rights-of-way.  Construction and operation of the pipeline will have a significant adverse impact on air quality and other fragile desert resources.

36.     A significant portion of the ARZC rights-of-way at issue transect Mojave Trails National Monument near the Cadiz Dunes Wilderness Area.  The ARZC rights-of-way also transect federal land that is subject to the California Desert Conservation Area Management Plan of 1980 (CDCA Plan), as amended by both the Northern and Eastern Colorado Desert Coordinated Management Plan (NECO Plan), and the Desert Renewable Energy Conservation Plan (DRECP).  The ARZC rights-of-way are located outside of the transmission corridors designated in the CDCA Plan.

## LEGAL BACKGROUND

### The General Railroad Right-of-Way Act of 1875

37.     The General Railroad Right-of-Way Act of 1875 "was designed to permit the construction of railroads through the public lands, and thus enhance their value and hasten their settlement." *Great N. Ry. Co. v. United States*, 315 U.S. 262, 271 (1942).  Section 1 of the 1875 Act provides "[t]he right of way through the public lands of the United States is granted to any railroad company" meeting certain specified criteria "to the extent of one hundred feet on each side of the central line of said road." 43 U.S.C. § 934.

38.     Construing the plain language and legislative history of the 1875 Act, the Supreme Court has confirmed that the statute grants "only an easement for railroad purposes." *United States v. Union Pac. R. Co.*, 353 U.S. 112, 119 (1957).  Activities that do not derive from or further a railroad purpose are beyond the scope of an 1875 Act right-of-way easement.

**The Federal Land Policy and Management Act**

39.     Congress enacted the Federal Land Policy and Management Act (FLPMA) in 1973 to ensure that federal public land administered by BLM is "managed in a manner that will protect the quality of scientific, scenic, historic, ecological, environmental, air and atmospheric, water resource, and archeological values." 43 U.S.C. § 1701(a)(8).

40.     FLPMA finds that the deserts of southeastern California are a rich and unique environment teeming with "historical, scenic, archeological, environmental, biological, cultural, scientific, educational, recreational, and economic resources." 43 U.S.C. § 1781(a)(1). Though vast, the statute recognizes that these deserts are "extremely fragile, easily scarred, and slowly healed." 43 U.S.C. § 1781(a)(2). FLPMA finds that "the California desert environment and its resources, including certain rare and endangered species of wildlife, plants, and fishes, and numerous archeological and historic sites, are seriously threatened by air pollution . . . and pressures of increased use." 43 U.S.C. § 1781(a)(3).

41.     In an effort to protect southern California's deserts for future generations, FLPMA designated 25 million acres of federal public land as the California Desert Conservation Area (CDCA). 43 U.S.C. § 1781(c). About half of the CDCA is public land administered by the Bureau of Land Management. *Id.* Congress mandated that the Secretary of the Interior develop a "comprehensive, long-range plan for the management, use, development, and protection of the public lands within the [CDCA]." 43 U.S.C. § 1781(d).

42.     FLPMA also "replaced a tangled array of laws granting rights-of-way across federal lands, with a single method for establishing a right-of-way over public lands" administered by BLM. *W. Watersheds Project v. Matejko*, 468 F.3d 1099, 1104 (9th Cir. 2006). The statute preserves "any right-of-way . . . heretofore issued, granted, or permitted." 43 U.S.C. § 1769(a). However, "[e]ffective on and after October 21, 1976," FLPMA provides that "no right-of-way for the purposes listed in

First Amended Complaint for Declaratory & Injunctive Relief – No. 2:17-cv-08587-GW-AS

this subchapter shall be granted, issued, or renewed over, upon, under, or through such lands except under and subject to the provision, limitations, and conditions of this subchapter."  43 U.S.C. § 1770(a).

43.     FLPMA sets forth a process by which the Secretary of Interior, acting through BLM, may "grant, issue, or renew rights-of-way over, upon, under, or through" federal land administered by BLM for, among other things, "pipelines . . . for the . . . transportation or distribution of water."  43 U.S.C. § 1761 (a)(1).

44.     Prior to granting a right-of-way for a water pipeline under FLPMA, the applicant must submit substantial analysis, and the Secretary of Interior, acting through BLM, must make a number of findings.  For example, "prior to granting or issuing a right-of-way . . . for a new project which may have a significant impact on the environment," BLM "shall require the applicant to submit a plan for construction, operation, and rehabilitation for such right-of-way."  43 U.S.C. § 1764(d).

45.     When granting rights-of-way, BLM is authorized to include terms, conditions, and stipulations it determines to be in the public interest, which may include modifying the proposed use or changing the route or location of the proposed facilities. 43 CFR § 2805.10(a)(1).  In deciding whether to grant a right-of-way, BLM must also comply with the existing land and resource management plans, including the CDCA Plan, as amended by the NECO Plan and the DRECP.

**The National Environmental Policy Act**

46.     NEPA is "our basic national charter for protection of the environment." *Or. Nat'l Desert Ass'n v. Jewell*, 840 F.3d 562, 568 (9th Cir. 2016) (quoting 40 C.F.R. § 1500.1(a)).  "To the fullest extent possible," NEPA requires all federal agencies to prepare a "detailed statement" that discusses the environmental effects of, and reasonable alternatives to, all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C).  This statement is commonly known as an "environmental impact statement" or EIS.

47.     The Supreme Court has explained that an EIS serves two purposes:

First Amended Complaint for Declaratory & Injunctive Relief – No. 2:17-cv-08587-GW-AS

> First, it ensures that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts.  Second, it guarantees that the relevant information will be made available to the larger audience that may also play a role in both the decisionmaking process and the implementation of that decision.

*Dep't of Transp. v. Public Citizen,* 541 U.S. 752, 768 (2004).

48.     Regulations promulgated by the Council on Environmental Quality to assist federal agencies in implementing NEPA explain that an EIS must analyze both the direct effects of the agency action on the environment and the "indirect effects, which are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable."  40 C.F.R. § 1508.8.  An EIS must also consider the "cumulative impacts" of the action, that is, the environmental impacts that result "from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions."  *Id.* § 1508.7.

49.     An EIS must also consider alternatives to the agency action and "present the environmental impacts of the proposal and the alternatives in comparative form, thus sharply defining the issues and providing a clear basis for choice" among the alternatives.  40 C.F.R. § 1502.14.  The consideration and evaluation of alternatives "is the heart of the [EIS]."  *Id.*  An EIS must "[d]evote substantial treatment to each alternative considered in detail including the proposed action so that reviewers may evaluate their comparative merits."  *Id.* § 1502.14(b).

### PROCEDURAL BACKGROUND

50.     In September 2008, Cadiz, Inc. entered into a lease with ARZC for the purpose of constructing the Cadiz Project pipeline within ARZC's 1875 Act rights-of-way through Mojave Trails National Monument and other federal public land.

51.     In June 2009, Senator Feinstein sent then-Secretary of Interior Ken Salazar a letter requesting that the Department of Interior examine whether construction and operation of the Cadiz Project pipeline within the existing ARZC rights-of-way would require federal review and authorization.

First Amended Complaint for Declaratory & Injunctive Relief – No. 2:17-cv-08587-GW-AS

52.     On November 4, 2011, the Department of Interior's Solicitor's Office issued Opinion M-37025, in which it analyzed the "the scope of a railroad's authority to authorize activities within a right-of-way (ROW) granted pursuant to the General Railroad Right-of-Way Act of March 3, 1875." Opinion M-37025 concluded:

> Within an 1875 Act [right-of-way], a railroad's authority to undertake or authorize activities is limited to those activities that derive from or further a railroad purpose, which allows a railroad to undertake, or authorize others to undertake, activities that have both railroad and commercial purposes, but does not permit a railroad to authorize activities that bear no relationship to the construction or operation of a railroad.

53.     On December 2, 2011, BLM issued Instruction Memorandum No. 2012-038 (IM 2012-038) to provide "interim guidance" to BLM field offices "in light of the release of Solicitor's Opinion M-37025." IM 2012-038 confirmed that BLM "retains authority over proposed uses within 1875 Act ROWs across BLM-managed public lands which do not derive from or further a railroad purpose." IM 2012-038 provided that "in those situations where a use is proposed within an 1875 Act ROW located on public lands," the relevant BLM field office "must first evaluate whether a railroad purpose will be served by the proposed use."

54.     On October 1, 2012, the Board of Supervisors for the County of San Bernardino voted to approve the Cadiz Project.

55.     On August 11, 2014, BLM issued Instruction Memorandum No. 2014-122 (IM 2014-122). IM 2014-122 established revised and more detailed guidance to assist BLM field offices in evaluating whether an activity falls within the scope of an 1875 Act right-of-way. IM 2014-122 reaffirmed that "[t]he determination of whether an activity located within an 1875 Act ROW across BLM-managed public lands is within or outside the scope of such 1875 Act ROW must be made by the BLM." IM 2014-122 also clarified that "[d]etermining whether a particular activity derives from or furthers a railroad purpose requires a fact-specific case-by-case evaluation."

56.     In 2015, BLM prepared a 24-page recommendation document in which it analyzed, in accordance with Opinion M-37025 and Instruction Memorandum No.

2014-122, "whether activities proposed within Arizona and California Railroad . . . railroad rights-of-way (ROWs), as undertaken by third-party proponent Cadiz, Inc., across public land managed by [BLM], fall within the scope of the Railroad's ROW grants." BLM's recommendation concluded that the Cadiz Project "pipeline and the water it will convey do not fall within that set of activities that derive from or further a railroad purpose," and therefore "would need approval from BLM." It explains:

> The primary purpose of the pipeline is to convey water for distribution to a separate and distant location for commercial distribution, and nearly 100 percent of the conveyed water would be solely devoted to this purpose. There is no relationship between the express purpose for the pipeline and the railroad's operation. Cadiz, Inc. has not provided any facts that adequately explain how this primary purpose helps promote or advance railroad purposes.
>
> Construction of the pipeline itself is not necessary for rail operations, nor will the conveyance of water through the pipeline convert the pipeline into a facility that is necessary for operation of the railroad. . . . There simply are no facts that suggest that the continuation of railroad operations is in any way dependent on the water pipeline's construction, nor does the proponent offer any evidence of such need.

57.     On October 2, 2015, BLM informed Cadiz, Inc. by letter that it had "reached an administrative determination that the [Cadiz] Project as described cannot be authorized by ARZC because it is outside the scope of ARZC's [right-of-way] grants held under the 1875 Act." BLM's letter states that "[i]n order to proceed with the proposed Project, Cadiz, Inc., ARZC, or other parties involved will require . . . authorization for a right-of-way for the Project." BLM's letter enclosed a five-page summary of the "case-specific evaluation" that BLM undertook with respect to the Cadiz Project pipeline.

58.     On March 14, 2016, Cadiz, Inc. made available its "Form 10-K Annual Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 for the fiscal year ended December 31, 2015." Therein, Cadiz, Inc. stated that "if the BLM will not change [its October 2, 2015, determination], then [Cadiz, Inc.] will need to file a right-of-way permit application with the BLM for a review of the pipeline's use . . . and/or seek to clarify a railroad's property rights in U.S. Federal Court. Both

alternatives will likely result in a delay of final Project implementation and we cannot reasonably predict the outcome of either process."

59.     On January 20, 2017, President Donald Trump took office.

60.     On March 29, 2017, BLM issued Instruction Memorandum No. 2017-060 (IM 2017-060).  IM 2017-060 rescinded both IM 2014-122 and IM 2012-038, and directed that "[a]ll issues related to addressing activities within railroad rights-of-way granted pursuant to the [1875 Act] across [BLM]-managed lands are to be directed to the BLM Washington Office."

61.     On June 30, 2017, the Acting Solicitor of Interior, Daniel H. Jorjani temporarily suspended Solicitor Opinion M-37025.

62.     On September 1, 2017, Acting Solicitor Jorjani issued Opinion M-37048. Opinion 37048 permanently withdrew Opinion M-37025 and wrongly concluded "that the rights-of-way granted to railroad companies under the 1875 Act allow railroad companies to lease portions of their easements to third parties without permit or grant from [BLM], provided that such leases are limited to the surface, broadly defined, of the easement and do not interfere with the continued use of the easement as a railroad."

63.     On October 13, 2017, defendant Michael Nedd, then serving as BLM's Acting Director, advised Cadiz, Inc. that BLM's October 2, 2015 administrative determination with respect to the Cadiz Project pipeline "is no longer an accurate representation of BLM's view of the applicable law and facts."  Mr. Nedd advised Cadiz, Inc. that "[i]n light of further review of the relevant law, the BLM concludes that authorizing the proposed activity [i.e., the Cadiz Project pipeline] falls within the scope of rights granted to the [ARZC] under the [1875 Act], and therefore does not require authorization from BLM."  Mr. Nedd explained that BLM's conclusion in this regard was based on BLM's view "that the Cadiz Project would not interfere with the continued use of the easement of the easement for railroad operations, nor would the proposed activities extend beyond the surface of the easement, broadly defined."  In

First Amended Complaint for Declaratory & Injunctive Relief – No. 2:17-cv-08587-GW-AS

addition, Mr. Nedd explained that BLM had decided "in the alternative that the Cadiz Project would further a railroad purpose consistent with the historical understanding of the incidental use doctrine." Mr. Nedd concluded by stating:

> [T]he BLM determines that the ability to authorize the proposed uses of easements under the 1875 Act falls within the decision rights of the [ARZC] railroad. Because those rights were transferred from the United States government as part of the 1875 easement, authorization by the BLM is unnecessary.

64. On October 16, 2017, Cadiz, Inc. issued a press release in which it stated that, as a result of BLM's October 13, 2017, determination, "no further federal permits or authorizations are required for Project construction within the ARZC railroad right-of-way." The release continued: "With the receipt of this definitive determination by the BLM, [Cadiz] will now turn its attention to final engineering design, contract arrangements with its participating agencies and a conveyance agreement with the Metropolitan Water District of Southern California."

## FIRST CLAIM FOR RELIEF

### (Violation of FLPMA, the 1875 Act, and the APA)

65. Plaintiffs re-allege, as if fully set forth herein, each and every allegation contained in the preceding paragraphs.

66. BLM's October 13, 2017, determination with respect to the Cadiz Project pipeline is a "final agency action" subject to judicial review under the Administrative Procedure Act (APA). 5 U.S.C. § 704.

67. The APA provides that courts must "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

68. The Supreme Court has clarified that an agency action is arbitrary and capricious for purposes of the APA "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a

First Amended Complaint for Declaratory & Injunctive Relief – No. 2:17-cv-08587-GW-AS

difference in view or the product of agency expertise." *Motor Vehicles Mfrs v. State Farm*, 463 U.S. 29, 43 (1983).  The agency "must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Id*.  Moreover, "an agency changing course" is "obligated to supply a reasoned analysis for the change" beyond what would be required if the agency were operating on a clean slate.  *Id*. at 42; *see also Organized Vill. of Kake v. U.S. Dep't of Agriculture*, 795 F.3d 956, 968 (9th Cir. 2015) ("[E]ven when reversing a policy after an election, an agency may not simply discard prior factual findings without a reasoned explanation.").

69.    FLPMA prohibits BLM from authorizing or allowing anyone to construct or operate a water pipeline on federal public land within its jurisdiction unless (1) BLM grants a right-of-way in accordance with the procedural and substantive provisions of FLPMA or (2) the water pipeline falls within the scope of a right-of-way granted by the United States prior to FLPMA's enactment.  *See* 43 U.S.C. § 1770(a).

70.    BLM's October 13, 2017, determination that the Cadiz Project pipeline falls within the scope of the 1875 Act rights-of-way held by ARZC and may proceed in the absence of a new right-of-way issued by BLM in accordance with FLPMA is arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law within the meaning of the APA.

71.    First, BLM's October 13, 2017, determination is contrary to law, because it is premised upon an erroneous interpretation of the 1875 Act.  The 1875 Act grants "only an easement for railroad purposes." *United States v. Union Pac. R. Co.*, 353 U.S. 112, 119 (1957).  Thus, ARZC may authorize or undertake activities within its 1875 Act rights-of-way only to the extent those activities derive from or further a railroad purpose.  BLM's conclusion that ARZC has a legal right to authorize or undertake any activity within its 1875 Act rights-of-way "as long as the activity is incidental to and does not interfere with continued railroad operations" is not in accordance with the law.

72.     Second, BLM's October 13, 2017, determination is arbitrary, capricious, and an abuse of discretion, to the extent that BLM alternatively concludes that the Cadiz Project pipeline furthers a railroad purpose.  BLM's conclusion that the Cadiz Project pipeline furthers a railroad purpose runs counter to the evidence.  Moreover, BLM failed to examine the relevant data, failed to provide a rational connection between the facts found and the choice made, and failed to supply a reasoned explanation for its decision to abandon the detailed findings that it made in 2015 regarding the Cadiz Project pipeline.

73.     Because the Cadiz Project pipeline is beyond the scope of the 1875 Act rights-of-way held by ARZC, BLM violated FLPMA by authorizing or otherwise allowing the Cadiz Project pipeline to proceed in the absence of a valid right-of-way granted by BLM in accordance with FLPMA.

## SECOND CLAIM FOR RELIEF
## (Violation of NEPA and the APA)

74.     Plaintiffs re-allege, as if fully set forth herein, each and every allegation contained in the preceding paragraphs.

75.     NEPA requires all federal agencies to prepare an EIS on all "major Federal actions significantly affecting the quality of the human environment."  42 U.S.C. § 4332(2)(C).  BLM's compliance with NEPA is subject to judicial review under the APA.

76.     BLM's October 13, 2017, determination that the Cadiz Project pipeline falls within the scope of the 1875 Act rights-of-way held by ARZC is a major federal action significantly affecting the quality of the human environment within the meaning of NEPA.

77.     BLM did not prepare an EIS prior to issuing its October 13, 2017, determination regarding the Cadiz Project pipeline, and BLM has never analyzed the impact that construction and operation of the Cadiz Project pipeline within the ARZC rights-of-way will have on the environment in accordance with NEPA's standards.

78.   BLM's failure to prepare an EIS prior to issuing its October 13, 2017, determination regarding the Cadiz Project pipeline is arbitrary, capricious, an abuse of discretion, and not in accordance with NEPA.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

A.   Find and declare:

(1)   The Cadiz Project pipeline is beyond the scope of the 1875 Act rights-of-way held by ARZC;

(2)   BLM's October 17, 2017, determination that the Cadiz Project pipeline falls within the scope of the 1875 Act rights-of-way held by ARZC is arbitrary, capricious, an abuse of discretion, and not in accordance with law;

(3)   BLM violated FLPMA by allowing the Cadiz Project pipeline to proceed in the absence of a right-of-way granted in accordance with FLPMA; and

(4)   BLM violated NEPA by failing to prepare an EIS in connection with its October 13, 2017, determination regarding the Cadiz Project pipeline;

B.   Vacate and set aside BLM's October 13, 2017, determination with regard to the Cadiz Project pipeline;

C.   Enjoin BLM from authorizing or otherwise allowing construction and operation of the Cadiz Project pipeline to proceed pending compliance with FLPMA, NEPA, and all other applicable laws and regulations;

D.   Award Plaintiffs their costs of litigation, including reasonable attorneys' fees and costs; and

E.   Grant Plaintiffs such additional relief as the Court may deem proper.

//
//
//
//
//

1

2

Respectfully submitted,

3   Dated: February 28, 2018        /s/ Gregory C. Loarie
                                    GREGORY C. LOARIE (CA Bar No. 215859)
4                                   MARIE E. LOGAN (CA Bar No. 308228)
                                    EARTHJUSTICE
5                                   50 California Street, Suite 500
                                    San Francisco, CA 94111
6                                   T: (415) 217-2000 • F: (415) 217-2040
                                    E: gloarie@earthjustice.org
7                                       mlogan@earthjustice.org

8                                   *Lead Counsel for All Plaintiffs*

9                                   LISA T. BELENKY (CA Bar No. 203225)
10                                  ARUNA M. PRABHALA (CA Bar No. 278865)
                                    CENTER FOR BIOLOGICAL DIVERSITY
11                                  1212 Broadway Street, Suite 800
                                    Oakland, CA 94612
12                                  T: (510) 844-7100 • F: (510) 844-7150
                                    E: lbelenky@biologicaldiversity.org
13                                      aprabhala@biologicaldiversity.org

14

15                                  *Counsel for Plaintiff*
                                    *Center for Biological Diversity*
16

17                                  ADAM F. KEATS (CA Bar No. 191157)
                                    CENTER FOR FOOD SAFETY
18                                  303 Sacramento Street, Floor 2
                                    San Francisco, CA 94111
19                                  T: (415) 826-2770 • F: (415) 826-0507
                                    E: akeats@centerforfoodsafety.org
20

21                                  *Counsel for Plaintiff*
                                    *Center for Food Safety*
22

23

24

25

26

27

28

First Amended Complaint for Declaratory & Injunctive Relief – No. 2:17-cv-08587-GW-AS