GREGORY C. LOARIE (CA Bar No. 215859)
MARIE E. LOGAN (CA Bar No. 308228)
EARTHJUSTICE
50 California Street, Suite 500
San Francisco, CA 94111
T: (415) 217-2000 • F: (415) 217-2040
E: gloarie@earthjustice.org
     mlogan@earthjustice.org

*Additional Counsel for Plaintiffs*
*Listed in Signature Block*

IN UNITED STATES DISTRICT COURT FOR THE
CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY and CENTER FOR FOOD SAFETY,<br><br>Plaintiffs,<br><br>vs.<br><br>U.S. BUREAU OF LAND MGMT., et al.,<br><br>Defendants,<br><br>and<br><br>CADIZ, INC., et al.,<br><br>Defendant-Intervenors. | Case No. 2:17-cv-08587-GW-AS<br><br>(Consolidated with Case No. 2:18-cv-06775-GW-AS)<br><br>**PLAINTIFFS' OPPOSITION TO CROSS-MOTIONS FOR SUMMARY JUDGMENT**<br><br>Date:   June 20, 2019<br>Time:   8:30 a.m.<br>Judge:  Hon. George H. Wu<br>Place:  Courtroom 9D |

# TABLE OF CONTENTS

INTRODUCTION ...............................................................................................1

ARGUMENT .....................................................................................................2

I.  BLM's Conclusion the Cadiz Project Is Within the Scope of the 1875 Act Easement If It Does Not Interfere with Railroad Operations Misinterprets the 1875 Act..........................................................................................2

    A.  The Acting Solicitor's 2017 M-Opinion Is Not Entitled to Deference................................................................................2

    B.  The Text and Purpose of the 1875 Act Demonstrate Congress Intended to Create an Easement for Railroad Purposes Only...............3

    C.  A Railroad's Authority to Apportion an 1875 Act Easement Is Limited by the Scope of the Easement....................................7

    D.  The Acting Solicitor's 2017 M-Opinion Conflicts with Longstanding Interpretations of the 1875 Act. ....................................8

    E.  The Incidental Use Doctrine Cannot Expand the Scope of an 1875 Act Easement Granted Exclusively for Railroad Purposes.................10

II.  BLM's Alternative Conclusion the Cadiz Project Furthers a Railroad Purpose Is Arbitrary and Capricious. ...............................................12

    A.  BLM's Alternative Conclusion Rests on Factual Findings that Directly Contradict Findings BLM Made in 2015.............................14

    B.  BLM Gave No Explanation for Discarding Its Prior Findings. ..........15

III. BLM's 2017 Determination Is a Major Federal Action Triggering NEPA. .17

CONCLUSION .................................................................................................20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Air Alliance Houston v. Envtl. Prot. Agency,*
  906 F.3d 1049 (D.C. Cir. 2018) ................................................................16

*Barahona v. Union Pac. R.R. Co.,*
  881 F.3d 1122 (9th Cir. 2018) .......................................................8, 11, 12

*Barnhart v. Peabody Coal Co.,*
  537 U.S. 149 (2003) ....................................................................................5

*Beres v. United States,*
  104 Fed. Cl. 408 (2012) ...........................................................................6, 7

*California v. Azar,*
  No. 19-01184, 2019 WL 1877392 (N.D. Cal. Apr. 26, 2019) ...............16

*Cash v. S. Pac. R. Co.,*
  123 Cal. App. 3d 974 (1981) ....................................................................12

*Ctr. for Biological Diversity v. U.S. Dep't of Interior,*
  623 F.3d 633 (9th Cir. 2010) ....................................................................19

*City of Palo Alto v. City & Cty. of San Francisco,*
  548 F.2d 1374 (9th Cir. 1977) ....................................................................5

*Ellamae Phillips Co. v. United States,*
  99 Fed. Cl. 483 (2011) ................................................................................5

*F.C.C. v. Fox Television Stations,*
  556 U.S. 502 (2009) ..................................................................................14

*Friends of Alaska Nat'l Wildlife Refuges v. Bernhardt,*
  No. 18-00029, 2019 WL 1437596 (D. Alaska Mar. 29, 2019) ...............16

*Geneva Rock Prod. v. United States,*
  107 Fed. Cl. 166 (2012) ......................................................................4, 5, 7

*Great N. R. Co. v. United States,*
  315 U.S. 262 (1942)...........................................................................passim

*Hallaba v. Worldcom Network Servs. Inc.,*
  196 F.R.D. 630 (N.D. Okla. 2000) ...........................................................11

*Home on the Range v. AT&T Corp.,*
  386 F. Supp. 2d 999 (S.D. Ind. 2005).................................................6, 8, 9

*Indigenous Envtl. Network v. Dep't of State*,
   347 F. Supp. 3d 561 (D. Mont. 2018)...................................................17

*Int'l Paper Co. v. MCI Worldcom Network Servs., Inc.*,
   202 F. Supp. 2d 895 (W.D. Ark. 2002) ..............................................12

*Kansas City S. Ry. Co. v. Arkansas La. Gas Co.*,
   476 F.2d 829 (10th Cir. 1973) ............................................................8

*L.K.L. Assocs., Inc. v. Union Pac. R.R. Co.*,
   No. 15-00347, 2018 WL 2433563 (D. Utah May 29, 2018) ................8

*MacDonald v. United States*,
   119 F.2d 821 (9th Cir. 1941) ..............................................................7

*Marvin M. Brandt Revocable Tr. v. United States*,
   572 U.S. 93 (2014) ..............................................................................4

*McMaster v. United States*,
   731 F.3d 881 (9th Cir. 2013) .......................................................3, 10

*Mellon v. S. Pac. Transp. Co.*,
   750 F. Supp. 226 (W.D. Tex. 1990) ..................................................11

*Miss. Invs. v. New Orleans & N. E. R.R. Co.*,
   188 F.2d 245 (5th Cir. 1951) ............................................................11

*Organized Village of Kake v. Dep't of Agriculture*,
   795 F.3d 956 (9th Cir. 2015) ..................................................14, 16, 17

*Perez v. Mortg. Bankers Ass'n*,
   135 S. Ct. 1199 (2015)......................................................................14

*Ritter v. Thompson*,
   144 S.W. 910 (1912)........................................................................12

*Ryan Mercantile Co. v. Great N. Ry. Co.*,
   294 F.2d 629 (9th Cir. 1961) ..............................................................4

*United States ex rel. S. Ute Indian Tribe v. Hess*,
   348 F.3d 1237 (10th Cir. 2003) ..........................................................3

*Saget v. Trump*,
   No. 18-1599, 2019 WL 1568755 (E.D.N.Y. Apr. 11, 2019).................16

*Sample v. Centurylink Commc'ns LLC*,
   No. 16-00624, 2018 WL 3997484 (D. Ariz. Aug. 21, 2018) ...................4

*Skidmore v. Swift & Co.*,
   323 U.S. 134 (1944)................................................................................3

*Stewart v. Travelers Corp.*,
   503 F.2d 108 (9th Cir. 1974) ...............................................................5

*Union Pac. R.R. Co. v. Santa Fe Pac. Pipelines*,
   231 Cal. App. 4th 134 (2014) ...........................................................4, 8

*United States v. Denver & Rio Grande Ry. Co.*,
   150 U.S. 1 (1893).................................................................................5

*United States v. Union Pac. R.R. Co.*,
   353 U.S. 112 (1957)................................................................4, 6, 7, 11

## Statutes

43 U.S.C. § 934 .................................................................................3, 5

43 U.S.C. § 937 ....................................................................................3

## Regulations

40 C.F.R. § 1508.18 .........................................................................18, 19

## Federal Register Notices

81 Fed. Reg. 8,371 (Feb. 18, 2016) ......................................................6

## Other Authorities

56 Interior Dec. 206, 1937 WL 3355 (D.O.I.) ........................................9

96 Interior Dec. 439, 1989 WL 434834 (D.O.I.) .....................................9

Pls.' Opp. to Cross-Motions for Summary Judgment—No. 2:17-cv-08587-GW-AS

# INTRODUCTION

The material facts contained in the administrative record are undisputed.  The "overall purpose" of the Cadiz project is to pump billions of gallons of groundwater from the Mojave Desert for sale to southern California water districts.  BLM5021.  An essential component of the Cadiz project is a "43-mile-long underground water conveyance pipeline" designed "to deliver water extracted from the Project wellfield to the [Colorado River Aqueduct]."  BLM5047.  To evade federal laws enacted to protect the fragile desert environment, Cadiz intends to build its pipeline within a railroad easement across Mojave Trails National Monument established under the General Railroad Right-of-Way Act of 1875 (1875 Act).  BLM2107.

In 2015, the Bureau of Land Management (BLM) determined Cadiz's proposed pipeline is beyond the scope of the 1875 Act easement.  BLM2243.  Consistent with caselaw interpreting the statute, BLM concluded an activity fits within an 1875 Act easement only if it "derives from or furthers a railroad purpose."  BLM2257-61.  BLM found "no relationship between the express purpose for the pipeline and the railroad's operation."  BLM2264.  BLM concluded the other purported "railroad benefits" Cadiz hastily tacked on to its water project in 2011 are minimal or illusory, and ultimately insufficient to imbue a massive pipeline designed to facilitate a commercial groundwater venture with a genuine railroad purpose.  BLM2267-80.

On March 6, 2017, the new administration's Acting Deputy Secretary of Interior directed BLM to reverse course, and specifically to "write an analysis that says the facts suggesting railroad benefits were ignored" and "leave the matter up to the railroad."  BLM1996.  As directed, BLM advised Cadiz on October 13, 2017 that its pipeline "falls within the scope" of the 1875 Act railroad easement, either because it will not "interfere" with the railroad, or because it will "further a railroad purpose."  BLM4-5.  BLM made this 2017 determination without the benefit of an environmental impact statement—or even a preliminary environmental assessment—documenting the significant effect of its reversal on human health and the environment.

1

1   Plaintiffs Center for Biological Diversity and Center for Food Safety (the

2   Centers) moved for summary judgment on April 6, 2019, ECF No. 67, because the

3   undisputed facts in the record establish BLM's 2017 determination is arbitrary,

4   capricious, and contrary to law.  This brief responds to the cross-motions for summary

5   judgment filed by BLM, ECF No. 69, and Cadiz, ECF No. 68, on April 6, 2019.[1]

**ARGUMENT**

6

7   **I.    BLM's Conclusion the Cadiz Project Is Within the Scope of the 1875 Act
        Easement If It Does Not Interfere with Railroad Operations Misinterprets
        the 1875 Act.**

8

9       The Centers' opening brief details a substantial body of caselaw establishing

10  that an activity falls within the scope of an 1875 Act easement if—and only if—it

11  derives from or furthers a railroad purpose.  *See* Memo. in Support of Pls' Mot. for

12  Summ. J. (ECF No. 67-1) ("Centers Memo.") at 13-18.  Neither BLM nor Cadiz

13  identify a single case in which any court has held otherwise.  Instead, BLM and Cadiz

14  rely on the Acting Solicitor's 2017 M-Opinion, which concluded incorrectly that an

15  activity falls within scope of an 1875 Act easement, provided it is "limited to the

16  surface, broadly defined, of the easement and do[es] not interfere with the continued

17  use of the easement as a railroad."  BLM76 (footnote citation omitted).  Their reliance

18  on the Acting Solicitor's 2017 M-Opinion is misplaced, because the Acting Solicitor

19  misinterpreted the 1875 Act.

20      **A.    The Acting Solicitor's 2017 M-Opinion Is Not Entitled to Deference.**

21      As an initial matter, BLM and Cadiz are incorrect in claiming the Acting

22  Solicitor's M-Opinion is "entitled to deference."  *See* BLM Memo. at 9; Memo. in

23

24  ───────────────

[1] The Centers have challenged and seek to set aside only BLM's October 13, 2017
25  determination regarding the Cadiz project.  Accordingly, the Centers do not address
    BLM's arguments regarding the justiciability of a facial challenge to the Acting
26  Solicitor's 2017 M-Opinion.  See Dfs.' Memo. in Support of Mot. for Summ. J. (ECF
    No. 69-1) ("BLM Memo.") at 5-8.  This Court has already determined BLM's October
27  13, 2017 determination is final agency action subject to judicial review under the
    Administrative Procedure Act.  See Final Ruling on Defs.' Mot. to Dismiss Pls.' First
28  Am. Cmplt. (ECF No. 31) ("Order Denying Motion to Dismiss") at 14-16.

Support of Intervenors' Mot. for Summ. J. (ECF No. 68-1) ("Cadiz Memo.") at 10. The Ninth Circuit has held Solicitor's opinions "cannot properly be viewed as an administrative agency interpretation of statute," and therefore they are not entitled to traditional, *Chevron*-style deference. *McMaster v. United States*, 731 F.3d 881, 891-92 (9th Cir. 2013) (quoting *Wilderness Soc'y v. Fish & Wildlife Serv.*, 353 F.3d 1051, 1068 n.16 (9th Cir. 2003)); *see also United States ex rel. S. Ute Indian Tribe v. Hess*, 348 F.3d 1237, 1250 (10th Cir. 2003) ("Agency opinions, because they are not the product of the rigors of formal rulemaking, are not entitled to any deference.").

A Solicitor's opinion may sometimes be entitled to judicial "respect"—but not deference—in accordance with Supreme Court's decision in *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944). *See McMaster*, 731 F.3d at 892. But that "depend[s] upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and any other factors which give it power to persuade." *Id.* (quoting *Skidmore*, 323 U.S. at 140)). For the reasons set forth in the Centers' opening brief and below, the Acting Solicitor's interpretation of the 1875 Act is unpersuasive, and it therefore does not warrant judicial respect under *Skidmore*. The Acting Solicitor's interpretation certainly is not entitled to deference.

**B.    The Text and Purpose of the 1875 Act Demonstrate Congress Intended to Create an Easement for Railroad Purposes Only.**

BLM's argument that "[t]he text of the 1875 Act does not limit the scope of the right-of-way grant solely to railroad purposes" is not persuasive. BLM Memo. at 10.

First, BLM concedes the 1875 Act conveyed only "an easement to the railroad companies." BLM Memo. at 3. Indeed, the plain text of the 1875 Act grants "a right of way through the public lands" and provides that "thereafter, all such lands over which such right of way shall pass shall be disposed of subject to such right of way." 43 U.S.C. §§ 934, 937. According to the Supreme Court, "[a]pter words to indicate the intent to convey an easement would be difficult to find." *Great N. R. Co. v. United States* ("*Great Northern*"), 315 U.S. 262, 271 (1942).

Second, it is black-letter law that "[g]ranting an easement merely gives the grantee the right to enter and use the grantor's land *for a certain purpose*."  *Marvin M. Brandt Revocable Tr. v. United States*, 572 U.S. 93, 105 (2014) (emphasis added); *see also Ryan Mercantile Co. v. Great N. Ry. Co.*, 294 F.2d 629, 638 (9th Cir. 1961) ("Sometimes it is a right of way for a road, sometimes for a ditch, sometimes for a canal, but whatever the particular right of way may be for, it is a right of passage over another person's land, or, in other words, an easement to use the land of another for such particular purpose.").  As a result, "the easement holder's use is limited by the requirement that it be reasonably necessary and consistent with the purposes for which the easement was granted."  *Union Pac. R.R. Co. v. Santa Fe Pac. Pipelines*, 231 Cal. App. 4th 134, 164 (2014) (quoting *Atchison, T. & S.F. Ry. Co. v. Abar*, 275 Cal. App. 2d 456, 464 (1969)).

In the case of the 1875 Act, the Supreme Court has determined Congress intended to grant "an easement *for railroad purposes*."  *United States v. Union Pac. R.R. Co.*, 353 U.S. 112, 119 (1957) (emphasis added); *Great Northern*, 315 U.S. at 272 (holding the 1875 Act "was designed to permit the construction of railroads through the public lands" and granted an easement for "[t]he achievement of that purpose").  Consequently, "the text of the 1875 Act implies the grant of a narrow and specific easement for railroad purposes only."  *Geneva Rock Prod. v. United States*, 107 Fed. Cl. 166, 171 (2012); *see also Sample v. Centurylink Commc'ns LLC*, No. 16-00624, 2018 WL 3997484, at *2 (D. Ariz. Aug. 21, 2018) ("The term 'railroad purpose' does not appear in the 1875 Act . . . but it is inherent in the statutory language granting a 'right of way' to 'any railroad.'").

Counterintuitively, BLM invokes "the doctrine of *expressio unius est exclusion alterius*" to argue Congress could not have intended to grant an easement only for railroad purposes, because the 1875 Act grants two ancillary rights that BLM concedes are indisputably "limited to particular railroad purposes."  BLM Memo. at 10.  Those ancillary rights are "the right to take, from the public lands adjacent to [the

railroad easement] material, earth, stone, and timber necessary for the construction of such railroad," and the right to use up to 20 acres of adjacent land for each 10 miles of road "for station buildings" and other railroad infrastructure. *See* 43 U.S.C. § 934.

BLM's reliance on the *expressio unius* canon is misplaced. As discussed above, the text of the 1875 Act is ample evidence that Congress intended use of the easement—like use of the adjacent timber and occasional 20 acres—would be limited to railroad purposes. *See Great Northern*, 315 U.S. at 272; *Geneva Rock Prod.*, 107 Fed. Cl. at 171. Moreover, courts construing the 1875 Act "are not limited to the lifeless words of the statute and formalistic canons of construction in our search for the intent of Congress." *Id.* at 273. As a rule, "the purposes in drafting a statute are controlling in its interpretation rather than the application of convenient Latin formulae." *City of Palo Alto v. City & Cty. of San Francisco*, 548 F.2d 1374, 1377-78 (9th Cir. 1977). Accordingly, "the tendency is to limit the *expressio unius* rule in favor of construing an act so as to effectuate its dominant purpose." *Stewart v. Travelers Corp.*, 503 F.2d 108, 112 (9th Cir. 1974).

Here, "[t]he general nature and purpose of the [1875 Act] were manifestly to promote the building of railroads." *United States v. Denver & Rio Grande Ry. Co.*, 150 U.S. 1, 8 (1893). Construing the plain language of the 1875 Act against the backdrop of this dominant historical purpose, this Court has properly determined Congress "intended to give limited rights of way to railroads to promote the nation's railway system, but not to grant large tracts of land unrelated to that purpose." Order Denying Motion to Dismiss at 14; *see also Ellamae Phillips Co. v. United States*, 99 Fed. Cl. 483, 486 (2011) ("[T]he context in which the Act was passed indicates that the grant was intended for only railroad purposes.").

By specifically allowing the taking of "material, earth, stone, and timber" from land adjacent to an 1875 Act easement, the *expressio unius* canon might support a presumption that Congress did not intend to allow the taking of other resources (*e.g.*, water) from those same lands. *See Barnhart v. Peabody Coal Co.*, 537 U.S. 149, 168

(2003) (holding the *expressio unius* canon "has force only when the items expressed are members of an associated group or series, justifying the inference that items not mentioned were excluded by deliberate choice, not inadvertence").  However, the *expressio unius* canon cannot be employed to defeat Congress' manifest intent to grant "only an easement for railroad purposes."  *United States v. Union Pac. R.R. Co.*, 353 U.S. at 119; *see also Beres v. United States*, 104 Fed. Cl. 408, 453 (2012) ("1875 Act easements by the 1875 Act's very terms, as validated by contextual history, were limited to railroad purposes.").

BLM argues courts should "liberally construe" the 1875 Act to allow any use that encourages "westward expansion and economic development."  BLM Memo. at 11.  If the Court were to adopt such an "expansive assertion that the purpose of all this legislation was to develop western lands, it is hard to imagine anything the railroads would be unauthorized to do within the right of way."  *Home on the Range v. AT&T Corp.*, 386 F. Supp. 2d 999, 1021 (S.D. Ind. 2005).  And again, the history of the 1875 Act demonstrates Congress had much narrower purposes in mind.  Congress' specific goal was "to permit the construction of railroads through the public lands," without "subsidizing railroad construction by lavish grants from the public domain."  *Great Northern*, 315 U.S. at 272-73.  Congress' solution was to grant "only an easement for railroad purposes."  *United States v. Union Pac. R.R. Co.*, 353 U.S. at 119.

Ultimately, the Supreme Court has held the 1875 Act "is to be liberally construed," but only so far as is necessary "*to carry out its purposes*" of permitting railroad construction across public lands while preserving the land itself "for the purpose of securing homesteads to actual settlers, and for educational purposes."[2] *Great Northern*, 315 U.S. at 272 (emphasis added).  Beyond that, the Supreme Court

---

[2] The eventual designation of Mojave Trails National Monument is consistent with Congress' wise decision almost 150 years ago to retain public land for educational purposes.  *See* 81 Fed. Reg. 8,371 (Feb. 18, 2016) ("The Mojave Trails area is an invaluable treasure and will continue to serve as an irreplaceable national resource for geologists, ecologists, archaeologists, and historians for generations to come.").

has confirmed the 1875 Act remains "subject to the general rule of construction that any ambiguity in a grant is to be resolved favorably to a sovereign grantor—nothing passes but what is conveyed in clear and explicit language." *Id.* at 272; *accord United States v. Union Pac. R. Co.*, 353 U.S. at 116.  Together, "[t]hese principles mandate that the 1875 Act be construed in a manner that recognizes what was passed to the railroads by the United States as a matter of law should not exceed the Congressional intent to grant easements for the limited purpose of promoting railroad development and operation." *Beres*, 104 Fed. Cl. at 453; *see also Geneva Rock Prod.*, 107 Fed. Cl. at 172 ("1875 Act easements must be limited to the purposes described in the Act itself, commensurate with Congress's intent to provide for transportation across states.").  In short, "[i]t is not lightly to be assumed that Congress intended to grant rights more extensive than those necessary to enable the [rail]roads to build over the public land." *MacDonald v. United States*, 119 F.2d 821, 825 (9th Cir. 1941).

For all these reasons, the text and purpose of the 1875 Act demonstrate that Congress intended to create an easement for railroad purposes only.

### C.    A Railroad's Authority to Apportion an 1875 Act Easement Is Limited by the Scope of the Easement.

BLM argues at length that a railroad may "apportion" an 1875 Act easement (*e.g.*, lease a portion of the easement to a third party), because the 1875 Act granted "an exclusive easement in gross."  BLM Memo. at 13.  Assuming for the sake of argument an 1875 Act easement may be apportioned, it does not follow "a railroad may permit a broad range of uses, as long as those uses do not interfere with railroad operations."  *Id.*  As BLM concedes, "[a] railroad's right to divide and apportion the land . . . is *limited to the scope of the easement*."  *Id.* at 14 (emphasis added).

Because the right of apportionment is limited to the scope of the easement, courts have held a railroad may authorize a third party to undertake an activity within an 1875 Act easement only if the activity derives from or furthers a railroad purpose. *See, e.g., Home on the Range*, 386 F. Supp. 2d at 1020-22; *Union Pac. R.R. Co. v.*

1  *Santa Fe Pac. Pipelines*, 231 Cal. App. 4th at 164.  Thus, "a railroad may license third

2  parties to do what it could do itself."  *Barahona v. Union Pac. R.R. Co.*, 881 F.3d

3  1122, 1135 (9th Cir. 2018).  However, "[i]t would be an impermissibly expansive

4  reading of the 1875 Act to find that it allows [the railroad] to enter into lease

5  agreements under which [the railroad] receives payments in exchange for letting [a

6  third party] engage in business that does not serve a railroad purpose."  *L.K.L. Assocs.,*

7  *Inc. v. Union Pac. R.R. Co.*, No. 15-00347, 2018 WL 2433563, at *9 (D. Utah May

8  29, 2018), *appeal filed*, No. 18-4123 (10th Cir. Aug. 30, 2018).

9          Equally off point is BLM's argument that a railroad's right to apportion an 1875

10  Act easement "includes the subsurface of a right-of-way."  BLM Memo. at 14.  If a

11  railroad has any right to use the land beneath an 1875 Act easement, "the subsurface

12  must be used to support the construction or operation of the railroad (*i.e.*, for railroad

13  purposes)."  *Union Pac. R.R. Co. v. Santa Fe Pac. Pipelines*, 231 Cal. App. 4th at

14  163; *see also Kansas City S. Ry. Co. v. Arkansas La. Gas Co.*, 476 F.2d 829, 834

15  (10th Cir. 1973) (concluding an easement granted for railroad purposes under post-

16  1875 Act statutes encompassed the right "to excavate drainage ditches; to construct

17  beneath the surface supports for bridges and other structures;" and "to make fills and

18  cuts to decrease the grades of the rail lines").  Accordingly, the Ninth Circuit held the

19  subsurface oil pipeline at issue in *Barahona* could conceivably fall within the scope of

20  an 1875 Act easement, *but only if* the pipeline served a legitimate railroad purpose.

21  *See* 881 F.3d at 1135.  No court has held a railroad may lease the subsurface of an

22  1875 Act easement to a third party for non-railroad purposes.

23          In sum, a railroad's authority to apportion an 1875 Act easement is limited to

24  activities that derive from or further a railroad purpose.

25  **D.   The Acting Solicitor's 2017 M-Opinion Conflicts with Longstanding**
           **Interpretations of the 1875 Act.**
26
27  BLM argues the Acting Solicitor's 2017 M-Opinion "is consistent with the way

28  in which railroad rights-of-way have been interpreted and used for over a hundred

years." BLM Memo. at 15.  That is not true.  Throughout most of the 1875 Act's near 150-year history, both Congress and the Department of Interior have correctly construed the statute as granting only an easement for railroad purposes.

As the Supreme Court acknowledged in *Great Northern,* a House committee report for railroad legislation enacted in 1906 confirmed Congress' understanding that the 1875 Act "simply grants an easement for railroad purposes."  315 U.S. at 277 (quoting H. Rpt. No. 4777, 59th Cong., 1st Sess., p. 2 (Ser. No. 4908)).  Several years later, a 1937 opinion by the Department of Interior's Office of the Solicitor examined the 1875 Act and agreed "[a] right of way through the public domain granted to a railroad by Congress may be used *only and exclusively for railroad purposes*, irrespective of whether the use of a portion of the right of way for other purposes interferes with the continued operation of the railroad."  56 Interior Dec. 206, 1937 WL 3355 (D.O.I.) (emphasis added).

The Department of Interior's interpretation of the 1875 Act as requiring a railroad purpose remained consistent until 1989, when the Acting Solicitor at the time changed course and opined railroads may use an 1875 Act for any purpose "not inconsistent with railroad operations."  96 Interior Dec. 439, 1989 WL 434834 (D.O.I.).  This 1989 opinion—called M-36964 and reproduced in the administrative record at BLM7997—did not persuade the courts.  *See, e.g., Home on the Range*, 386 F. Supp. 2d at 1022 (concluding the 1989 opinion "did not cite any law" and "effectively ignores the Supreme Court's decision *Great Northern*").  As a result, the Interior Solicitor withdrew opinion M-36964 in 2011 and confirmed the Department of Interior's prior, longstanding position that "[a] railroad's authority to undertake or authorize activities within an 1875 Act [right-of-way] is limited to those activities that derive from or further a railroad purpose."  BLM8049.

The 2011 Solicitor's opinion remained the Department of Interior's official interpretation of the 1875 Act until September 2017, when current Acting Solicitor Daniel Jorjani withdrew the 2011 Solicitor's opinion and asserted a railroad may use

an 1875 Act easement for any purpose that does not "interfere with the continued use of the easement as a railroad." BLM75. Acting Solicitor Jorjani claimed the Supreme Court's intervening decision in *Marvin M. Brandt Revocable Tr. v. United States*, 572 U.S. 93, 105 (2014), explained his sudden decision to revisit the 2011 Solicitor's opinion. *See* BLM785, BLM79. However, "*Brandt* merely confirmed what the Supreme Court had already said more than a century before in *Great Northern*." *L.K.L. Assocs., Inc.*, 2018 WL 2433563 at *7. It is therefore unclear why *Brandt* would have motivated that Acting Solicitor. More likely, the Acting Solicitor's decision to revisit the 2011 Solicitor's opinion was the result of the Acting Deputy Secretary's politically-driven mandate to "get rid of the Hillary [sic] opinion" (*i.e.,* the 2011 M-Opinion authored by then-Solicitor Hilary Tompkins) in order to facilitate the Cadiz project. BLM1996; *see also* BLM2188 (ranking the Cadiz project as number 15 on President-elect Trump's list of "Emergency & National Security Projects").

Whatever the reason for Acting Solicitor's 2017 M-Opinion, the fact remains both Congress and the Department of Interior have long interpreted the 1875 Act as granting an easement exclusively for railroad purposes. *See Great Northern,* 315 U.S. at 277; 56 Interior Dec. at 206. It is the Acting Solicitor's 2017 M-Opinion, therefore, that is inconsistent with longstanding "earlier pronouncements," another factor that weighs against affording the 2017 M-Opinion judicial respect. *See McMaster*, 731 F.3d at 892.

### E.   The Incidental Use Doctrine Cannot Expand the Scope of an 1875 Act Easement Granted Exclusively for Railroad Purposes.

"Even if the scope of an 1875 Act right-of-way is limited to uses that serve a railroad purpose," BLM argues, "the allowable scope of such uses should be broadly construed consistent with the incidental use doctrine." BLM Memo. at 17. Assuming for the sake of argument the incidental use doctrine is applicable to easements granted under the 1875 Act, it cannot save the Acting Solicitor's flawed interpretation of the 1875 Act. According to the Ninth Circuit, the incidental use doctrine could apply to

1  bring an activity into the scope of an 1875 Act easement *only if* the activity serves a

2  legitimate and sufficient railroad purpose.  *See Barahona*, 881 F.3d at 1136.  The

3  incidental use doctrine cannot expand the scope of an easement created by Congress

4  exclusively "for railroad purposes."  *United States v. Union Pac. R.R. Co.*, 353 U.S. at

5  119.  Indeed, the Ninth Circuit's opinion in *Barahona* was premised on the railroad's

6  concession that "the 1875 Act conferred only an easement . . . for railroad purposes."

7  *See* 881 F.3d at 1133.

8          Consistent with the Ninth Circuit's opinion in *Barahona,* an activity is

9  "incidental" to an 1875 Act easement only if it derives from or furthers a railroad

10  purpose.  As the 2011 Solicitor's opinion correctly explained:

> [C]ourts have concluded that railroads were given . . . the right to conduct
> whatever activities would be necessary to construct and operate said
> railroad.  Therefore, courts confronted with such questions examine the
> activity in question to determine whether it derives from or furthers a
> railroad purpose.  *Some courts and commentators refer to this inquiry as
> the incidental use doctrine*.

15  BLM8045 (citations omitted, emphasis added); *see also Hallaba v. Worldcom*

16  *Network Servs. Inc.*, 196 F.R.D. 630, 639 (N.D. Okla. 2000) ("[C]ourts have allowed

17  railroads to lease easements for incidental use, if the use is necessary or helpful to the

18  operation of the railroad itself.").

19          The caselaw cited by BLM is not to the contrary, because in each case the court

20  concluded the activity in question served a legitimate and significant railroad purpose.

21  *See, e.g., Miss. Invs. v. New Orleans & N. E. R.R. Co.*, 188 F.2d 245, 247 (5th Cir.

22  1951) (holding warehouses for "storage and handling of freight forwarded and

23  received by the lessee over the lessor's railroad lines" were "for a use consistent with

24  the purposes for which the easements were acquired and were not so foreign to

25  railroad purposes"); *Mellon v. S. Pac. Transp. Co.*, 750 F. Supp. 226, 228 (W.D. Tex.

26  1990) (holding fiber optic cable would "provide telecommunications capacity to

27  Southern Pacific for railroad communication purposes"); *Cash v. S. Pac. R. Co.*, 123

28  Cal. App. 3d 974, 979 (1981) (holding a "team track," defined as "a siding upon

---

11

1    which a railroad places cars for the loading and unloading of freight by its customers,"

2    served a railroad purpose); *Int'l Paper Co. v. MCI Worldcom Network Servs., Inc.*,

3    202 F. Supp. 2d 895, 903 (W.D. Ark. 2002) (holding "the laying of the fiber optic

4    cable was for railroad purposes," where "a portion of the cable is used for railroad

5    communications and data transmission").[3]

6         Ultimately, the Ninth Circuit made clear in *Barahona* that "an appurtenance

7    might be of such minimal or illusory benefit to railroad operations as to make the

8    incidental-use doctrine inapplicable." 881 F.3d at 1136. That is precisely the case

9    with the Cadiz project. BLM recognized caselaw applying the incidental use doctrine

10   in 2015, and BLM found the Cadiz project "differ[s] from the cases identified as

11   examples of incidental uses that further a railroad purpose." BLM2265. BLM

12   explained a 7-foot-diameter water pipeline designed to convey desert groundwater to

13   distant urban water districts "does not represent a use that is incidental to the railroad

14   operations." BLM2266. The question now before the Court is whether BLM gave an

15   adequate explanation for its decision in 2017 to discard the exhaustive factual findings

16   that led BLM to conclude in 2015 the Cadiz project does not further—and is therefore

17   not incidental to—a railroad purpose. Because BLM failed to do so, the agency's

18   2017 determination is arbitrary and capricious, as set detailed below.

19   **II.   BLM's Alternative Conclusion the Cadiz Project Furthers a Railroad**
     **Purpose Is Arbitrary and Capricious.**

20        The indisputable "overall purpose" of the Cadiz project is "to create a local

21   water supply alternative for Southern California water providers." BLM5021. The

22   specific purpose of the 43-mile-long pipeline Cadiz intends to lay across Mojave

23   Trails National Monument is "to deliver water extracted from the Project wellfield to

24

25   _____

26   [3] BLM mistakenly asserts *Int'l Paper Co.* involved "structures for a saloon, a doctor's
     office, a barbershop, a hardware store, and a furniture store." BLM Memo. at 19.

27   BLM may have intended to refer to the Arkansas Supreme Court's opinion in *Ritter v.*
     *Thompson*, 144 S.W. 910, 911 (1912), a case discussed in *Int'l Paper*. *Ritter* did not

28   resolve whether such uses served "railroad purposes," because the Arkansas court
     concluded those claims had been waived. *See Int'l Paper*, 202 F. Supp. 2d at 901.

the [Colorado River Aqueduct] for delivery to Project Participants." BLM5047. As the U.S. Bureau of Reclamation stated succinctly in August 2017, the Cadiz project is "a private company proposal to pull groundwater from under the Mojave Desert and pipe it to Los Angeles." BLM103; *see also* BLM2264 (BLM finding "[t]he primary purpose of the [Cadiz] pipeline is to convey water for distribution to a separate and distant location for commercial distribution, and nearly 100 percent of the conveyed water would be solely devoted to this purpose").[4]

Despite the Cadiz pipeline's stated purpose—and after going to considerable legal lengths to argue the Cadiz pipeline fits within an 1875 Act easement whether or not it serves a railroad purpose—BLM and Cadiz defend BLM's alternative conclusion that the Cadiz pipeline furthers a railroad purpose. BLM Memo. at 21; Cadiz Memo. at 14. They point to the cursory findings in BLM's October 13, 2017 determination regarding the railroad purposes BLM claims will be served by the six "anticipated design improvements" Cadiz hastily tacked on to its project in response to the 2011 Solicitor's opinion confirming activities within an 1875 Act easement must further a railroad purpose. *See* BLM5-6 (findings); BLM4676-78 (amended lease agreement).

The Centers dispute the evidentiary basis for BLM's 2017 findings regarding the Cadiz pipeline's purported railroad purpose.[5] However, the legal issue in this case *is not* whether the BLM's 2017 findings are "supported by substantial evidence," as

---

[4] Cadiz describes the groundwater it intends to sell as water that would otherwise "be lost to evaporation." Cadiz Memo. at 4. But groundwater that sustains desert springs and riparian areas in the Mojave Desert is "lost to evaporation" only in the sense that water flowing through a river is lost to the ocean. For the many rare plants and animals that depend upon the desert's springs and riparian areas, the groundwater Cadiz intends to extract is, of course, essential. Despite Cadiz's claims to the contrary, the U.S. Bureau of Reclamation stated the Cadiz project does not "have a reclamation component" and indeed is "problematic on a couple fronts." BLM103.

[5] BLM made its 2017 determination regarding the Cadiz project without any public process or disclosure. The Centers therefore had no opportunity to rebut the "evidence" submitted by Cadiz that its pipeline furthers a railroad purpose.

13

Cadiz contends.  Cadiz Memo. at 14.  The question is whether BLM provided a legally sufficient explanation for discarding the factual findings that led BLM to conclude in 2015 the Cadiz pipeline *does not* further a railroad purpose.  Because BLM did not provide any explanation whatsoever for disregarding its prior findings, its reversal is arbitrary and capricious.

### A.   BLM's Alternative Conclusion Rests on Factual Findings that Directly Contradict Findings BLM Made in 2015.

As detailed on pages 19 and 20 of the Centers' opening brief, "even when reversing a policy after an election, an agency may not simply discard prior factual findings without a reasoned explanation."  *Organized Village of Kake v. Dep't of Agriculture*, 795 F.3d 956, 968 (9th Cir. 2015) (en banc).  Indeed, the Administrative Procedure Act (APA) requires an agency to provide a "substantial justification when its new policy rests upon factual findings that contradict those which underlay its prior policy."  *Perez v. Mortg. Bankers Ass'n*, 135 S. Ct. 1199, 1209 (2015) (quoting *F.C.C. v. Fox Television Stations*, 556 U.S. 502, 515 (2009)).

In this case, it is beyond reasonable dispute that BLM's 2017 determination the Cadiz project furthers a railroad purpose rests upon factual findings that completely contradict factual findings that underlay BLM's prior, 2015 determination the Cadiz project does not further a railroad purpose.  Specifically, BLM and Cadiz concede the 2017 determination rests on brief factual findings regarding the "railroad purposes" served by the six "improvements" Cadiz added to its project in 2011.  *See* BLM Memo. at 22-23; Cadiz Memo. at 15-21.  As discussed in the Centers' opening brief, BLM's 2017 findings regarding the railroad purposes ostensibly served by those six improvements directly contradict findings BLM made in 2015 about precisely the same six components.  *See* Centers Memo. at 21-22.

For example, BLM's 2017 determination finds "[w]ater pumped through the Cadiz pipeline will enable the creation and operation of a new fire suppression system to prevent and minimize damage to railroad assess and disruption of railroad

operations." BLM5. However, BLM found in 2015 the "water-based hydrants and sprinklers . . . do not derive from or further a railroad purpose." BLM2270. In so finding, BLM noted "there have been no fires on these [rights-of-way] in their 100-year-plus lifetime," and there are "no plans for a fire suppression system beyond the 43-mile stretch through public land." BLM2268. Without explanation, BLM's 2017 findings simply contradict the agency's 2015 findings regarding the exactly same fire suppression system.

Ultimately, BLM found in 2015 that Cadiz intends to build within an 1875 Act railroad easement a pipeline capable of conveying, on average, an astonishing 44.6 million gallons of water *every day* for 50 years. BLM2263. Only "0.02% of this water is intended for the Railroad's use." BLM2263. BLM found "the pipeline itself is not necessary for rail operations, nor will the conveyance of water through the pipeline convert the pipeline into a facility that is necessary of operation of the railroad." BLM2265. BLM's 2017 conclusory finding that the Cadiz pipeline provides "critical benefits to the railroad that facilitate elements of its operations" completely contradicts the exhaustive findings BLM made in 2015.

### B.     BLM Gave No Explanation for Discarding Its Prior Findings.

Because BLM's 2017 determination rests on factual findings that contradict findings BLM made in 2015, BLM had a duty to provide a "detailed justification" for disregarding its prior findings. *See Fox Television Stations*, 556 U.S. at 515. BLM failed to do so. Indeed, BLM's 2017 determination—just three pages long—offers no explanation whatsoever for the agency's decision to discard the extensive findings it made only two years earlier. BLM's failure to address its 2015 findings renders its 2017 determination arbitrary and capricious. *See, e.g., Organized Village of Kake*, 795 F.3d at 968-69; *Air Alliance Houston v. Envtl. Prot. Agency*, 906 F.3d 1049, 1066-69 (D.C. Cir. 2018).

The motion for summary judgment filed by Cadiz does not even acknowledge BLM's extensive 2015 findings regarding the Cadiz project. BLM acknowledges its

2015 findings in a single paragraph of its Statement of Uncontroverted Facts.  *See* ECF No. 69-3 at ¶ 12.  BLM's opening brief merely asserts, "BLM has provided a reasonable explanation for its change in position from its prior determination."  BLM Memo. at 24 (citing *Fox Television Stations*, 556 U.S. at 515).  Neither BLM nor Cadiz identity any document in the record where BLM in fact *explained* its reasons for reversing its prior factual findings.  No such document exists.

The Centers' opening brief cites numerous cases in which federal courts across the country have concluded the current administration violated the APA by reversing federal policy without sufficient explanation.  *See* Centers Memo. at 24 (citing cases). In the five weeks since the Centers filed their opening brief, more such cases have been decided.  *See, e.g., California v. Azar*, No. 19-01184, 2019 WL 1877392, at *30-34 (N.D. Cal. Apr. 26, 2019) (preliminarily enjoining the Department of Health and Human Services' reversal of funding policy for family planning, because the agency failed to explain its decision to discard factual findings underlying prior policy); *Saget v. Trump*, No. 18-1599, 2019 WL 1568755, at *49-54 (E.D.N.Y. Apr. 11, 2019) (preliminarily enjoining the Department of Homeland Security's decision to terminate temporary protected status for Haitian immigrants, because the agency failed to explain its decision to disregard past practices).

This case is analogous to the many cases cited in the Centers' opening brief and decided since.  In *Friends of Alaska Nat'l Wildlife Refuges v. Bernhardt*, No. 18-00029, 2019 WL 1437596 (D. Alaska Mar. 29, 2019), for example, the plaintiffs challenged the Trump administration's 2018 decision to approve a land exchange intended to facilitate the construction of a road through public land in Alaska.  The Department of Interior based its approval on factual findings regarding the perceived need for the road and its insignificant environmental impact.  *Id.* at *8.  The Alaska District Court concluded the Department's findings were contrary to findings it made in 2013, when the Department concluded the proposed road was unnecessary and would result in unacceptable environmental impacts.  *Id.*  The court concluded the

current administration had "reverse[d] the previous policy of the [Department of Interior] without any reasoned explanation for the change of course," in violation of the APA. *Id.* at *10.

Similarly, *Indigenous Envtl. Network v. Dep't of State*, 347 F. Supp. 3d 561 (D. Mont. 2018), *order amended*, 2018 WL 7352955 (D. Mont. Dec. 7, 2018), involved the current administration's decision to permit the construction of the "Keystone" oil pipeline. In 2015, the prior administration's State Department found Keystone would undermine the United States' leadership position in addressing climate change, and it therefore declined to permit the pipeline. *See id.* at 583. Reversing course, the Trump administration's State Department found "the climate-related impacts from Keystone subsequently would prove inconsequential." *Id.* at 584. The Montana District Court concluded the State Department had "simply discarded prior factual findings related to climate change to support its course reversal," and it held the agency's failure to provide a reasoned explanation for abandoning its prior findings was arbitrary and capricious, in violation of the APA. *Id.* (citing *Fox Television Stations*, 556 U.S. at 537, and *Organized Village of Kake*, 795 F.3d 968).

This case is no different. Here, BLM's 2017 determination the Cadiz pipeline furthers a railroad purpose rests on factual findings that contradict exhaustive findings BLM made in 2015, and BLM gave no explanation at all for its decision to discard its prior findings. BLM's failure to provide a "detailed justification"—indeed, *any* justification—for disregarding its prior findings makes the agency's 2017 determination arbitrary and capricious. *See Fox Television Stations*, 556 U.S. at 515.

## III.   BLM's 2017 Determination Is a Major Federal Action Triggering NEPA.

BLM and Cadiz concede the National Environmental Policy Act (NEPA) "requires agencies to prepare an environmental impact statement (EIS) for 'major federal actions significantly affecting the quality of the human environment.'" BLM Memo. at 25 (quoting 42 U.S.C. § 4332(2)(C)); Cadiz Memo. at 22. Neither BLM nor Cadiz dispute that construction and operation of the Cadiz pipeline may significantly

affect the environment within the meaning of NEPA.  Nor do they dispute BLM issued the 2017 determination at issue without preparing an EIS (or even a shorter "environmental assessment") in accordance with NEPA.

BLM's only argument with respect to NEPA is that "it was not necessary for BLM to approve the [Cadiz] Pipeline, and therefore BLM took no major federal action triggering an obligation to prepare an EIS."  BLM Memo. at 25.  BLM's defense of its failure to prepare an EIS is therefore little more than a rehashing of arguments this Court properly rejected in denying BLM's motion to dismiss this case.  This Court has already concluded that BLM's 2017 determination "amounts to agency action," and that "there was a direct line of causation between BLM's action in issuing the 2017 [determination] and Cadiz's alleged actions moving forward with the Project."  Order Denying Motion to Dismiss at 10, 15.  The Court appropriately declined to resolve, in the context of a motion to dismiss, whether BLM's 2017 determination amounted to "major" federal action triggering NEPA.  *Id*. at 17.  However, an action is "major" for purposes of NEPA if it "significantly" affects the environment.  *See* 40 C.F.R. § 1508.18 ("Major reinforces but does not have a meaning independent of significantly.").  Here, BLM does not—and cannot—dispute that BLM's 2017 determination regarding the Cadiz project will significantly affect the environment, and BLM's 2017 determination is therefore a "major federal action" that requires the preparation of an EIS under NEPA.  *See* Centers Memo. at 25.

Cadiz's short defense of BLM's failure to comply with NEPA is only slightly more nuanced than BLM's, and it is equally unavailing.  Cadiz concedes the term "major federal action" includes actions with effects that may be major "and which are potentially subject to Federal control and responsibility."  Cadiz Memo. at 22 (quoting 40 C.F.R. § 1508.18).  Cadiz insists BLM's 2017 determination was not a major federal action, because "BLM was deciding only whether it had authority to require a permit for Cadiz's proposed uses . . . not whether it should exercise its authority."  *Id.*

Cadiz's mischaracterization of BLM's 2017 determination obscures the true extent of BLM's control and decision-making with respect to the Cadiz project.

BLM's 2017 determination the Cadiz project "falls within the scope" of an 1875 Act easement reflects the agency's exercise of discretion and ultimate judgment (1) "that the Cadiz project would not interfere with the continued use of the easement for railroad operations" and (2) "that the activities proposed in the Cadiz Project further a railroad purpose." BLM5. BLM's 2017 determination also reversed the regulatory status quo, by expressly superseding the agency's prior, 2015 determination that the Cadiz project does not serve a railroad purpose and is therefore outside the scope of the 1875 Act railroad easement. BLM4.

As this Court correctly observed, BLM's 2017 determination ultimately "operates as permission to proceed" with the Cadiz project. Order Denying Motion to Dismiss at 10. Because BLM was responsible for approving the Cadiz project, BLM had sufficient "control" over the Cadiz project to trigger NEPA. *See* 40 C.F.R. § 1508.18 (recognizing "federal actions" include "approval of specific projects, such as construction or management activities located in a defined geographic area"). Consistent with NEPA, BLM's determination that the Cadiz project "will not interfere" with the railroad and will "further a railroad purpose" should have been informed by an EIS. Preparation of an EIS would have served two purposes:

> First, [an EIS] ensures that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts. Second, [an EIS] guarantees that the relevant information will be made available to the larger audience that may also play a role in both the decisionmaking process and the implementation of that decision.

*Ctr. for Biological Diversity v. Dep't of Interior*, 623 F.3d 633, 642 (9th Cir. 2010) (quoting *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 768 (2004)).

In short, BLM's failure to prepare an EIS, or even an environmental assessment, in connection with its 2017 determination violated NEPA.

//

**CONCLUSION**

For all these reasons, BLM's October 13, 2017 determination regarding the Cadiz project is arbitrary, capricious, and not in accordance with law. *See* 5 U.S.C. § 706(2)(A). The Centers ask this Court to grant their motion for summary judgment, deny the cross-motions for summary judgment filed by BLM and Cadiz, and set aside BLM's 2017 determination regarding the Cadiz project.

Respectfully submitted,

Dated: May 10, 2019

 /s/ Gregory C. Loarie
GREGORY C. LOARIE (CA Bar No. 215859)
MARIE E. LOGAN (CA Bar No. 308228)
EARTHJUSTICE
50 California Street, Suite 500
San Francisco, CA 94111
T: (415) 217-2000 • F: (415) 217-2040
E: gloarie@earthjustice.org
   mlogan@earthjustice.org

*Lead Counsel for All Plaintiffs*

LISA T. BELENKY (CA Bar No. 203225)
ARUNA M. PRABHALA (CA Bar No. 278865)
CENTER FOR BIOLOGICAL DIVERSITY
1212 Broadway Street, Suite 800
Oakland, CA 94612
T: (510) 844-7100 • F: (510) 844-7150
E: lbelenky@biologicaldiversity.org
   aprabhala@biologicaldiversity.org

*Counsel for Plaintiff Center for Biological Diversity*

ADAM F. KEATS (CA Bar No. 191157)
CENTER FOR FOOD SAFETY
303 Sacramento Street, Floor 2
San Francisco, CA 94111
T: (415) 826-2770 • F: (415) 826-0507
E: akeats@centerforfoodsafety.org

*Counsel for Plaintiff Center for Food Safety*