1  JEAN E. WILLIAMS
   Acting Assistant Attorney General
2  U.S. Department of Justice
   Environment & Natural Resources Division
3  LUTHER L. HAJEK
   U.S. Department of Justice
4  Environment & Natural Resources Division
   Natural Resources Section
5  999 18th Street, South Terrace, Suite 370
   Denver, CO  80202
6  Tel.:  (303) 844-1376
   Fax:  (303) 844-1350
7  E-mail:  luke.hajek@usdoj.gov
   *Attorneys for Defendants*
8

9              **UNITED STATES DISTRICT COURT**
10            **CENTRAL DISTRICT OF CALIFORNIA**
                    **WESTERN DIVISION**
11

12  CENTER FOR BIOLOGICAL          )  Case No. 2:17-cv-08587-GW-AS
    DIVERSITY, *et al.*,           )  Case No. 2:18-cv-06775-GW-AS
13                                 )  Consolidated
                                   )
14  and                            )
                                   )  **DEFENDANTS' OPPOSITION TO**
15  NATIONAL PARKS CONSERVATION)   **PLAINTIFFS' MOTIONS FOR**
    ASSOCIATION,                   )  **SUMMARY JUDGMENT**
16                                 )
17            Plaintiffs,          )  Hearing Date:  June 20, 2019
                                   )  Time:  8:30 a.m.
18  v.                             )  Courtroom:  9D
                                   )  Judge: Honorable George H. Wu
19                                 )
    U.S. BUREAU OF LAND            )
20  MANAGEMENT, *et. al.*,         )
21                                 )
              Defendants,          )
22                                 )
    and                            )
23                                 )
    CADIZ, INC., *et al.*,         )
24                                 )
25            Defendant-Intervenors.)
26  _____ )
27

28

*Defendants' Opposition to Plaintiffs' Motions for Summary Judgment*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**TABLE OF CONTENTS**

INTRODUCTION ..................................................................................................1

ARGUMENT .......................................................................................................1

    I.      The Court Lacks Jurisdiction Over the M-Opinion Claim ..................1

           A.      NPCA Has Failed to Demonstrate Standing as to Any
                    Application of the M-Opinion Other Than the Cadiz Pipeline ..2

           B.      The M-Opinion Is Not a Final Agency Action ...........................2

    II.     The M-Opinion's Interpretation of the 1875 Act is Reasonable and
         Therefore the M-Opinion and BLM's Determination Should be
         Upheld ...........................................................................................3

           A.      A Railroad May Lease an 1875 Act Right-of-Way for Uses that
                    Do Not Interfere with the Operation of the Railroad.................4

           B.      Alternatively, Under the Incidental Use Doctrine, a Railroad
                    May Lease an 1875 Act Right-of-Way for Uses that Provide an
                    Incidental Benefit to the Railroad ...............................................7

    III.    BLM's Alternative Determination That the Cadiz Pipeline Will
         Further a Railroad Purpose Should Be Upheld ...................................9

           A.      BLM Adequately Explained its Change in Position from the
                    2015 Determination Regarding the Cadiz Pipeline ...................9

           B.      *Barahona* Supports the Conclusion that the Cadiz Pipeline
                    Furthers a Railroad Purpose.......................................................19

    IV.    The M-Opinion and BLM's Determination Were Not Based on
         Pretext...............................................................................................21

    V.     BLM Complied With NEPA and FLPMA .........................................25

CONCLUSION ..................................................................................................25

# TABLE OF AUTHORITIES

Cases

*Air Transp. Ass'n of Am., Inc. v. Nat'l Mediation Bd.*,
  663 F.3d 476 (D.C. Cir. 2011) ...........................................................25

*Alaska v. Andrus*,
  591 F.2d 537 (9th Cir. 1979) .............................................................25

*Barahona v. Union Pacific Railroad Co.*,
  881 F.3d 1122 (9th Cir. 2018) ..................................... 5, 6, 7, 18, 20, 21

*Beres v. United States*,
  64 Fed. Cl. 403 (2005) ....................................................................6, 7

*Caldwell v. United States*,
  250 U.S. 14 (1919) .............................................................................5

*California v. Ross*,
  358 F. Supp. 3d 965 (N.D. Cal. 2019) ................................................21

*Clapper v. Amnesty Int'l USA*,
  568 U.S. 398 (2013) ............................................................................2

*Ellamae Phillips Co. v. United States*,
  99 Fed. Cl. 483 (2011) .......................................................................7

*FCC v. Fox Television Stations, Inc.*,
  556 U.S. 502 (2009) ............................ 9, 10, 11, 12, 13, 14, 15, 16, 17

*Geneva Rock Products, Inc. v. United States*,
  107 Fed. Cl. 166 (2012) ....................................................................6, 7

*Great Northern Ry. Co v. United States*,
  315 U.S. 262 (1942) ...........................................................................4

*Home on the Range v. AT&T Corporation*,
  386 F. Supp. 2d 999 (S.D. Ind. 2005) ...................................................6

*Jagers v. Fed. Crop. Ins. Corp.*,
  758 F.3d 1179 (10th Cir. 2014) .........................................................25

*L.K.L. Associates, Inc. v. Union Pacific Railroad Co.*,
  No. 2:15-CV-347-BSJ, 2018 WL 2433563 (D. Utah May 29, 2018)...............5, 8

*Leo Sheep Co. v. United States*,
  440 U.S 668 (1979) .............................................................................8

*Marvin M. Brandt Revocable Trust v. United States*,
   572 U.S. 93 ................................................................................4, 8

*Mitchell v. Ill. Cent. R.R. Co.*,
   51 N.E.2d 271 (Ill. 1943) .......................................................... 20, 21

*Modesto Irrigation Dist. v. Gutierrez*,
   619 F.3d 1024 (9th Cir. 2010) ...........................................................9

*Motor Vehicles Mfrs. Ass'n of the U.S., Inc. v. State Farm Auto. Ins. Co.*,
   463 U.S. 29 (1983) ................................................................. 19, 24

*Nat'l Ass'n of Homebuilders v. EPA*,
   682 F.3d 1032 (D.C. Cir. 2012) .........................................................9

*Nat'l Audubon Soc'y v. Dep't of the Navy*,
   422 F.3d 174 (4th Cir. 2005) ...........................................................24

*New York v. U.S. Dep't of Commerce*,
   351 F. Supp. 3d 502 (S.D.N.Y. 2019) ...............................................22

*Oregon v. Ashcroft*,
   368 F.3d 1118 (9th Cir. 2004) ...........................................................3

*Organized Vill. of Kake v. U.S. Dep't of Agric.*,
   795 F.3d 956 (9th Cir. 2015) .............................................. 9, 10, 17

*U.S. Army Corps of Engineers v. Hawkes Co.*,
   136 S. Ct. 1807 (2016) ....................................................................3

*U.S. Dep't of Commerce v. New York*,
   139 S. Ct. 953 (Feb. 15, 2019) .......................................................22

*Union Pacific Railroad Co. v. Santa Fe Pacific Pipelines, Inc.*,
   180 Cal Rptr. 3d 173 (Cal. Ct. App. 2014) .........................................6

*United States v. Denver & Rio Grande Railway Co.*,
   150 U.S. 1 (1893) .......................................................................5, 8

*United States v. Union Pacific Railroad Co.*,
   353 U.S. 112 (1957) ....................................................................6, 8

*W. Mont. Cmty. Partners, Inc. v. Austin*,
   696 Fed. Appx. 789 (9th Cir. 2017) ...................................................9

*Whitmore v. Arkansas*,
   495 U.S. 149 (1990) ......................................................................2

*Defendants' Opposition to Plaintiffs' Motions for Summary Judgment*     iii

Statutes

*Federal Land Policy and Management Act,*
   43 U.S.C. § 1769(a)......................................................................25

*General Railroad Right-of-Way Act,*
   43 U.S.C. § 934..........................................................................5

Other Authorities

*Right-of-Way R.Rs.,*
   37 Pub. Lands Dec. (May 21, 1909)....................................5

# TABLE OF ACRONYMS

| 2011 M-Opinion | Solicitor's Opinion M-37025 |
| APA | Administrative Procedure Act |
| ARZC | Arizona and California Railroad Company |
| BLM | U.S. Bureau of Land Management |
| BLM's Determination | BLM's October 13, 2017 Administrative Determination Regarding the Cadiz Pipeline |
| CBD | Center for Biological Diversity |
| EIS | Environmental Impact Statement |
| FLPMA | Federal Land Policy and Management Act |
| M-Opinion | Solicitor Opinion M-37048 |
| NEPA | National Environmental Policy Act |
| SMWD | Santa Margarita Water District |

1
2
3

**EXHIBITS**

4
5
6

Exhibit 1    Memorandum from Deputy Secretary of the Interior David Bernardt
to U.S. Department of the Interior Officials, Subject: Ethics Recusal
(August 15, 2017)

7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**INTRODUCTION**

The Solicitor's M-Opinion regarding the scope of 1875 Act rights-of-way and BLM's Determination regarding the Cadiz Pipeline are reasonable and should be accorded deference.  The record shows that agency officials grappled with the complex issues associated with 1875 Act rights-of-way and appropriately analyzed those issues based on the factual record.  The M-Opinion analyzed the history of 1875 Act rights-of-way, the purpose for which the statute was enacted, and judicial precedent interpreting the Act, and reached the reasonable conclusion that a railroad could lease a right-of-way as long as the use did not interfere with the operation of the railroad.  BLM's Determination relied on this interpretation and found that the Cadiz Pipeline will not interfere with railroad operations.  Plaintiffs offer no evidence to the contrary.

In addition, the record shows that the Cadiz Pipeline will serve a railroad purpose in several ways, including the installation of a fire suppression system, which will allow the railroad to detect and quickly put out trestle fires that could otherwise cost the railroad millions of dollars in repair or replacement costs.  Plaintiffs argue that the agency did not adequately explain its decisions to withdraw the 2011 M-Opinion and to reach a different determination regarding the Cadiz Pipeline, but the record shows that the agency's decisions were based on the factual evidence before it and a more accurate reading of the 1875 Act and the incidental use doctrine.  Thus, the M-Opinion and BLM's Determination should be upheld.

**ARGUMENT**

**I.    The Court Lacks Jurisdiction Over the M-Opinion Claim**

To the extent the M-Opinion claim addresses anything other than the Cadiz Pipeline, the Court lacks jurisdiction over the claim.

### A.   NPCA Has Failed to Demonstrate Standing as to Any Application of the M-Opinion Other Than the Cadiz Pipeline

NPCA's opening brief demonstrates that it lack of standing to challenge BLM's actions with respect to any project occurring in an 1875 Act right-of-way other than the Cadiz Pipeline.  It fails to identify any other projects occurring in an 1875 Act right-of-way or show how such a project may affect their interests.  *See* Mem. in Supp. of NPCA's Mot. for Summ. J. at 6-7 (No. 2:18-cv-6775, ECF No. 55-2) ("NPCA Mem.").  This is significant because, through its challenge to the M-Opinion, NPCA seeks relief, not only as to the Cadiz Pipeline, but also as to any other lessees that "may engage in activities outside the lawful scope of their 1875 Act rights-of-way."  *Id.* at 7.  Standing, however, may not be based on speculation. Indeed, the Supreme Court has stressed that an injury must be "'*certainly* impending' to constitute injury in fact" – "'[a]llegations of *possible* future injury' are not sufficient.'"  *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)).  Accordingly, Plaintiffs have failed to demonstrate standing to challenge, or to seek relief, as to any application of the M-Opinion other than the Cadiz Pipeline.

### B.   The M-Opinion Is Not a Final Agency Action

As demonstrated in numerous court decisions addressing the legal opinions of government counsel, the M-Opinion is not a final agency action.  *See* Defs.' Mem. in Supp. of Mot. for Summ. J. at 6-8 (No. 17-cv-8587, ECF No. 69-1) ("Def. Mem.").  NPCA attempts to liken the M-Opinion to an interpretive rule, but the M-Opinion differs from an interpretive rule because it applies only within the Department of the Interior and does not apply to any outside entities, as even NPCA acknowledges.  *See* NPCA Mem. at 8 (citing 209 Interior Department Manual 3.2(A)(11)).  Thus, it is unlike the Attorney General's directive

interpreting and implementing the Controlled Substances Act at issue in *Oregon v. Ashcroft*, 368 F.3d 1118, 1120-21 (9th Cir. 2004).

Nor is the M-Opinion akin to a U.S. Army Corps of Engineers ("Corps") jurisdictional statement.  In *U.S. Army Corps of Engineers v. Hawkes Co.*, 136 S. Ct. 1807 (2016), the Supreme Court held that a Corps jurisdictional statement as to whether a property contains jurisdictional waters was a final agency action.  *Id.* at 1813-14.  The Court explained that a negative determination would bind the government, thereby creating a statutory five-year safe harbor from civil suits under the Clean Water Act for the property owner.  *Id.* at 1814.  Conversely, an affirmative determination would remove the safe harbor and expose the property owner to potential civil and criminal penalties.  *Id.* at 1815.  The M-Opinion, however, is unlike a Corps jurisdictional statement because it does not determine any rights or obligations of third parties.  *See* Def. Mem. at 8.  Nor does the M-Opinion provide any immunity to railroad companies who may seek to lease 1875 Act rights-of-way for particular uses, as evidenced by the current lawsuits.

Finally, NPCA is simply incorrect when it asserts that the M-Opinion is the last opportunity for it to challenge potential uses of 1875 Act rights-of-way on public land.  *See* NPCA Mem. at 9.  If a railroad uses, or allows a third party to use, an 1875 Act right-of-way in a manner that harms NPCA's interests, NPCA may bring suit to protect its interests.  Until that happens, NPCA cannot circumvent Article III of the Constitution and the judicial review provisions of the APA by seeking relief with respect to actions that have not yet occurred.

## II.   The M-Opinion's Interpretation of the 1875 Act is Reasonable and Therefore the M-Opinion and BLM's Determination Should be Upheld

The interpretation of the 1875 Act in the M-Opinion is reasonable and should be accorded deference, and therefore the M-Opinion and BLM's Determination relying on it should be upheld.

*Defendants' Opposition to Plaintiffs' Motions for Summary Judgment*       3

**A.    A Railroad May Lease an 1875 Act Right-of-Way for Uses that Do Not Interfere with the Operation of the Railroad**

As demonstrated in the M-Opinion, the text of the 1875 Act, the purpose of the Act, longstanding historical practice, and judicial precedent support a broad interpretation of 1875 Act rights-of-way.  BLM 75-99.  Plaintiffs fail to demonstrate that the analysis in the M-Opinion is incorrect.

First, the Supreme Court has not decided the scope of permissible uses of an 1875 Act right-of-way.  NPCA reads a footnote in *Marvin M. Brandt Revocable Trust v. United States* as establishing that a grantees' use of an 1875 Act right-of-way must be limited to "certain purposes," and on that basis concludes that no other uses are permitted.  *See* NPCA Mem. at 1, 11 (citing  *Marvin M. Brandt Revocable Trust v. United States,* 572 U.S. 93. 105 n.4 (2014)).  But that is not what *Brandt* holds.  Instead, the Court in *Brandt* merely confirmed that an 1875 Act right-of-way is an easement and consequently held that, unlike grants under pre-1871 Acts, when a railroad abandons an 1875 Act right-of-way, the land reverts to adjacent landowners, not the federal government.  Contrary to NPCA's contentions, *Brandt* does not also address whether the easement holder may lease the right-of-way for uses that do not strictly serve a railroad purpose.  Similarly, *Great Northern* held that the 1875 Act conveyed an easement and therefore the railroad did not own the mineral rights in the right-of-way, but it said nothing about the uses to which the right-of-way may be put.  *See Great Northern Ry. Co v. United States*, 315 U.S. 262, 275-79 (1942).[1]

---

[1] *Great Northern* cites Interior Department regulations, *Right-of-Way R.Rs.*, 37 Pub. Lands Dec. 787 (May 21, 1909), but only for the proposition that the regulations construed the 1875 Act as conveying an easement, not a fee interest. *See* 315 U.S. at 276.  The regulations state only that the right-of-way is to be used "for the purposes for which it is granted" and do not address whether an operating railroad may lease the right-of-way for other uses.  *See* 37 Pub. Lands Dec. at 788.

*Defendants' Opposition to Plaintiffs' Motions for Summary Judgment*        4

CBD also relies on *United States v. Denver & Rio Grande Railway Co.*, 150 U.S. 1 (1893), but that case supports the analysis in the M-Opinion.  In *Denver & Rio Grande*, the Court interpreted only the ancillary right to take "material, earth, stone, and timber *necessary for the construction of said railroad*"; it did not interpret the primary grant of a "right of way through the public lands of the United States." 43 U.S.C. § 934 (emphasis added).  Unlike the primary grant of a right-of-way, the ancillary right to take material is limited for the use of constructing the railroad, which is precisely the distinction made in the M-Opinion.  BLM 87-88.  Construing that provision, the Court found that it was permissible for the railroad to cut timber and transport it, as long as the timber was used for structures for the railroad, such as stations and water tanks.  150 U.S. at 10-14.[2]

In *Caldwell v. United States*, 250 U.S. 14 (1919), the railroad argued that it should be permitted, not only to cut timber for purposes of constructing the railroad and related structures, but also to sell the leftover timber for profit.  *See id.* at 18-20.  This, the Supreme Court said, took the right to use timber in the 1875 Act too far—the railroad was not permitted to sell the timber for profit.  *Id.* at 21-22.  But this still says nothing about the primary right granted in the 1875 Act— "[t]he right of way through the public lands of the United States"—or the permissible uses of that right-of-way.

Second, *Barahona v. Union Pacific Railroad Co.*, 881 F.3d 1122 (9th Cir. 2018) does not resolve whether uses of an 1875 Act right-of-way must further a railroad purpose because the issue was not squarely before the court.  NPCA

---

[2] *L.K.L. Associates, Inc. v. Union Pacific Railroad Co.*, No. 2:15-CV-347-BSJ, 2018 WL 2433563 (D. Utah May 29, 2018), *appeal docketed*, No. 18-4123 (10th Cir. Aug. 30, 2018), incorrectly interpreted the scope of 1875 Act rights-of-way, and, in any event, is not binding on this Court and is on appeal.

*Defendants' Opposition to Plaintiffs' Motions for Summary Judgment*        5

claims that the Ninth Circuit "concluded" that 1875 Act rights-of-way must further a railroad purpose, *see* NPCA Mem. at 12; in fact, the issue was not contested because the grantee in the case *conceded* that the 1875 Act granted an easement only for a railroad purpose. *Barahona*, 881 F.3d at 1133.[3]  Thus, the Ninth Circuit has not decided the question of whether a railroad may lease a right-of-way for a use that does not serve a railroad purpose.[4]

Third, Plaintiffs rely on *Home on the Range v. AT&T Corporation*, 386 F. Supp. 2d 999 (S.D. Ind. 2005).  As already demonstrated, however, the M-Opinion explains that the *Home on the Range* decision was wrongly decided because it disregarded the Supreme Court's direction that railroad grants are to be construed liberally and misconstrued the Supreme Court's decision in *Union Pacific*, which interpreted a different statute.  *See* Def. Mem. at 16-17; BLM 92-94.  Plaintiffs make no effort to rebut the legal rationale in the M-Opinion.

Finally, Plaintiffs' reliance on a pair of Federal Court of Claims cases— *Beres v. Beres v. United States*, 64 Fed. Cl. 403 (2005) and *Geneva Rock Products, Inc. v. United States*, 107 Fed. Cl. 166 (2012)—is to no avail.  In *Beres*, the plaintiff claimed that the conversion of an abandoned rail line into a recreational trail constituted a Fifth Amendment taking.  64 Fed. Cl. at 406-08.  In light of *Great Northern*, the court found that the underlying property reverted to the adjacent landowners, not the government, and therefore a taking had occurred.  *Id.* at 421-28.  But the case speaks only to whether the government has a reversionary

---

[3] *Barahona* also cited *dicta* in *United States v. Union Pacific Railroad Co.*, 353 U.S. 112, 119 (1957), but *Union Pacific* involved a right-of-way granted under a pre-1871 Act.  *See id.* at 113-14.

[4] *Union Pacific Railroad Co. v. Santa Fe Pacific Pipelines, Inc.*, 180 Cal Rptr. 3d 173 (Cal. Ct. App. 2014), is in direct conflict with *Barahona* and therefore does not control the outcome here.

*Defendants' Opposition to Plaintiffs' Motions for Summary Judgment*          6

interest in abandoned rail lines—the issue settled in *Brandt*—not whether an active 1875 Act right-of-way may be used by the railroad or a lessee for uses that do not serve a railroad purpose. *See id.* Similarly, *Geneva Rock* addressed only whether, after abandonment, the conversion of a rail line to a recreational trail was within the scope of the right granted in the 1875 Act. 107 Fed. Cl. at 170-73; *see also Ellamae Phillips Co. v. United States*, 99 Fed. Cl. 483, 486 (2011) (same). The *Geneva Rock* court did *not* address what other uses of a rail line easement may be permissible where, as here, the rail line is still being used for a railroad. Accordingly, the Court of Claims cases address different issues and cannot be relied on to limit the scope of an active 1875 Act right-of-way.

In sum, the case law fails to support Plaintiffs' view that the uses of 1875 Act rights-of-way are limited to uses that serve a railroad purpose.

**B.    Alternatively, Under the Incidental Use Doctrine, a Railroad May Lease an 1875 Act Right-of-Way for Uses that Provide an Incidental Benefit to the Railroad**

NPCA argues that the incidental use doctrine may not be applied to an 1875 Act rights-of-way. *See* NPCA Mem. at 13-15. There is no basis for this theory. In *Barahona*, the Ninth Circuit recognized the incidental use doctrine in the context of the 1875 Act right-of-way at issue in the case. *See* 881 F.3d at 1134. The court noted that, based on the doctrine, "courts have approved a variety of uses incidental to railroad operations." *Id.* (citations omitted). The court also rejected the arguments by the plaintiffs in that case that the incidental use doctrine did not apply. *See id.* at 1134-35. The 2011 M-Opinion—which Plaintiffs do not challenge—also expressly referred to the incidental use doctrine and the cases applying it in the context of 1875 Act rights-of-way. BLM 8045-47.

Nevertheless, NPCA argues that the scope of the 1875 Act is not broad enough to encompass other uses, even ones that serve a railroad purpose. *See*

NPCA Mem. at 13-14.  They point to language in *L.K.L.*, where the court disagreed with the railroad's broad interpretation of the incidental use doctrine, which was based on the railroad's interpretation of the M-Opinion.  2018 WL 2433563, at *9 n.77.  The facts of the *L.K.L.* case are not similar to those here.[5] But even putting aside those factual distinctions, *L.K.L.* does not support NPCA's argument because the court did not adopt the view that the incidental use doctrine is inapplicable to 1875 Act rights-of-way.  *See id.* at *7-9.

NPCA also argues that 1875 Act rights-of-way should be construed narrowly in favor of the government.  *See* NCPA Mem. at 14 (citing *Union Pacific*, 353 U.S. at 116).  This ignores the more liberal construction that courts have generally given railroad grants.  *See Leo Sheep Co. v. United States*, 440 U.S 668, 683 (1979) (such statutes "should receive at the hands of the court a more liberal construction in favor of the purposes for which it was enacted") (quoting *Denver & Rio Grande*, 150 U.S. at 14).  In any event, neither *Union Pacific* nor any other case that Defendants are aware of has found that the incidental use doctrine is inapplicable to 1875 Act rights-of-way.  Indeed, NPCA admits that "in some circumstances," a railroad may lease an 1875 Act right-of-way for "uses that go beyond the scope of an 1875 Act right-of-way."  NPCA Mem. at 15 n.6.[6]

---

[5] In *L.K.L.*, the district court found that the leasing of the land in an 1875 Act right-of-way to a rental company did not serve a railroad purpose.  *See* 2018 WL 2433563, at *2-4, 7-9.  There was no evidence offered that the leasing of the property served a railroad purpose.  *See id.*  The case is currently on appeal.

[6] NPCA argues that if the right-of-way were on private land, the railroad would have to negotiate with adjacent landowners if it were to lease the right-of-way for other uses.  *See* NPCA Mem. at 15 n.6 (citing *Brandt*, 572 U.S. at 98-101).  They misconstrue *Brandt*, which involved an abandoned rail line, not an active one.  *See* 572 U.S. at 95.  The issue in *Brandt* was whether an 1875 Act right-of-way would pass to the government or adjacent landowners after it was abandoned, not what uses were permissible while the railroad was still operating.  *See id.* at 95, 102-10.

*Defendants' Opposition to Plaintiffs' Motions for Summary Judgment*        8

In sum, the incidental use doctrine is applicable to 1875 Act rights-of-way, and the M-Opinion's analysis of both the scope of 1875 Act rights-of-way and the incidental use doctrine should be upheld.

## III.   BLM's Alternative Determination That the Cadiz Pipeline Will Further a Railroad Purpose Should Be Upheld

BLM reasonably determined that the Cadiz Pipeline will further a railroad purpose, and that determination should be upheld.  As explained below, the rescission of IM 2014-122 and the issuance of the new M-Opinion provided a new legal framework for BLM to review the materials submitted by Cadiz, and it reasonably concluded that the pipeline will serve a railroad purpose.

### A.   BLM Adequately Explained its Change in Position from the 2015 Determination Regarding the Cadiz Pipeline

In making its Determination, BLM relied on the 2017 M-Opinion, which reflects the legal position of the Department and is binding on BLM.  *See* section I.B., *supra*.  The bases for the changed legal interpretation in the M-Opinion are amply explained in the 25-page M-Opinion, BLM 75-99, consistent with *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009).  The changes to BLM's Determination, relying on the changed legal interpretation in the M-Opinion, also are adequately explained in accordance with *Fox*.  Agencies have "flexibility to alter policies" and "considerable latitude to change course."  *Modesto Irrigation Dist. v. Gutierrez*, 619 F.3d 1024, 1034 (9th Cir. 2010).  BLM was permitted to reevaluate the evidence, give different weight to applicable factors, and reach a different result.  *See Organized Vill. of Kake v. U.S. Dep't of Agric.*, 795 F.3d 956, 968 (9th Cir. 2015).  "*Fox* makes clear that this kind of reevaluation is well within the agency's discretion."  *Id.* (quoting *Nat'l Ass'n of Homebuilders v. EPA*, 682 F.3d 1032, 1038 (D.C. Cir. 2012)); *see also W. Mont. Cmty. Partners, Inc. v.*

*Austin*, 696 Fed. Appx. 789, 792 (9th Cir. 2017) ("[A]n agency's change in position alone is not a reason to reverse the agency.").

In making the Determination in 2017, BLM was not required to provide a greater explanation or justification than it provided for the prior determination. *See Fox*, 556 U.S. at 514 ("We find no basis in the [APA] or in our opinions for a requirement that all agency change be subjected to more searching review."). Instead, the same "arbitrary and capricious" standard in the APA applies. *Id.* at 514-15. An agency should, however, "display awareness that it *is* changing position," and it may not "depart from a prior policy *sub silentio* or simply disregard rules that are still on the books." *Id.* at 515. An agency must show "that there are good reasons for the new policy . . . [b]ut it need not demonstrate to a court's satisfaction that the reasons for the new policy are *better* than the reasons for the old one." *Id.* Instead, "it suffices that the new policy is permissible under the statute, that there are good reasons for it, and that the agency *believes* it to be better." *Id.*; *see also Organized Village of Kake*, 795 F.3d at 966. A more detailed explanation is required only in certain circumstances, such as when the "new policy rests upon factual findings that contradict those which underlay its prior policy." *Fox*, 556 U.S. at 515.

BLM's Determination meets the *Fox* requirements. BLM did not rely on facts that contradicted those underlying the 2015 determination regarding the Cadiz Pipeline; instead it reevaluated those facts based on a different interpretation of the relevant law and reached a different result. BLM acknowledged the change in position, provided good reasons for it, and believed that it reached the right decision. The M-Opinion itself acknowledges the 2011 M-Opinion and explains, in detail, the basis for its contrary interpretation. BLM 75-99. As reflected in the record, BLM had ample reason to change the 2015 determination and adequately explained its reasons for doing so.

To begin with, it is important to understand that BLM's 2015 determination that the Cadiz Pipeline would not serve a railroad purpose was based, not only on an application of the case law interpreting the incidental use doctrine, but also on the additional requirements in IM 2014-122.  BLM 2260, 2726-29.  IM 2014-122 instructed BLM officials, when considering whether particular uses were within the scope of an 1875 Act right-of-way, that "a railroad [right-of-way] holder must provide sufficient evidence to overcome any doubts as to whether a particular activity is within the scope of the [right-of-way]."  BLM 2727.  In other words, BLM officials were to consider potential uses of a right-of-way with significant skepticism.  Further, the IM instructed BLM officials to consider whether the activity was one that "has been used by railroads previously in furtherance of a railroad purpose."  *Id.*

BLM's 2015 determination followed the instructions in IM 2014-122.  BLM 2243, 2256-57.  In light of those instructions, BLM did, indeed, view the assertion that the Cadiz Pipeline would serve a railroad purpose with great skepticism and asked not merely whether proposed uses would further a railroad purpose, but whether the pipeline was "necessary" for railroad operations, BLM 2265, and whether "the origin" of the use was a railroad purpose.  BLM 2266.  In support of the 2015 determination, BLM provided a summary evaluation (BLM 2245-49) and a more detailed recommendation memorandum from the BLM California State Director (BLM 2255-80), which CBD refers to as "the 24-page report."  Mem. in Supp. of CBD's Mot. for Summ. J. at 21 (No. 17-cv-8587, ECF No. 67-1) ("CBD Mem.").  The report from the California State Director conceded several times that the Cadiz Pipeline would serve a railroad purpose, but still concluded that those purposes were insufficient to meet the higher standard in IM 2014-122.  *See* BLM 2264-80.

1    The report conceded, for example, that fire suppression is a railroad purpose.

2    BLM 2268.  Specifically, it stated that: "[F]ire suppression may further a railroad

3    purpose inasmuch as rail lines in certain locations may be more susceptible to fire;

4    in addition, water may be the appropriate substance to extinguish fires in certain

5    circumstances."  BLM 2268.  The report went on to explain, however, that IM

6    2014-122 "instructs the BLM to consider historical industry practices with respect

7    to the activity in question."  *Id.*  Based on its interpretation of a railroad industry

8    manual, BLM found that "water is not the preferred method of fire suppression on

9    creosoted structures," such as the trestle bridges along the railroad line.  *Id.*[7]  BLM

10   also questioned why Cadiz would have a fire suppression system using fire

11   hydrants along this stretch of the pipeline and not along other sections.  BLM

12   2268-69.  Given these factors and the purported "historical lack of fire" on this

13   section of the rail line, BLM found that there was "no operational evidence" to

14   support the use of a fire suppression system as a railroad purpose.  BLM 2269.

15   BLM further explained that IM 2014-122 required it to "determine whether

16   the railroad use or non-railroad use actually drive the activity's design."  *Id.* (citing

17   IM 2014-122 at pt. E).  According to BLM, the water recovery system drove the

18   design of the fire suppression system, and therefore the design of the activity was

19   "not driven by or for railroad purposes."  BLM 2270.  Thus, after applying the

20   criteria in IM 2014-122, and despite acknowledging that fire suppression furthers a

22   [7] Evidence in the record shows that water is an established method of fire

23   suppression along rail lines.  BLM 2675-76 (engineering report noting a railroad

24   industry trade association's manual identifying water as a form of fire suppression

     and that the Federal Railroad Administration does not mandate particular fire

25   suppression methods); BLM 2864-65 (letter from RailAmerica to BLM California

26   State Director listing examples of other railroads that use hydrant water systems

     for fire suppression); BLM 2347-48 (same); BLM 2550-51 (explaining that the

27   system is modeled after a system on a Union Pacific railway line).

*Defendants' Opposition to Plaintiffs' Motions for Summary Judgment*      12

1  railroad purpose, BLM concluded that the fire suppression system proposed by

2  Cadiz and ARZC did not further a railroad purpose.[8]  *Id.*

3          BLM reached similar conclusions with respect to each of the other railroad

4  purposes offered by Cadiz and ARZC.  *See* BLM 2266 (dismissing the use of the

5  water by the railroad for washing cars and other purposes "only as possible" future

6  uses); BLM 2273 (stating that "[a]n access road may serve railroad purposes," but

7  finding that no such purpose existed with respect to Cadiz because "the origin of

8  the access road is to support the non-railroad purpose of water conveyance"); BLM

9  2275-76 (stating that "[a] power line may further a railroad purpose," but

10  concluding that the power lines for the Cadiz pipeline would not serve a railroad

11  purpose because the "in-line turbines" used to generate the power were "not within

12  the scope of the [right-of-way] granted by the Act"); BLM 2280 (stating that "[a]

13  steam-based excursion train may derive from or further a railroad purpose," but

14  concluding that the operation of an excursion train did "not convert" the water

15  pipeline "into a legitimate railroad purpose").  In other words, despite finding that

16  the Cadiz Pipeline would serve several railroad purposes, BLM nevertheless

17  concluded that the pipeline did not serve a railroad purpose based on the additional

18  criteria in IM 2014-122.[9]

19

20  [8] In contrast, in the 2011 M-Opinion, BLM showed significantly more deference to
    MCI in concluding, based on a letter from the railroad company, that a fiber optic
21  cable would  "improve the efficiency of its own communications system, and
    thereby improve the safety of its operations" and therefore further a railroad
22  purpose.  BLM 8048.  Thus, the railroad "had the authority to approve the
    installation of MCI's line in its [right-of-way] across BLM-administered lands
23  without approval from the Department."  *Id.*

24  [9] Because BLM made factual findings in 2015 that the pipeline would serve several
25  railroad purposes, the premise of Plaintiffs' argument—that the prior factual
    findings found no railroad purpose—is false.  Instead, it is apparent from a review
26  of BLM's 2015 determination and the analysis supporting it, that BLM found that

27

28  *Defendants' Opposition to Plaintiffs' Motions for Summary Judgment*      13

1    Cadiz immediately responded, disputing the conclusion that BLM reached in

2    its 2015 determination.  BLM 2238-41.  Cadiz argued that the proper starting point

3    for the analysis under the 2011 M-Opinion and the incidental use doctrine was not

4    whether the water pipeline *was* a railroad purpose, but whether it would *further* a

5    railroad purpose.  BLM 2239.  Thus, with respect to the in-line turbines used for

6    power generation, the proper question was "whether, along with whatever

7    commercial purposes it serves, it also <u>furthers</u> a railroad purpose," which Cadiz

8    stated that it did.  *Id.*  With respect to the analysis of fire suppression, Cadiz

9    rejected the conclusion that fire suppression would not serve a railroad purpose and

10   suggested that BLM "would prefer that the ARZC let their trestles burn until crews

11   can arrive and throw dry sand on a fire rather than access a fire suppression system

12   made available by the water conveyance pipeline."  *Id.*

13   Cadiz also pointed out that even BLM had admitted that an access road

14   could serve a railroad purpose.  BLM 2240.  With respect to power generation,

15   Cadiz stated that the origin of the power (the water pipeline) should not be relevant

16   to the analysis, and instead BLM should have considered whether the power

17   generated would serve a railroad purpose, which it would.  *Id.*  Similarly, Cadiz

18   criticized the conclusion that an excursion train would not further a railroad

19   purpose because BLM wrongly suggested that the excursion train could "not

20   convert" the water pipeline into a railroad purpose.  *Id.*  In sum, BLM's error was

21   to consider whether the water pipeline itself was a railroad purpose, rather than

22   asking whether the water pipeline would serve a railroad purpose.  *Id.*[10]

23

24   railroad purposes existed, but offered various explanations to show that those

25   railroad purposes were not sufficient for it to make a finding of railroad purpose in

     accordance with IM 2014-122.

26   [10] On multiple occasions prior to BLM's 2015 Determination, both Cadiz and

27   RailAmerica (ARZC's previous parent company) pointed out these exact errors

28

     *Defendants' Opposition to Plaintiffs' Motions for Summary Judgment*      14

1    Members of Congress also were critical of BLM's determination.  A letter

2    signed by twenty-three congressmen stated that "[f]or over a century, the 1875 Act

3    [had] been interpreted to allow railroads to authorize other entities to use railroad

4    rights-of-way for infrastructure over BLM land, without further authorization from

5    the BLM, as long as the activity [did] not interfere with railroad operations."  BLM

6    2227.  The letter noted that the 2011 M-Opinion had departed from this long

7    established understanding and that BLM's 2015 determination had gone even

8    further by requiring that a use "originate from a railroad purpose," and thus found

9    that the Cadiz Pipeline would not serve a railroad purpose "despite providing

10   inarguable benefits to the railroad."  *Id.*; *see also* BLM 345-47, 2020-23.

11   Following the change in administration, several other entities submitted comments

12   critical of BLM's determination and in support of the pipeline.  *See* BLM 2170-71,

13   2168-69, 940-47, 921, 888-89, 884-85, 870-79, 866-69, 834-35, 830-33.

14       In light of the objections raised by Cadiz and the criticism raised by

15   Congress and other entities, BLM initiated a review of Interior's interpretations

16   and policies regarding 1875 Act right-of-way grants and the basis for the 2015

17   determination.  *See*, *e.g.*, BLM 2110 (e-mail between BLM staff requesting a

18   briefing paper on the Cadiz Pipeline for discussion with Department of the Interior

19   officials); BLM 2107 (briefing paper for the Assistant Secretary for Land and

20   Minerals Management providing background information on the 2015

21   determination for the Cadiz Project); BLM 2103 (e-mail discussing need for

22   briefing material regarding the Cadiz Project); BLM 2068-69, 2064, 2062 (e-mails

23   providing background legal information on the 1875 Act); BLM 2012 (e-mail

24   forwarding background material on legal issues surrounding the 1875 Act).

25   _____

26   based on BLM's preliminary conclusions about whether the benefits of the pipeline

27   would serve a railroad purpose.  *See*, *e.g.*, BLM 2539-42, 2664-68, 2882.

28

*Defendants' Opposition to Plaintiffs' Motions for Summary Judgment*      15

Following this initial internal review, BLM considered rescinding IM 2014-022, on which the 2015 determination was based, BLM 1027-30, and did so in late March 2017. BLM 971-72. Following the rescission of IM 2014-122, Department of the Interior officials and BLM staff continued to discuss the issue of 1875 Act rights-of-way and the proper uses of such rights-of-way. BLM 843, 730-31 (briefing papers regarding the Cadiz Pipeline); BLM 737 (e-mail regarding material regarding the Cadiz Pipeline); BLM 109-10, 105 (e-mails discussing draft Congressional rider that would prohibit Cadiz from seeking a right-of-way).

At the same time, in early 2017, the Solicitor's Office had multiple discussions with Interior's leadership regarding the legal underpinnings of the 1875 Act and the 2011 M-Opinion. These discussions were, in part, to provide an understanding of, and recommendation for, the need to participate as *amicus curiae* in the *Barahona* case, which raised two legal questions before the Ninth Circuit regarding the scope of rights granted to railroads through pre-1871 Acts and the 1875 Act. *See*, *e.g.*, BLM 2068-2102, 2064-67, 2062-63. These discussions raised questions about the Department's interpretation of the 1875 Act outlined in the 2011 M-Opinion. In turn, following several months of internal Solicitor's Office discussions, in June 2017, the Acting Solicitor temporarily suspended the 2011 M-Opinion to review that opinion's analysis based, in part, on the Supreme Court's opinion in *Brandt*, as well as the ongoing litigation in *Barahona*. BLM 785.

In light of the rescission of IM 2014-022 and the subsequent suspension of the 2011 M-Opinion, Cadiz requested that BLM review its 2015 determination that the Cadiz Pipeline was not within the scope of ARZC's 1875 Act right-of-way. BLM 862-63. On July 17, 2017, Cadiz formally requested that BLM reconsider its 2015 determination. BLM 163-65. Cadiz explained how the pipeline would further railroad purposes for ARZC. *Id.* Further, Cadiz referred to the extensive supporting documentation that they had previously submitted to BLM showing that

the pipeline would serve several railroad purposes, including in-line power generation, fire suppression, the operation of a tourist train, and a new access road. BLM 166-723.  Cadiz also explained how BLM's 2015 determination had misapplied the standard established in the 2011 M-Opinion.  BLM 164-65.

In September 2017, the Acting Solicitor issued the M-Opinion, replacing the 2011 M-Opinion.  BLM 75.  The M-Opinion referred to the 2011 M-Opinion and explained that it was being withdrawn "[i]n light of further analysis of the general history and review of recent case law concerning the 1875 Act."  *Id.*  The bases for the withdrawal are explained in the 25-page M-Opinion.  BLM 75-99.

The withdrawal of the 2011 M-Opinion, along with the rescission of IM 2014-022, provided a new legal lens through which to view the Cadiz Pipeline and therefore a basis to review BLM's prior determination.  *See*, *e.g.*, BLM 58, 56, 54, 43-53.  BLM subsequently issued its new Determination regarding the Cadiz Pipeline, expressly overruling the 2015 determination and explaining that the pipeline would serve several railroad purposes.  BLM 4-6.  Thus, BLM acknowledged its prior determination and explained the reasons for its reversal, which is all that is required.  *See Fox*, 556 U.S. at 515.  Reaching a new determination based on a different weighing of the factual evidence before the agency and on new binding legal guidance in the M-Opinion is precisely what is permitted by the case law.  *See Organized Village of Kake*, 795 F.3d at 968 (such a reevaluation of a prior factual record is "well within an agency's discretion") (citation omitted).[11]

---

[11] NPCA appears to suggest that BLM's conclusion regarding railroad purpose in its 2015 determination was, itself, a "factual finding," but that is incorrect.  NPCA Mem. at 21.  While the question of whether a particular use furthers a railroad purpose is a fact intensive inquiry, whether a use of a right-of-way constitutes a railroad purpose under the incidental use doctrine is ultimately a legal question, not

*Defendants' Opposition to Plaintiffs' Motions for Summary Judgment*     17

NPCA contends that BLM's Determination is invalid because it is not clear what standard BLM applied in determining whether the uses proposed by Cadiz and ARZC would serve a railroad purpose.  *See* NPCA Mem. at 22-23.  But that simply ignores the language in BLM's Determination, as well as the M-Opinion.  With respect to application of the incidental use doctrine, BLM's Determination clearly states, following the M-Opinion, that the "incidental use doctrine would allow a railroad to authorize third party activities, as long as the activity is incidental to and does not interfere with continued railroad operations."[12]  BLM 4; *see also* BLM 99.  The M-Opinion further explains that, in accordance with the incidental use doctrine, a railroad may permit a third party use "as long as the proposed use is not otherwise prohibited, provides some incidental benefit to the railroad, and does not inhibit the continued use of the right-of-way for railroad operations."[13]  BLM 99.  Accordingly, NPCA is simply incorrect that BLM did not apply any standard in determining whether the Cadiz Pipeline would serve a railroad purpose.  Further, BLM did not merely rely on statements by the railroad

---

a factual finding.  *See Barahona*, 881 F.3d at 1133-35 (considering the legal question of whether an oil pipeline served a railroad purpose for purposes of the incidental use doctrine).  Moreover, BLM's 2015 determination was based on the misunderstanding, based on IM 2014-122, that a use must be "necessary" for, or "originate" from, railroad operations, not whether a use would further a railroad purpose.  *See*, *e.g.*, BLM 2265-66.  Therefore, BLM's prior determination was based on a different legal interpretation, not different factual findings.

[12] BLM's Determination also implicitly rejects the more restrictive standard adopted in IM 2014-122 by stating that uses of a right-of-way may serve a railroad purpose "even if they do not originate or derive from that purpose."  BLM 5.

[13] NPCA suggests that the Solicitor's explication of the incidental use doctrine is incorrect.  *See* NPCA Mem. at 21 & n.12.  But other than its erroneous theory that the incidental use doctrine is inapplicable on BLM land, *see id.* at 13-15 & n.6, NPCA offers no argument to suggest that the analysis of the incidental use doctrine in the M-Opinion is incorrect.

*Defendants' Opposition to Plaintiffs' Motions for Summary Judgment*      18

company, as NPCA suggests, but instead relied on the voluminous materials, including engineering reports, showing that the pipeline would serve multiple railroad purposes.[14]  BLM 163-723.

Finally, NPCA urges the Court not to "shoulder the burden of determining whether the Cadiz Project furthers a railroad purpose."  NPCA Mem. at 24 (citation omitted).  We agree.  BLM made a reasonable determination based on the hundreds of pages of factual material before it that the Cadiz Pipeline would further a railroad purpose by allowing ARZC to install a fire suppression system, use energy generated by the pipeline exclusively for railroad purpose, use water from the pipeline to wash rail cars and other purposes, use an improved access road for maintenance and other purposes, and develop a tourist train using water from the pipeline.  BLM 5-6; *see also* BLM 163-723, 2238-41, 2303-470, 2482-521, 2522-33, 2535-714, 2819-43, 2844-47.  BLM sufficiently explained the bases for its decision, and the decision should be upheld.  *See Motor Vehicles Mfrs. Ass'n of the U.S., Inc. v. State Farm Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).[15]

In sum, BLM was justified in concluding that the Cadiz Pipeline will serve a railroad purposes and thereby reversing its prior determination.

**B.**   ***Barahona* Supports the Conclusion that the Cadiz Pipeline Furthers a Railroad Purpose**

The Ninth Circuit found in *Barahona* that an oil pipeline could "plausibly" serve a railroad purpose within the meaning of the incidental use doctrine, and that

---

[14] Moreover, relying on statements by the railroad was precisely what the Solicitor did in the 2011 M-Opinion when she relied on a letter from Southern Pacific to determine that MCI's fiber optic cable would serve a railroad purpose.  BLM 8048.

[15] Even where a court finds that a more detailed explanation could have been provided, it should "uphold a decision of less than ideal clarity if the agency's path may be reasonably discerned."  *State Farm*, 463 U.S. at 43 (citation omitted).

finding supports BLM's Determination that the Cadiz Pipeline will serve a railroad purpose. *See Barahona*, 881 F.3d at 1135.  CBD's attempt to distinguish *Barahona* is to no avail.  CBD points to language in the opinion where the court stated that some uses of a railroad right-of-way could provide "such [a] minimal or illusory benefit to railroad operations" so that the incidental use doctrine would not apply. *Id.* at 1135.  The benefits provided by the Cadiz Pipeline to the railroad, however, are not minimal or illusory.  To the contrary, the pipeline would provide substantial benefits to the railroad by providing water for fire prevention, generating electricity for use by the railroad, providing water for use by the railroad, enabling the construction of a new access road, and providing water for a steam powered excursion train.  BLM 5-6.  These uses are neither minimal nor illusory, and CBD fails to demonstrate otherwise.

Instead, CBD turns again to the flawed 2015 determination relying on the more restrictive standards in IM 2014-122.  In the language cited by CBD, BLM stated in the 2015 determination that there were "no facts that suggest the continuation of railroad operations is *in any way dependent* on the water pipeline's construction."  CBD Mem. at 23 (quoting BLM 2265) (emphasis added).  Similarly, the 2015 determination stated the "primary purpose" of the Cadiz Pipeline was to convey water for distribution, not to serve the railroad.  BLM 2264.  But the cases involving the incidental use doctrine do not turn on whether the railroad was dependent on the incidental uses of the right-of-way or whether those uses originated to serve a railroad purpose.  Instead, uses that are incidental to railroad operations may be permitted as long as they provide an incidental benefit to railroad operations. *See*, *e.g.*, *Mitchell v. Ill. Cent. R.R. Co.*, 51 N.E.2d 271, 274 (Ill. 1943).  Thus, CBD's argument merely serves to underscore the improper standard applied in the 2015 determination.

Finally, CBD attempts to distinguish *Barahona* on the grounds that the oil pipeline in that case would provide millions of gallons of oil to the railroad and reduce operating costs by millions of dollars per year.  *See* CDB Mem. at 23 (citing *Barahona*, 881 F.3d at 1134).  There is no requirement under the incidental use doctrine to show that an incidental use will provide a certain level of financial benefit to the railroad; instead, it suffices if the use "directly or indirectly, contributes to the safe, economical and efficient operation of the [rail]road." *Mitchell*, 51 N.E.2d at 274.  The Cadiz Pipeline will clearly provide such a benefit. Moreover, the cost of the fire suppression system alone would be approximately $10,000,000 if the railroad were to build it on its own.  BLM 221.  And the use of the fire suppression system could save ARZC millions of dollars in the replacement or repair of bridges after a fire.  BLM 290-94 (documenting instances of trestle fires and the costs of repair or replacement); *see also* BLM 212-14 (same).  Therefore, the pipeline will provide tangible benefits to the railroad that are not minimal or illusory.

In sum, the factual evidence in the record demonstrates that the Cadiz Pipeline will serve a railroad purpose, consistent with the incidental use doctrine.

## IV.   The M-Opinion and BLM's Determination Were Not Based on Pretext

NPCA argues that the M-Opinion and BLM's Determination were unlawful because they were based on pretext.  *See* NPCA Mem. at 15-20.  This argument is based on the notion that the grounds set forth in the M-Opinion and BLM's Determination were not the "true basis" for the agency's decisions and instead the agency's stated rationale is a cover for some ulterior motive.  NPCA relies primarily on two recent cases involving the census where the courts found that the agency head had an ulterior motive for his decision and that the decision could not be upheld based on the stated grounds.  *See California v. Ross*, 358 F. Supp. 3d 965, 1040 (N.D. Cal. 2019) (finding that the Secretary of Commerce's decision to

add a citizenship question to the census was invalid, in part, because the
Secretary's stated reason—to improve enforcement of the Voting Rights Act—was
a pretext), *appeal docketed*, No. 19-15456 (9th Cir. Mar. 14, 2019), *petition for
cert. filed*, No. 18-1214 (U.S. Mar. 18, 2019); *New York v. U.S. Dep't of
Commerce*, 351 F. Supp. 3d 502, 660 (S.D.N.Y. 2019) (same), *appeal filed*, No.
19-212 (2d Cir. Jan. 22, 2019), *cert. granted before judgment*, *U.S. Dep't of
Commerce v. New York*,139 S. Ct. 953 (Feb. 15, 2019).  This argument fails
because NPCA fails to identify any "true basis" for the agency's decisions other
than that the agency believed the prior M-Opinion and determination to be wrong.

In an attempt to show something nefarious about the decision-making
process, NPCA points to meetings between Department of the Interior officials and
representatives for Cadiz.  *See* NPCA Mem. at 18.  But it is not improper for an
agency to meet with an entity that has business before it.  And far from showing
anything inappropriate, the record demonstrates that new Interior Department
officials held internal and external meetings in order to understand the issues
relating to the Cadiz Pipeline and, more broadly, 1875 Act rights-of-way.  BLM
2114, 2111.  The new officials also requested briefing papers from BLM staff and
held several meetings to discuss railroad issues and the Cadiz Pipeline.  BLM
2110, 2107, 2103, 2068, 2064, 2062, 2057, 2050, 2031, 2024.  Contrary to
Plaintiffs' assertions, the briefing materials do not reflect a determination that was
already made and instead show that BLM staff were providing even handed
information about the Cadiz Project.  *See*, *e.g.*, BLM 2107 (February 15, 2017
memorandum from the BLM Acting Director to the Acting Assistant Secretary for
Lands and Minerals Management).[16]

---

[16] NPCA claims that internal briefing memoranda show that BLM based its
decision on inappropriate factors.  *See* NPCA Mem. at 18 n.8.  But those

Plaintiffs also claim that Acting Deputy Secretary Cason improperly directed the outcome of the agency's decision-making.  *See* NPCA Mem. at 18-20; CBD Mem. at 10-11.  A few short entries in a lengthy task matrix from Acting Deputy Secretary Cason stated, "At meeting re Cadiz, asked Kathleen to revise the IM." BLM 1996.  He also asked that the prior M-Opinion be revised and suggested that the analysis be re-written to reflect that in the prior determination "facts suggesting railroad benefits were ignored" and to "leave the matter up to the railroad right of ways." BLM 1996.  These statements by the Acting Deputy Secretary do not reflect a final determination regarding IM 2014-122, the 2015 determination, or the M-Opinion.  Indeed, the Acting Deputy Secretary was in no position to make such decisions, which would later be made by the Acting Solicitor (M-Opinion, BLM 99) and the Acting BLM Director (Determination, BLM 6).[17]

Plaintiffs ascribe too much significance to a topic on a task matrix more than five months prior to *any* decisions being made by an official who ultimately made no decisions at all.  Instead, the record reflects that, after the circulation of the task list, the Solicitor's Office spent three months analyzing the potential need for a different interpretation of the 1875 Act and an additional two months drafting and discussing whether to rescind and replace the interpretation in the 2011 M-Opinion.  *See* section III.A., *supra*.  The record also shows that, even after the

---

documents show only that officials reviewed information provided to them, not that a determination was made based on inappropriate factors.  *See* BLM 2108 (memorandum noting the positions of various entities); BLM 2103 (e-mail discussing connection between water projects and mentioning congressional interest); BLM 886-87 (talking points for the rescission of IM 2014-122).

[17] CBD suggests that the decision-making process was tainted by the involvement of Secretary Bernhardt.  CBD Mem. at 10 & n.5.  But Secretary Bernhardt was recused from all decision-making relating to Cadiz and was not involved in the M-Opinion or Determination.  *See* Ethics Recusal Mem., Ex. 1.

*Defendants' Opposition to Plaintiffs' Motions for Summary Judgment*     23

1  circulation of the task list, BLM acknowledged that the 2011 M-Opinion, at the

2  time, controlled the legal interpretation of the 1875 Act.  BLM 1028, 882, 829.

3  Rather than simply reverse course, BLM continued to consider whether and how to

4  reevaluate the uses of 1875 Act rights-of-way following the rescission of IM 2014-

5  122.  BLM 886.  BLM prepared memoranda and held multiple meetings to discuss

6  how to respond to the request from Cadiz and ARZC to reevaluate the 2015

7  Determination.  BLM 843, 747, 730.  Thus, the statements in the task matrix do not

8  show that any decisions were actually made at the time of those statements.

9      More significantly, the statements in the task list do not advance Plaintiffs'

10  pretext argument because the grounds suggested in the task list, although in

11  nascent form, are consistent with the grounds ultimately offered in the M-Opinion

12  and BLM's Determination, *i.e.*, that the facts suggesting a railroad purpose for the

13  Cadiz Pipeline were ignored in BLM's prior determination, BLM 4-6, and that the

14  scope of 1875 Act rights-of-way should be more broadly construed.  BLM 75-99.

15  Unlike in the *Ross* and *Department of Commerce* cases, Plaintiffs offer no

16  pretextual reason that served as the "true basis" for the decisions by the Acting

17  Solicitor and the BLM Director.  Instead, the reasons offered in the M-Opinion and

18  Determination are the bases for those decisions, and the Court should determine

19  whether they are valid based on the agency's stated reasons.[18]  *See State Farm*, 463

20  U.S. at 50 ("an agency's action must be upheld, if at all, on the basis articulated by

21

22  _____

23  [18] NPCA argues, NPCA Mem. at 20 n.10, that the Department of the Interior
   attempted to "block" the U.S. Geological Survey from responding to an inquiry

24  from Senator Feinstein regarding the recharge rate of the aquifer, but the letter was,
   in fact, disclosed.  BLM 848-54.  There was also nothing improper about an

25  internal e-mail directing BLM staff to work with the Division Chief for railroad

26  rights-of-way.  BLM 8521; *cf. Nat'l Audubon Soc'y v. Dep't of the Navy*, 422 F.3d
   174, 198 (4th Cir. 2005) (in the context of a NEPA claim, warning against

27  "[p]sychoanalyzing an agency's intent" based on internal e-mails).

28

*Defendants' Opposition to Plaintiffs' Motions for Summary Judgment*      24

the agency itself"); *see also Jagers v. Fed. Crop. Ins. Corp.*, 758 F.3d 1179, 1185-86 (10th Cir. 2014) (rejecting argument that "the agency's subjective desire to reach a particular result must necessarily invalidate the result, regardless of the objective evidence supporting the agency's conclusion"); *Air Transp. Ass'n of Am., Inc. v. Nat'l Mediation Bd.*, 663 F.3d 476, 488 (D.C. Cir. 2011) ("We would eviscerate the proper evolution of policymaking were we to disqualify every administrator who has opinions on the correct course of his agency's future actions.") (citation omitted).

Accordingly, NPCA's argument that the M-Opinion and BLM's determination were based on pretext should be rejected.

## V.   BLM Complied With NEPA and FLPMA

As previously demonstrated, because the Cadiz Pipeline is within the scope of ARZC's 1875 Act right-of-way, it was not necessary for BLM to grant a right-of-way under FLPMA and there was no major federal action triggering the requirement to comply with NEPA.  *See* Def. Mem. at 24-25.  Plaintiffs nevertheless argue that a right-of-way application is required by FLPMA and that an environmental impact statement is required because the Cadiz Pipeline will have significant effects on the environment.  *See* NPCA Mem. at 24-25; CBD Mem. at 25.  But Plaintiffs fail to recognize that Congress preserved preexisting rights when it enacted FLPMA.  43 U.S.C. § 1769(a).  Since the Cadiz Pipeline is within the scope of the existing right-of-way, there is no need for BLM to grant a right-of-way under FLPMA and no major federal action requiring an analysis under NEPA.  *See*, *e.g.*, *Alaska v. Andrus*, 591 F.2d 537, 541-42 (9th Cir. 1979).

## CONCLUSION

For the foregoing reasons, the Court should grant summary judgment to Defendants on all claims.

DATED:  May 10, 2019          Respectfully submitted,

JEAN E. WILLIAMS
Deputy Assistant Attorney General
Environment & Natural Resources Division
U.S. Department of Justice

*/s/ Luther L. Hajek*_____
Luther L. Hajek
Trial Attorney (CO Bar No. 44303)
U.S. Department of Justice
Environment & Natural Resources Division
Natural Resources Section
999 18th Street
South Terrace, Suite 370
Denver, CO 80202
Tel | (303) 844-1376
Fax | (303) 844-1350
Email:  Luke.Hajek@usdoj.gov

*Attorneys for Defendants*