BROWNSTEIN HYATT FARBER SCHRECK, LLP
LAWRENCE J. JENSEN (Admitted *Pro Hac Vice*)
ljensen@bhfs.com
DIANE C. DE FELICE (SBN: 149021)
ddefelice@bhfs.com
CHRISTOPHER R. GUILLEN (SBN: 299132)
cguillen@bhfs.com
2049 Century Park East, Suite 3550
Los Angeles, CA 90067
Telephone: 310.500.4600
Facsimile: 310.500.4602

Attorneys for Intervening-Defendants,
CADIZ, INC. and CADIZ REAL ESTATE, LLC

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, *et al.*,<br><br>and<br><br>NATIONAL PARKS CONSERVATION ASSOCIATION,<br><br>          Plaintiffs,<br><br>v.<br><br>U.S. BUREAU OF LAND MANAGEMENT, *et al.*,<br><br>          Defendants.<br><br>and<br><br>CADIZ, INC., *et al.*<br><br>          Intervening-Defendants. | Case No. 2:17-cv-8587-GW-ASx<br>Case No. 2:18-cv-06775-GW-AS<br>Consolidated<br><br>**CADIZ, INC. AND CADIZ REAL ESTATE, LLC'S OPPOSITION TO MOTIONS FOR SUMMARY JUDGMENT**<br><br>Date:          June 20, 2019<br>Time:          8:30 a.m.<br>Courtroom: 9D<br>Judge:          Hon. George H. Wu<br><br>[Filed concurrently herewith: Statement of Genuine Disputes; Request for Evidentiary Ruling] |

BROWNSTEIN HYATT FARBER SCHRECK, LLP
2049 Century Park East, Suite 3550
Los Angeles, CA 90067

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ................................................................................ 1

II. TIMELINE OF FEDERAL DEFENDANTS' TREATMENT OF THE PIPELINE ................................................................................. 2

III. PLAINTIFFS AGREE WITH DEFENDANTS AND THE NINTH CIRCUIT THAT ACTIVITIES THAT FURTHER A RAILROAD PURPOSE ARE WITHIN THE SCOPE OF 1875 ACT ROWS ........................................................................................ 5

IV. CBD'S ATTEMPT TO DISTINGUISH BARAHONA FAILS........... 8

V.  PLAINTIFFS DO NOT CHALLENGE THE SUBSTANTIAL EVIDENCE THAT SUPPORTS BLM'S FACTUAL CONCLUSION THE PIPELINE WILL FURTHER RAILROAD PURPOSES ....................................................................... 10

VI. THE OCTOBER 2017 LETTER MET ALL THE REQUIREMENTS OF REASONABLE DECISION MAKING ....... 12

    A.  The 2017 Letter Acknowledges a Change in Position and Adopts a Position that Is Permissible Under the 1875 Act................. 13

    B.  BLM Changed Its Position Based on a Revised Understanding of the Law .................................................................. 14

    C.  In 2017, BLM Reasonably Concluded that the 2015 Determination Was Contrary to Law .................................... 16

VII. NO FLPMA PERMIT IS REQUIRED .............................................. 22

VIII. NO NEPA REVIEW IS REQUIRED ................................................ 22

IX. CONCLUSION.................................................................................. 24

i

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**FEDERAL CASES**

*Ad Hoc Shrimp Trade Action Comm. v. United States*,
596 F.3d 1365 (Fed. Cir. 2010) ..................................................... 14, 15

*Barahona v. Union Pac. R.R. Co.*,
881 F.3d 1122 (9th Cir. 2018) ...................................................... *passim*

*Caldwell v. United States*,
250 U.S. 14 (1919) ............................................................................. 9

*F.C.C. v. Fox Television Stations, Inc.*,
556 U.S. 502 (2009) ..................................................... 12, 13, 14, 15

*Geneva Rock Products, Inc. v. United States*,
107 Fed. Cl. 166 (Fed. Cl. 2012) ....................................................... 9

*Glosemeyer v. United States*,
45 Fed. Cl. 771 (Fed. Cl. 2000) ..................................................... 21

*Grand Trunk R.R. Co. v. Richardson*,
91 U.S. 454 (1875) ............................................................................. 6

*Hartford Fire Ins. Co. v. Chi., Milwaukee & Saint Paul Ry. Co.*,
175 U.S. 91 (1899) ............................................................................. 7

*Home on the Range v. AT&T Corp.*,
386 F. Supp. 2d 999 (S.D. Ind. 2005) ............................................... 9

*Illig v. United States*,
58 Fed. Cl. 619 (Fed. Cl. 2003) ..................................................... 19

*Indigenous Envtl. Network v. United States Dep't of State*,
347 F. Supp. 3d 561 (D. Mont. 2018) ............................................. 16

*Mellon v. S. Pac. Transp. Co.*,
750 F. Supp. 226 (W.D. Tex. 1990) ................................................ 18

*Morales-Izquierdo v. Gonzales*,
486 F.3d 484 (9th Cir. 2007) ........................................................ 15

BROWNSTEIN HYATT FARBER SCHRECK, LLP
2049 Century Park East, Suite 3550
Los Angeles, CA 90067

ii

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins.*
*Co.*,
    463 U.S. 29 (1983) ............................................................... 12, 15

*Organized Village of Kake v. U.S. Dep't of Agric.*,
    795 F.3d 956 (9th Cir. 2015) ........................................ 12, 14, 15, 16

*Pit River Tribe v. U.S. Forest Serv.*,
    469 F.3d 768 (9th Cir. 2006) .................................................... 23

*San Luis & Delta-Mendota Water Auth. v. Jewell*,
    747 F.3d 581 (9th Cir. 2014) .................................................... 10

*In re SFPP Right-of-Way Claims*,
    Case No. SACV 15-00718, 2016 WL 3456985 (C.D. Cal. June 7,
    2016) ............................................................................... 6

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,
    255 F. Supp. 3d 101 (D.D.C. 2017) ........................................ 14, 15

*United States v. Denver & Rio Grande Ry. Co.*,
    150 U.S. 1 (1893) ............................................................ 23, 24

*United States v. Union Pac. R.R.*,
    353 U.S. 112 (1957) ............................................................. 9

*W. Watersheds Project v. Matejko*,
    468 F.3d 1099 (9th Cir. 2006) .................................................. 22

**CALIFORNIA CASES**

*Union Pac. R.R. Co. v. Santa Fe Pac. Pipelines, Inc.*,
    231 Cal.App.4th 134 (2014) ..................................................... 6

**OTHER STATE CASES**

*L.K.L. Associates, Inc. v. Union Pac. R.R. Co.*,
    2:15-CV-00347-BSJ, 2018 WL 2433563 (D. Utah May 29, 2018) ..................... 9

*McSweyn v. Inter-Urban Ry. Co.*,
    130 N.W.2d 445 ................................................................. 19

*Mitchell v. Illinois Cent. R.R. Co.*,
    384 Ill. 258 (1943) ............................................................. 18

BROWNSTEIN HYATT FARBER SCHRECK, LLP
2049 Century Park East, Suite 3550
Los Angeles, CA 90067

iii

**FEDERAL STATUTES**

42 U.S.C.
  § 4332(C) ........................................................................................................ 23

43 U.S.C.
  §§ 934-939 ................................................................................................. *passim*

43 U.S.C.
  § 1769(a) ......................................................................................................... 22

Pub. L. 115-31
  131 Stat. 135 (2017) ......................................................................................... 5

Pub. L. No. 111-88
  § 110, 123 Stat. 2927 (2009) ........................................................................... 4

Pub. L. No. 112-74
  § 118, 125 Stat. 1011 (2011) ........................................................................... 4

Pub. L. No. 113-76
  § 114, 128 Stat. 312-13 (2014) ........................................................................ 4

Pub. L. No. 113-235
  § 112, 128 Stat. 2420 (2014) ........................................................................... 4

Pub. L. No. 114-113
  § 121, 129 Stat. 2552 (2015) ........................................................................... 4

**OTHER AUTHORITIES**

43 C.F.R. § 2801.6(a)(3) ...................................................................................... 22

BROWNSTEIN HYATT FARBER SCHRECK, LLP
2049 Century Park East, Suite 3550
Los Angeles, CA 90067

CADIZ, INC. AND CADIZ REAL ESTATE, LLC'S OPPOSITION TO MOTIONS FOR
SUMMARY JUDGMENT

1    Intervening-Defendants Cadiz, Inc. and Cadiz Real Estate, LLC (collectively,
2    "Cadiz") respectfully submit this Opposition to the Motions for Summary Judgment
3    filed by Plaintiffs Center for Biological Diversity and Center for Food Safety
4    (collectively, "CBD") in Case No. 2:17-cv-08587 (ECF Doc. 67) and Plaintiff
5    National Parks Conservation Association ("NPCA") in Case No. 2:18-cv-06775
6    (ECF Doc. 55) (CBD and NPCA are sometimes collectively referred to herein as
7    "Plaintiffs").

## I.   **INTRODUCTION**

9    The Court should find that the Bureau of Land Management ("BLM")
10   reasonably concluded in its October 13, 2017 letter ("October 2017 Letter") that the
11   Arizona and California Railroad Company's ("ARZC") authorization of the
12   construction and operation of a water pipeline and related improvements
13   ("Pipeline") by Cadiz within its railroad right-of-way ("ROW"), granted under the
14   General Railroad Right-of-Way Act of March 3, 1875, 43 U.S.C. §§ 934-939
15   ("1875 Act"), did not require BLM permission.

16   In its October 2017 Letter, BLM set forth alternative justifications for its
17   conclusion.  The first, or primary, justification was that the Pipeline will not
18   interfere with ARZC's railroad operations and is therefore within the scope of
19   ARZC's ROW.  The second, or alternative, justification was that the Pipeline will
20   further railroad purposes—i.e., provide benefits to ARZC's railroad operations—
21   and is therefore within the scope of ARZC's ROW.

22   With respect to BLM's primary justification, Plaintiffs argue only that it was
23   contrary to law; they do not argue that BLM's underlying factual findings were
24   unreasonable.  With respect to BLM's alternative justification, Plaintiffs argue only
25   that BLM failed to adequately explain why it reached a different conclusion in 2015
26   about whether the Pipeline will further a railroad purpose; they do not argue that the
27   alternative justification was contrary to law, that BLM's underlying factual findings
28   were unreasonable or identify any controverted facts.

BROWNSTEIN HYATT FARBER SCHRECK, LLP
2049 Century Park East, Suite 3550
Los Angeles, CA 90067

1

BROWNSTEIN HYATT FARBER SCHRECK, LLP
2049 Century Park East, Suite 3550
Los Angeles, CA 90067

1  The Court should also find that no Federal Land Policy Management Act

2  ("FLPMA") permit is required if the Pipeline is within the scope of ARZC's ROW

3  and that the October 2017 Letter did not trigger the need to comply with the

4  National Environmental Policy Act ("NEPA") as it was not "a major federal

5  action."

6  For the reasons explained below and in their opening briefs, Cadiz and the

7  Federal Defendants (i.e., the Department of Interior ("Department"), BLM, *et al.*)

8  are entitled to judgment against Plaintiffs on all of Plaintiffs' claims with respect to

9  BLM's primary and alternative justifications. However, it should be noted that to

10  resolve this case in favor of Cadiz and the Federal Defendants, the Court need not

11  reach and resolve Plaintiffs' legal claims with respect to BLM's primary

12  justification; it need only decide that BLM reasonably concluded there was

13  substantial evidence that the Pipeline will further a railroad purpose.[1]

14  ## II.  TIMELINE OF FEDERAL DEFENDANTS' TREATMENT OF THE

15  PIPELINE

16  For the Court's reference, the following is a chronological timeline of the

17  Federal Defendants' interpretations of the scope of 1875 Act ROWs and

18  applications of those interpretations to the Pipeline referenced in the parties' briefs:

19  In **1989**, the Solicitor of the Department issued Memorandum M-36964

20  _____

21  [1]      Plaintiffs continue to argue that the primary interpretation in the
Solicitor of the Interior's Memorandum M-37048 ("2017 M-Opinion")—i.e., that
22  third parties may use 1875 Act ROWs as long as their activities do not interfere
with railroad operations—is incorrect. For the Court's convenience, as it did in its
23  Motion for Summary Judgment, Cadiz hereby incorporates and fully supports the
arguments made by the Federal Defendants in support of the primary interpretation.
24  Given the fact that the 1875 Act granted a railroad the exclusive use and occupancy
of the ROW as long as it continues to use it for railroad operations, the logic of that
25  interpretation is unassailable. Only the railroad, not BLM, has the right to
determine whether other uses may be made of the ROW, and the railroad may allow
26  other uses as long as they do not interfere with railroad operations. On the record
before the Court, the Pipeline clearly meets this standard as the October 2017 Letter
27  states: "BLM has no evidence, and neither the railroad nor any other person or
entity has claimed, that the Cadiz Project will interfere with the ARZC railroad
28  operations." AR 5.

CADIZ, INC. AND CADIZ REAL ESTATE, LLC'S OPPOSITION TO MOTIONS FOR
SUMMARY JUDGMENT

Brownstein Hyatt Farber Schreck, LLP
2049 Century Park East, Suite 3550
Los Angeles, CA 90067

("1989 M-Opinion"), which, in part, found that holders of 1875 Act ROWs may permit uses of the ROWs "without the grant of an additional permit or right-of-way from BLM." AR[2] 8010.

In **January 2009**, the Department confirmed that no permit from the Federal Defendants was required for the Pipeline to be constructed and operated within the ARZC's 1875 Act ROW. AR 7896.

In **June 2009**, Senator Diane Feinstein, concerned about the alleged environmental impacts of the Cadiz Valley Water Conservation, Recovery, and Storage Project ("Project"), sent a letter to the Department, requesting "a review of [the Department's] right-of-way policy regarding" the Project. AR 7896-97; *see also* AR 4922. Senator Feinstein's letter to the Department also described language in a bill she had introduced related to the ARZC. *Id.* On October 30, 2009, Congress enacted Senator Feinstein's language into law, which stated:

> SEC. 110. (a) Any proposed new use of the Arizona & California Railroad Company's Right of Way for conveyance of water shall not proceed unless the Secretary of the Interior certifies that the proposed new use is within the scope of the Right of Way.
>
> (b) No funds appropriated or otherwise made available to the Department of the Interior may be used, in relation to any proposal to store water underground for the purpose of export, for approval of any right-of-way or similar authorization on the Mojave National Preserve or lands managed by the Needles Field Office of the Bureau of Land Management, or for carrying out any activities

---

[2] "AR" refers to the Revised Administrative Record submitted on November 29, 2018 (Case No. 2:17-cv-08587 ("CBD Case"), ECF Doc. 54; Case No. 2:18-cv-06775 ("NPCA Case"), ECF Doc. 42) and supplemented on March 18, 2019 (CBD Case, ECF Doc. 66; NPCA Case, ECF Doc. 52).

CADIZ, INC. AND CADIZ REAL ESTATE, LLC'S OPPOSITION TO MOTIONS FOR SUMMARY JUDGMENT

1    associated with such right-of-way or similar approval.

2    Pub. L. No. 111-88, § 110, 123 Stat. 2927 (2009).  The law was thereafter annually

3    attached as a rider to the appropriations bill for the Department.  *See* Pub. L. No.

4    112-74, § 118, 125 Stat. 1011 (2011); Pub. L. No. 113-76, § 114, 128 Stat. 312-13

5    (2014); Pub. L. No. 113-235, §112, 128 Stat. 2420 (2014); Pub. L. No. 114-113, §

6    121, 129 Stat. 2552 (2015).

7        In **November 2011**, the Solicitor of the Department issued Memorandum M-

8    37025 ("2011 M-Opinion"), which partially withdrew the 1989 M-Opinion and

9    stated that a holder of an 1875 Act ROW may permit activities "that derive from or

10   further a railroad purpose."  AR 8037-38.  The 2011 M-Opinion further specified

11   that the "further a railroad purpose" standard allows holders of 1875 Act ROWs to

12   "authorize others to undertake, activities that have both railroad and commercial

13   purposes, but does not permit a railroad to authorize activities that bear no

14   relationship to the construction or operation of a railroad."  AR 8038.

15       In **August 2014**, BLM issued Instruction Memorandum No. 2014-122

16   ("2014 IM"), which purported to provide guidance to BLM field offices as to how

17   to apply the "further a railroad purpose" standard delineated in the 2011 M-

18   Opinion.  AR 2726-28.  However, the 2014 IM instructed field offices to consider

19   whether the railroad purpose or the non-railroad purpose drove the activity.  AR

20   2727.  That led to an "originate or derive from" standard.

21       In **October 2015**, BLM sent a letter to Cadiz, informing Cadiz that the

22   Pipeline does not fall within the scope of the ARZC ROW because the "<u>primary</u>

23   <u>objective</u>" of the Pipeline was not a "railroad purpose."  AR 2243-44 (emphasis

24   added).  A "Summary Evaluation" is attached to the letter, which further describes

25   BLM's analysis.  AR 2245-49.  These documents are referred to herein as the

26   "2015 Determination."

27       On **March 1, 2017**, a bi-partisan letter from eighteen members of Congress

28   was sent to the Secretary of the Department, requesting that the 2015 Determination

BROWNSTEIN HYATT FARBER SCHRECK, LLP
2049 Century Park East, Suite 3550
Los Angeles, CA 90067

4

be "immediately withdraw[n]."  AR 2020-23.  This letter references the existence of over 3,500 third party uses of 1875 Act ROWs in the western United States and the "arbitrary" character of the 2015 Determination.  *Id.*

On **March 29, 2017**, BLM issued Instruction Memorandum 2017-060, which formally rescinded the 2014 IM.  AR 971.  In **June 2017**, the Solicitor of the Interior issued a memorandum, suspending and temporarily withdrawing the 2011 M-Opinion to permit further review of the history of the 1875 Act and the applicable law.  AR 785.

In **May 2017**, Congress failed to renew the rider in the appropriations bill for the Department, lifting the prohibition against processing a permit for the Pipeline's use of the ARZC ROW.  *See* Pub. L. 115-31, 131 Stat. 135 (2017).

In **September 2017**, the Solicitor of the Department issued the 2017 M-Opinion, which permanently withdrew the 2011 M-Opinion and, as discussed in Cadiz's Motion, sets forth two interpretations of the scope of 1875 Act ROWs: the "does not interfere" standard and the "furthers a railroad purpose" standard.  AR 75-99; Memorandum of Points and Authorities in Support of Cadiz's Motion for Summary Judgment ("Cadiz Motion"), pp. 5-6.

On **October 13, 2017**, BLM sent Cadiz the October 2017 Letter, expressly rescinding the 2015 Determination and informing Cadiz that, based upon BLM's review of the record, the Pipeline fell within the scope of the ARZC ROW under either standard delineated in the 2017 M-Opinion.  Cadiz Motion, pp. 7-8.

## III.   PLAINTIFFS AGREE WITH DEFENDANTS AND THE NINTH CIRCUIT THAT ACTIVITIES THAT FURTHER A RAILROAD PURPOSE ARE WITHIN THE SCOPE OF 1875 ACT ROWS

In *Barahona v. Union Pacific Railroad Company*, the Ninth Circuit held that a pipeline that "serves a railroad purpose" is within the scope of an 1875 Act ROW.  881 F.3d 1122, 1134 (9th Cir. 2018).  The Ninth Circuit also confirmed that the

BROWNSTEIN HYATT FARBER SCHRECK, LLP
2049 Century Park East, Suite 3550
Los Angeles, CA 90067

CADIZ, INC. AND CADIZ REAL ESTATE, LLC'S OPPOSITION TO MOTIONS FOR SUMMARY JUDGMENT

BROWNSTEIN HYATT FARBER SCHRECK, LLP
2049 Century Park East, Suite 3550
Los Angeles, CA 90067

1    incidental use doctrine informs the scope of "railroad purposes." *Id.* at 1134-35.[3]

2        Consistent with *Barahona*, both CBD and NPCA agree that activities that

3    further a railroad purpose are within the scope of 1875 Act ROWs.  CBD states that

4    "[c]aselaw construing the plain language and legislative history of the 1875 Act

5    establishes that an activity falls within the scope of an 1875 Act easement . . . if it

6    <u>derives from or furthers</u> a railroad purpose."  Memorandum in Support of Plaintiffs'

7    Motion for Summary Judgment ("CBD Motion"), p. 13:26-28 (emphasis added).

8    NPCA states that "'[r]ailroad purposes' define the outer limit of permissible uses of

9    1875 Act right-of-way grants."  Memorandum in Support of NPCA's Motion for

10   Summary Judgment ("NPCA Motion"), p. 12:9-10.

11       CBD takes no issue with the 2017 M-Opinion's explanation of the incidental

12   use doctrine.  NPCA, however, attempts to discredit the 2017 M-Opinion by

13   arguing that the Opinion allows the doctrine to be used "to bring activities that do

14   not serve a railroad purpose within the scope of an easement granted under the 1875

15   Act," by concluding "that any form of commercial activity that does not impede a

16   'free and safe passage'—even one that merely confers pecuniary benefit on a

17   railroad company—may properly be considered as 'incidental to railroad

18   operations."  NPCA Motion, p. 13:7-11, 18-21.  This is a blatant

19   mischaracterization of the 2017 M-Opinion.  The 2017 M-Opinion summarizes the

20   Supreme Court's decision in *Grand Trunk Railroad Company v. Richardson,* 91

21   U.S. 454, 468-69 (1875), and explains that third party licenses for commercial

22   activities can further a railroad purpose:

---

24   [3]    CBD suggests that the District Court opinion underlying *Barahona* (*In
25   re SFPP Right-of-Way Claims*, Case No. SACV 15-00718, 2016 WL 3456985
     (C.D. Cal. June 7, 2016)), and the California Court of Appeal decision in *Union
26   Pacific Railroad Co. v. Santa Fe Pacific Pipelines, Inc.*, 231 Cal.App.4th 134
     (2014) are still good law.  CBD Motion, p. 17:23-25.  This is not correct.  The
27   Ninth Circuit reversed and remanded *In re SFPP Right-of-Way Claims* and
     disagreed with the *Union Pacific Railroad Co.* decision.  881 F.3d at 1133-35.
28   *Barahona* represents the governing interpretation of the scope of 1875 Act ROWs.

CADIZ, INC. AND CADIZ REAL ESTATE, LLC'S OPPOSITION TO MOTIONS FOR
SUMMARY JUDGMENT

BROWNSTEIN HYATT FARBER SCHRECK, LLP
2049 Century Park East, Suite 3550
Los Angeles, CA 90067

1    [U]nder the incidental use doctrine, a railroad may undertake

2    commercial activity, including authorizing a third party to undertake

3    commercial activity, as long as the activity is incidental to the

4    operation of the railroad <u>and</u> 'free and safe passage' is left for the

5    operation of the railroad.

6    AR 97 (emphasis added). In its attack on the 2017 M-Opinion, NPCA cites only

7    the phrase "free and safe passage" from that summary. NPCA Motion, 13:18-20.

8    NPCA does not mention that, under the 2017 M-Opinion, "the activity [must] be

9    incidental to the operation of railroad." *See id.* But the language of the 2017 M-

10   Opinion is plain. In order to satisfy the "furthers a railroad purpose" standard, the

11   2017 M-Opinion requires that the activity in question be <u>both</u> incidental to the

12   operation of the railroad and leave "free and safe passage" for railroad operations.

13   AR 97. The several examples of activities cited in the 2017 M-Opinion as

14   permitted under the incidental use doctrine involve uses that, while commercial in

15   nature, also have an incidental relationship to a railroad purpose. *See* AR 97-99

16   (e.g., warehouses, bulk and retail oil facilities and fiber optic cables are uses

17   incidental to railroad operations).

18   NPCA also argues that case law construing grants of private and state ROWs

19   cannot be used as precedent to bring non-railroad uses within the scope of 1875 Act

20   ROWS. NPCA Motion, at pp. 13:25-14:16. This argument misinterprets the 2017

21   M-Opinion and *Barahona,* both of which confirm that, under the common law

22   incidental use doctrine, a use must further a railroad purpose to fall within the scope

23   of an 1875 Act ROW. Further, two of the cases upon which NPCA relies are cited

24   by the Ninth Circuit in *Barahona* to support its holding. 881 F.3d at 1134 (citing

25   *Mitchell v. Illinois Cent. R.R. Co.*, 384 Ill. 258 (1943) and *Miss. Invs. v. New*

26   *Orleans & N. E. R.R. Co.*, 188 F.2d 245 (5th Cir. 1951)). Another case cited by

27   NPCA, *Hartford Fire Ins. Co. v. Chi., Milwaukee & Saint Paul Ry. Co.*, 175 U.S.

28   91, 99 (1899), was cited by the 2011 M-Opinion in its delineation of the scope of

7

BROWNSTEIN HYATT FARBER SCHRECK, LLP
2049 Century Park East, Suite 3550
Los Angeles, CA 90067

1 | 1875 Act ROWs.  AR 8047.

2 | IV.   **CBD'S ATTEMPT TO DISTINGUISH *BARAHONA* FAILS**

3 | Even though CBD agrees that activities that further railroad purposes are

4 | within the scope of 1875 Act ROWs, CBD attempts to avoid the conclusion

5 | compelled by *Barahona*—i.e., that the Pipeline is within the scope of ARZC's 1875

6 | Act ROW.  CBD does so by arguing that the Pipeline is "unlike" the pipeline in

7 | *Barahona.*  CBD Motion, p. 23:10.  The distinction does not lie.  The pipeline in

8 | *Barahona* transports "petroleum products" both for commercial and railroad

9 | purposes.  *See generally* 881 F.3d 1122.  Union Pacific alleged it uses capacity on

10 | the pipeline to transport millions of gallons of fuel a year, which it "purchase[s]

11 | directly . . . from third party refineries" and uses to power its locomotives.  *Id.* at

12 | 1134.  Union Pacific alleged this practice reduces its operating costs.  *Id.*  The

13 | Ninth Circuit found these allegations established a *prima facie* showing of a

14 | railroad purpose.  *Id.*

15 | The pipelines in *Barahona* and this case are alike.  They transport a

16 | commodity—water or oil—for commercial and railroad purposes.  ARZC has

17 | access to millions of gallons of water per year (10,000 gallons per day or 3,650,000

18 | gallons per year); Union Pacific has access to millions of gallons of fuel per year.

19 | AR 4677-78; *Barahona*, 881 F.3d at 1134 .  The Pipeline will "increase the safety,

20 | efficiency [and] profitability" of the ARZC; the *Barahona* pipeline will reduce

21 | Union Pacific's operating costs.  AR 208; *Barahona*, 881 F.3d at 1134.  And the

22 | Pipeline's benefits go even further than the *Barahona* pipeline, providing, *inter*

23 | *alia*, a fire suppression system, power generation, and a maintenance road to benefit

24 | the ARZC.[4]  Cadiz Motion, pp. 14-22; AR 5-6.  These benefits are not so "minimal

25 | or illusory as to make the incidental-use doctrine inapplicable."  *Barahona*, 881

26 | F.3d at 1135.

27 |

28 | [4]   The Pipeline's benefits (e.g., the fire suppression system, power generation, etc.) are inextricably intertwined with the Pipeline.

CADIZ, INC. AND CADIZ REAL ESTATE, LLC'S OPPOSITION TO MOTIONS FOR
SUMMARY JUDGMENT

BROWNSTEIN HYATT FARBER SCHRECK, LLP
2049 Century Park East, Suite 3550
Los Angeles, CA 90067

1    The railroad cases cited by Plaintiffs in other parts of their Motions are also

2    easily distinguished.  In *L.K.L. Associates, Inc. v. Union Pacific Railroad Co.*, the

3    Court found that a lease of an 1875 Act ROW did not further a railroad purpose

4    because <u>the lease bore no relationship to the railroad whatsoever</u> and the only

5    benefit the railroad received was monetary.  2:15-CV-00347-BSJ, 2018 WL

6    2433563, at *8-10 (D. Utah May 29, 2018).[5]  In *Home on the Range v. AT&T*

7    *Corp.*, the Court held that a telecommunications line did not "further a purpose of

8    the railroad" where <u>no argument was made and nothing in the record suggested</u> a

9    connection between the telecommunications line and the railroad.  386 F. Supp. 2d

10   999, 1021 (S.D. Ind. 2005).  The Pipeline at issue here is nothing like the building

11   in *L.K.L. Associates* or the telecommunications line in *Home on the Range* because

12   the Pipeline provides significant non-monetary benefits to the ARZC.  Cadiz

13   Motion, pp. 14-22.[6]

14

15

16

17

18

---

19   [5]    NPCA also cites *United States v. Union Pacific Railroad,* 353 U.S.
112 (1957) and *L.K.L. Associates, Inc.,* 2018 WL 2433563, at *8-10, to support its
20   claim that the 2017 M-Opinion misapplied the incidental use doctrine.  NPCA
Motion, p. 14:11-16.  Not so.  In *Union Pacific*, the Supreme Court did not mention
21   the incidental use doctrine.  *See* 353 U.S. at 119.  In *L.K.L. Associates, Inc.*, the
Court refused to apply the doctrine to allow uses "incidental to <u>or</u> not inconsistent
22   with" the railroad.  2018 WL 2433563, at *8-10 n. 77 (emphasis added).  Thus,
contrary to NPCA's claim, the 2017 M-Opinion interpretation of the doctrine is
23   consistent with *L.K.L. Associates*.

24   [6]    The recreational trail and timber cases Plaintiffs cite are also
distinguishable because there was no argument in those cases that the use furthered
25   an identifiable railroad purpose.  *See, e.g., Geneva Rock Products, Inc. v. United
States*, 107 Fed. Cl. 166, 171-73 (Fed. Cl. 2012) (a recreational trail is "a venue for
26   healthful exercise and enjoyment of the outdoor environment"); *Caldwell v. United
States*, 250 U.S. 14, 21 (1919) (the railroad cannot take timber from land adjacent
27   to the ROW where the timber was being used for solely as a means for profit and no
evidence in record suggested that timber removal could even tangentially benefit
28   railroad).

CADIZ, INC. AND CADIZ REAL ESTATE, LLC'S OPPOSITION TO MOTIONS FOR
SUMMARY JUDGMENT

BROWNSTEIN HYATT FARBER SCHRECK, LLP
2049 Century Park East, Suite 3550
Los Angeles, CA 90067

## V.   PLAINTIFFS DO NOT CHALLENGE THE SUBSTANTIAL EVIDENCE THAT SUPPORTS BLM'S FACTUAL CONCLUSION THE PIPELINE WILL FURTHER RAILROAD PURPOSES

As Cadiz explained in its Motion, the standard of review in an APA case is "highly deferential."  Where the agency has relied on "relevant evidence [such that] a reasonable mind might accept as adequate to support a conclusion," its decision is supported by "substantial evidence" and must be upheld.  *San Luis & Delta-Mendota Water Auth. v. Jewell,* 747 F.3d 581, 601 (9th Cir. 2014).  Cadiz's Motion detailed the substantial evidence in the record that supports the October 2017 Letter's finding the Pipeline will further a railroad purpose in six different ways:

1.  "[w]ater pumped through the Cadiz pipeline will enable the creation and operation of a new fire suppression system to prevent and minimize damage to railroad assets and disruption of railroad operations;"

2.  "[w]ater pumped through the Cadiz pipeline will generate power that will be used in railroad operations;"

3.  "[t]he project will provide transmission lines to bring electrical power that will be used in railroad operations;"

4.  "Cadiz proposes to provide ARZC with access to 10,000 gallons of water a day pumped through the pipeline for their future [railroad] purposes;"

5.  "Cadiz proposes to construct [an] access road" "that will facilitate smoother railroad operations;" and,

6.  "[w]ater piped through Cadiz pipelines will enable the operation of a steam-based excursion train on the ARZC rail line."

AR 5-6; Cadiz Motion, pp. 14-22.

Significantly, neither Plaintiff argues that BLM's factual conclusions were unreasonable based on the record before it.  Nor could they.  For example, it is

10

BROWNSTEIN HYATT FARBER SCHRECK, LLP
2049 Century Park East, Suite 3550
Los Angeles, CA 90067

1   impossible to argue on this record that the availability of water to suppress fire and

2   wash rail cars, or power to light transloading facilities and fuel climate-controlled

3   storage containers, would not be beneficial to ARZC's railroad operations.  Even

4   BLM acknowledged in its 2015 Determination that several of the benefits that the

5   Pipeline will provide ARZC could "serve a railroad purpose."  AR 2248.  As will

6   be explained below, the only reason BLM did not conclude in 2015 that the

7   Pipeline will further railroad purposes is because BLM applied an erroneous legal

8   standard.  Instead of asking whether the six benefits would further a railroad

9   purpose, BLM asked whether the Pipeline itself "originated or derived" from a

10  railroad purpose.  *See* AR 2243-49.  Because BLM found that it did not so

11  originate—i.e., that the originating purpose of the Pipeline was to convey water for

12  public consumption by communities in Southern California—BLM concluded, as a

13  matter of law, that the benefits the Pipeline would provide to ARZC's railroad

14  operations could not be said to further a railroad purpose, regardless of how

15  beneficial they might be, as a matter of fact, to those operations.  AR 2243-49.  Put

16  another way, BLM concluded, by applying the incorrect legal test, that all of the six

17  benefits were fruit of a poisonous tree—i.e., of a pipeline whose primary purpose

18  was to convey water for public consumption—and that therefore those benefits

19  could not bring the Pipeline within the scope of the ARZC's 1875 Act ROW.  *See*

20  AR 2243-49.  As will be explained below, BLM was wrong to apply a "derives

21  from or originates" test, rather than the "furthers a railroad purpose" test, as set

22  forth in the 2017 M-Opinion, and confirmed by *Barahona* and a host of other cases

23  that have applied the incidental use doctrine.

24

25

26

27

28

CADIZ, INC. AND CADIZ REAL ESTATE, LLC'S OPPOSITION TO MOTIONS FOR
SUMMARY JUDGMENT

BROWNSTEIN HYATT FARBER SCHRECK, LLP
2049 Century Park East, Suite 3550
Los Angeles, CA 90067

## VI.   THE OCTOBER 2017 LETTER MET ALL THE REQUIREMENTS OF REASONABLE DECISION MAKING[7]

The October 2017 Letter is the product of BLM's rational decision making and complies with the APA in all respects.  Under the APA, agency action must be upheld if the agency examines "the relevant data and articulate[s] a satisfactory explanation for its action."  *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 513 (2009) ("*Fox*") (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.* ("*State Farm*"), 463 U.S. 29, 43 (1983)).  A court is "not to substitute its judgment for that of the agency . . . and should uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned."  *Id.* at 513-14 (internal quotations and citations omitted).

The Supreme Court has made clear that this deferential standard of review is not supplanted by a more "searching review" simply because an agency changes position.  *Id.* at 514-15.  Elections have policy consequences and agencies must be given ample latitude to "adapt their rules and policies to the demands of changing circumstances."  *State Farm*, 463 U.S. at 42; *Organized Village of Kake v. U.S. Dep't of Agric.*, 795 F.3d 956, 968 (9th Cir. 2015).  Therefore, to satisfy the APA, an agency changing positions need only acknowledge it is changing position, adopt a position that is permissible under the statute, show that there are good reasons for the new position and believe the new position to be better, "which the conscious change of course adequately indicates."  *Fox*, 556 U.S. at 515; *Organized Village of Kake*, 795 F.3d at 966.

In 2017, BLM acknowledged that it had applied an erroneous legal standard in 2015, and expressly stated that its purpose was to correct the error.  AR 4-6.

---

[7]   NPCA includes an argument in its Motion that the 2017 M-Opinion and the October 2017 Letter are the product of the Department's "pretextual reasoning."  NPCA Motion, pp. 16-21.  This argument is purely speculation and innuendo.  To avoid duplicative briefing, Cadiz hereby incorporates by reference and relies upon the Federal Defendants' briefing on this specious argument.

CADIZ, INC. AND CADIZ REAL ESTATE, LLC'S OPPOSITION TO MOTIONS FOR SUMMARY JUDGMENT

BLM's acknowledgment came after a review of the several objections that were filed by Cadiz, other railroads, and members of Congress immediately after the 2015 Determination was issued. The Federal Defendants' opposition brief details these objections. BLM complied with the APA in all respects.

### A.   The 2017 Letter Acknowledges a Change in Position and Adopts a Position that Is Permissible Under the 1875 Act

As explained in Section C, *infra*, the 2015 Determination was based on an erroneous interpretation of the law, one which would require an activity to "originate or derive" from a railroad purpose, rather than "further a railroad purpose." In 2017, BLM expressly acknowledged that it was changing positions from the 2015 Determination because "[t]he October 2015 administrative determination is no longer an accurate representation of the BLM's view of the applicable law and facts." AR 5. For that reason, BLM rescinded the 2015 Determination and "superseded" it by the 2017 Letter. AR 5.

The October 2017 Letter's alternative finding sets forth a proper standard: "The incidental use doctrine would allow a railroad to authorize third party activities, as long as the activity is incidental to and does not interfere with continued railroad operations"—and clarifies the "legal and institutional authorities" for the 2015 Determination "are no longer operative." AR 4-5. The October 2017 Letter also states: "the activities proposed in the Cadiz Project further a railroad purpose, even if they do not originate or derive from that purpose." AR 5 (emphasis added). The October 2017 Letter then applies the correct legal standard to the Pipeline and properly concludes that the Pipeline falls within the scope of ARZC's ROW. AR 5-6.

As discussed in Sections III and IV, *supra*, BLM's 2017 application of the incidental use doctrine to the Pipeline is permissible under the 1875 Act. Therefore, two of the *Fox* factors are met (i.e., the agency acknowledges a change in position and the new position is permissible under the statute). *See Fox*, 556

BROWNSTEIN HYATT FARBER SCHRECK, LLP
2049 Century Park East, Suite 3550
Los Angeles, CA 90067

BROWNSTEIN HYATT FARBER SCHRECK, LLP
2049 Century Park East, Suite 3550
Los Angeles, CA 90067

1  U.S. at 515.

2  **B.    BLM Changed Its Position Based on a Revised Understanding of**

3  **the Law**

4  The other two *Fox* factors are (a) good reasons for the new position and (b)

5  agency belief that the new position is better, "which the conscious change of course

6  adequately indicates." *Fox*, 556 U.S. at 515; *Organized Village of Kake*, 795 F.3d

7  at 966.  On the record, these two factors are also satisfied.

8  It is well settled that an agency is allowed to change its position based upon

9  its updated and revised understanding of the law.  *See Fox*, 556 U.S. at 538

10  (Kennedy, J., concurring in part); *Ad Hoc Shrimp Trade Action Comm. v. United*

11  *States*, 596 F.3d 1365, 1372 (Fed. Cir. 2010) (upholding agency's change in

12  interpretation of a statute resulting from the agency's "better reading" of the

13  statute); *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 255 F. Supp. 3d

14  101, 141 (D.D.C. 2017).  In *Fox*, for example, the Supreme Court upheld an

15  agency's change in position based not on a change in factual findings, but instead

16  upon the agency's evolved reading of Supreme Court precedent.  556 U.S. at 517-

17  18, 538.  The Court did so even though the reasons announced for the change were

18  "not so precise, detailed, or elaborate as to be a model for agency explanation."

19  556 U.S. at 538 (Kennedy, J., concurring in part).

20  In *Standing Rock Sioux Tribe*¸ the District Court for the District of Columbia

21  upheld the Army Corps of Engineers' determination to grant an easement for a

22  pipeline after having previously found that it would not grant the easement on the

23  same administrative record.  255 F. Supp. 3d at 141.  The District Court stated that

24  because the change in position was not founded on a change in factual findings, but

25  rather on a change in interpretation of legal requirements, the Corps "need only

26  have shown good reasons for its new policy."  *Id.* at 142.  The Corps satisfied this

27  standard by explaining that all legal requirements had been met to grant the

28  easement.  *Id.* at 142-43.

14

BROWNSTEIN HYATT FARBER SCHRECK, LLP
2049 Century Park East, Suite 3550
Los Angeles, CA 90067

1    In this case, like the agency actions in *Fox, Ad Hoc Shrimp Trade Action*

2    *Committee, and Standing Rock Sioux Tribe*, the October 2017 Letter did not

3    contradict the facts in the record on which the 2015 Determination was based.

4    Instead, BLM reexamined those facts through the proper legal lens.  Thus, the

5    change in position is the result of a change in application of the correct legal

6    standard to the administrative record.  This case does not involve a change in

7    factual findings that "underlay" a policy, as Plaintiffs claim, and there is no

8    requirement for a "more detailed explanation."  CBD Motion, p. 22-24; NPCA

9    Motion, pp. 23:20-24-15.[8]  A more detailed explanation is only required where

10   factual findings that drive an agency's initial position are contradicted by the

11   agency's new position.  *Fox,* 556 U.S. at 515; *Morales-Izquierdo v. Gonzales*, 486

12   F.3d 484, 493 (9th Cir. 2007) ("A broader rule would deny agencies the necessary

13   flexibility to change policies in light of changed factual circumstances, or a change

14   in administrations.") (internal quotation marks and citation omitted).

15   The cases upon which Plaintiffs rely, *State Farm* and *Organized Village of*

16   *Kake,* highlight the distinction.  In *State Farm,* Congress directed an agency to

17   address motor vehicle safety, and, after the agency found airbags and automatic

18   seatbelts saved lives, the agency issued regulations requiring such safety systems.

19   463 U.S. at 33, 37.  After a change in administration, the agency rescinded the

20   regulation, but never addressed the prior factual finding.  *Id.* at 47-52.  The Court

21   found this course of action violated the APA.  *Id.*  Here, BLM did not ignore prior

22   factual findings, it properly changed its interpretation of the law and applied that

23   law to the record.

24

25

---

26   [8]    Plaintiffs also attempt to characterize the change in position as *solely*
27   the product of political biases.  That this Project attracted policy attention was not a
     new development of the current administration.  The record reflects that the Project
28   was the subject of heavy political pressure during the Obama administration as
     well.  AR 7901, 7896, 4922, 4633, 2857, 2853, 2774-76, 2224.

BROWNSTEIN HYATT FARBER SCHRECK, LLP
2049 Century Park East, Suite 3550
Los Angeles, CA 90067

1    Similarly, in *Organized Village of Kake*, an agency adopted a regulation

2 restricting road construction in a particular national forest, finding that roadless

3 areas have significant scientific, environmental and recreational benefits.  795 F.3d

4 at 959-61.  The agency adopted the rule even though it acknowledged that it would

5 result in negative local economic impacts.  *Id.*  Thereafter, on the same record

6 which underlay the initial restrictions, the agency exempted the forest from the

7 regulation, finding the local economic impacts outweighed the environmental

8 benefits.  *Id.* at 962, 967.  Because there was no "reasoned explanation for

9 disregarding previous factual findings," the Court found a violation of the APA.  *Id.*

10 at 969; *see also Indigenous Envtl. Network v. United States Dep't of State,* 347 F.

11 Supp. 3d 561, 582-83 (D. Mont. 2018) (same).[9]  Again, here, BLM did not

12 disregard previous factual findings; it simply reexamined the facts based upon its

13 correct interpretation of the law.

14    As discussed above, the October 2017 Letter reflects a change in BLM's

15 interpretation of the law—pursuant to the 2017 M-Opinion—and not a change in

16 factual findings underlying a policy.  Further, the legal validity of the revised

17 interpretation has now been confirmed by the Ninth Circuit in *Barahona*.

18    **C.    In 2017, BLM Reasonably Concluded that the 2015 Determination**

19          **Was Contrary to Law**

20    In November 2011, the Department issued the 2011 M-Opinion, which stated

21 that uses fall within the scope of an 1875 Act ROW if the use "derives from or

22 furthers" a railroad purpose.  AR 8046.  The Department, in the 2011 M-Opinion,

23 then found that, under this standard, a commercial fiber optic line fell within the

24 scope of an 1875 Act ROW because the railroad used "capacity" on the line.  AR

25 8048.  The only evidence submitted to the Department was a letter from the

26 _____

27 [9]    CBD string cites several cases on page 24 of its Motion.  Unlike
BLM's change in interpretation of the law, each of these cases also involves a
28 change in factual findings underlying a change in policy.

CADIZ, INC. AND CADIZ REAL ESTATE, LLC'S OPPOSITION TO MOTIONS FOR
SUMMARY JUDGMENT

BROWNSTEIN HYATT FARBER SCHRECK, LLP
2049 Century Park East, Suite 3550
Los Angeles, CA 90067

1   railroad, stating the line would improve the railroad's communication systems. *Id.*

2   The Department found this evidence demonstrated the line "furthered, at least in

3   part, a railroad purpose, as required by the incidental use doctrine." *Id.*

4       In August 2014, BLM issued the 2014 IM.  AR 2726.  As discussed above,

5   the 2014 IM purported to provide "revised guidance" to BLM field offices tasked

6   with reviewing uses of 1875 Act ROWs overlying BLM-managed public lands *in*

7   *light of the 2011 M-Opinion*.  AR 2726.  That "guidance," however, departed

8   sharply from the 2011 M-Opinion.  The 2011 M-Opinion stated that a use can fall

9   within the scope of an 1875 Act ROW if it either <u>derives from or furthers</u> a railroad

10   purpose, whereas the 2014 IM erroneously instructed BLM field offices to inquire

11   (a) whether the non-railroad purpose "drive[s] the activity or drive[s] the design of

12   the activity in question," and (b) "[w]hat is the primary objective of the activity."

13   AR 2727-28.  That language led to the unfounded "<u>originates or derives from</u>"

14   standard, which considers only the first condition set forth in the 2011 M-Opinion

15   (i.e., whether the use derives from a railroad purpose), and ignores the fact that a

16   third party use is also permissible if it <u>furthers</u> a railroad purpose, even if it does not

17   derive from such a purpose.  In addition, the erroneous standard makes the "non-

18   railroad purposes" determinative, rather than the "railroad purposes."

19       In October 2015, relying on the erroneous interpretation in the 2014 IM,

20   BLM sent a letter to Cadiz informing Cadiz of its "administrative determination"

21   that the Pipeline does not fall within the scope of the ARZC ROW.  AR 2243.  In

22   its cover letter, the 2015 Determination stated:

23           As shown in the enclosed summary, BLM has determined

24           that the Project does not derive from or further a railroad

25           purpose.  <u>By determining the primary objective of the</u>

26           <u>Project and how the railroad purpose interrelates, BLM</u>

27           <u>examined "the nature and extent of the non-railroad</u>

28           <u>benefits of an activity relative to the railroad purpose of</u>

BROWNSTEIN HYATT FARBER SCHRECK, LLP
2049 Century Park East, Suite 3550
Los Angeles, CA 90067

1    the same activity" to provide for an overall evaluation of

2    the Project.

3    AR 2244 (emphasis added).  It is thus apparent from the outset that the 2015

4    Determination relied on the improper legal theory proposed by the 2014 IM in

5    determining the Pipeline falls outside the scope of the ARZC ROW.

6         The erroneous "originate or derive from" standard plagued the entirety of the

7    2015 Determination.  AR 2245-49.  The 2015 Determination stated the Pipeline "is

8    not a railroad purpose because the activity itself is not <u>necessary</u> for the

9    construction or operation of a railroad, and <u>the origin of the activity itself is a non-</u>

10   <u>railroad purpose</u>."  AR 2247 (emphasis added).  This is not the standard set forth in

11   the 2011 M-Opinion and confirmed in *Barahona*.  All that is required is that the use

12   "further" a railroad purpose; there is no requirement that the use be "necessary" to

13   or "originate" in a railroad purpose.  *See, e.g., Mellon v. S. Pac. Transp. Co.*, 750 F.

14   Supp. 226, 228-31 (W.D. Tex. 1990) (fiber optic line fell within scope of ROW

15   because the railroad was permitted to use "capacity" on the line for railroad

16   purposes); *Mitchell v. Illinois Cent. R.R. Co.*, 384 Ill. 258, 268 (1943) (wholesale

17   and retail gasoline station was permitted within the scope of a ROW).

18        The 2015 Determination continued:

19             Production of electricity via in-line turbines located in

20             such a pipeline likewise is not within the scope of the

21             ROW granted by the Act, as it remains unclear as

22             presented how power-generation activity <u>issues</u> from

23             railroad purposes, especially given that these turbines

24             would use water for the purpose of commercial

25             distribution and not railroad purposes.

26   AR 2247 (emphasis added).  Again, BLM is applying the erroneous "originate or

27   derive from" standard by considering only whether the use arises out of a railroad

28   purpose, rather than whether it furthers a railroad purpose.  Numerous courts have

18

BROWNSTEIN HYATT FARBER SCHRECK, LLP
2049 Century Park East, Suite 3550
Los Angeles, CA 90067

held a use that provides power to a railroad falls within the scope of the ROW. *See*, *e.g.*, *Barahona*, 881 F.3d at 1134-35 (pipeline that provided fuel for the railroad fell within the scope of the ROW); *Illig v. United States*, 58 Fed. Cl. 619, 634 (Fed. Cl. 2003) (electricity lines may fall within the scope of the ROW). These uses further a railroad purpose, even though they do not necessarily arise out of a railroad purpose. *See id.*[10]

The 2015 Determination next found that, because the use of water to suppress trestle fires "is an uncommon industry practice, with dry sand being the preferred method," the fire suppression system does "not derive from or further a railroad purpose." AR 2248. The 2015 Determination further stated that the fire suppression system does not further a railroad purpose because "[g]roundwater capture and use, not fire suppression, underlines the design of the activity." *Id.* (emphasis stated). That was erroneous for two reasons. First, there is substantial evidence in the record that railroads use water to suppress fires and that a lack of water in remote areas has allowed fires to cause significant damage to railroads. AR 201, 212-15, 222-37, 290-95, 532-43. Second, the 2015 Determination again relied on the improper "originate or derive from" standard because it is clear a railroad may undertake activities that improve its safety and efficiency. *See McSweyn v. Inter-Urban Ry. Co.*, 130 N.W.2d 445, 448 (uses that "directly or indirectly contribute[] to the safe, economical and efficient operation" of the railroad fall within the ROW).

---

[10]    BLM's 2015 Determination is inconsistent on this issue, because later in its evaluation BLM stated: "A power line may further a railroad purpose. Courts conducting such inquiries have allowed railroads to string power lines (see *Long Beach v. Pac. Elec., Ry. Co.*, 283 P.2d 1036 (Cal. 1955) (power lines necessary for operation of electric railroad)[)] as long as the power is connected with the operation of the railroad (see *Tompkins v. Atl. Coast Line. R. Co.*, 79 S.E.2d 41, 47 (Ga. Ct. App. 1953) ("The grant of an easement for railroad purposes does not include an easement for an electric-power transmission line, unconnected with the operation of the railroad.")." AR 2275 (emphasis added).

CADIZ, INC. AND CADIZ REAL ESTATE, LLC'S OPPOSITION TO MOTIONS FOR
SUMMARY JUDGMENT

BROWNSTEIN HYATT FARBER SCHRECK, LLP
2049 Century Park East, Suite 3550
Los Angeles, CA 90067

More egregiously, the 2015 Determination admitted that an access road and "power lines, expanding transload facilities and improving them with access to power, and supplying the railroad with a switchboard to tap into power" <u>may serve a railroad purpose</u>. AR 2248. However, the 2015 Determination concluded that those benefits cannot fall within the scope of the ARZC ROW because the Pipeline originates in a "non-railroad purpose." *Id.* The same admission of railroad purpose appears in BLM's discussion of the fiber optic line that will accompany the fire suppression system. AR 2270. These determinations are also contrary to the 2011 M-Opinion and the Ninth Circuit's decision in *Barahona.* A proposed use need not originate in a railroad purpose; it need only further a railroad purpose.

Finally, the 2015 Determination went so far as to find that the provision of water for use in a *steam-powered train* does not fall within the scope of the ARZC ROW because the train's "prospective use of a small portion of the pipeline's water" does not convert the Pipeline "into a legitimate railroad purpose." AR 2248. No case law supports the proposition that a use that furthers a railroad purpose must somehow outweigh a non-railroad purpose (e.g., commercial benefits), or that the respective benefits from the uses be quantified and compared. The fiber optic cable addressed in the 2011 M-Opinion, and the pipeline in *Barahona*, were only in part used for railroad purposes, but still fell within the scope of the 1875 ROW. *Barahona*, 881 F.3d at 1134; AR 8048. Further, preventing a use that would permit the operation of a locomotive on the railroad is entirely inconsistent with the primary purpose of the 1875 Act—the construction and operation of the railroad.[11]

---

[11] In 2015, BLM also prepared a lengthier evaluation to support the Summary Evaluation, plagued by the same improper reliance on the "originate and derive from" standard. *See* AR 2264 ("There is no relationship between the express purpose for the pipeline and the railroad's operation."), 2265 ("The primary purpose of this pipeline is to provide a means of conveying groundwater for sale and use by those other than the Railroad."), 2266 ("Because the pipeline and the water that is proposed to run through the pipeline are not necessary to railroad construction or operations, the pipeline and the water it will convey do not fall within that set of activities that derive from or further a railroad purpose."), 2269 ("Activities that derive from or further a railroad purpose must actually come from,

CADIZ, INC. AND CADIZ REAL ESTATE, LLC'S OPPOSITION TO MOTIONS FOR SUMMARY JUDGMENT

BROWNSTEIN HYATT FARBER SCHRECK, LLP
2049 Century Park East, Suite 3550
Los Angeles, CA 90067

*See Glosemeyer v. United States,* 45 Fed. Cl. 771, 778 (Fed. Cl. 2000) ("[T]he . . . running of a train[] over a stretch of land clearly constitutes a permissible railroad purpose.").

Plaintiffs' direct and indirect attempts to divorce themselves from the "furthers a railroad purpose" test and to distinguish *Barahona* are all based on the erroneous 2015 Determination.  For example, CBD claims that the Pipeline does not further a railroad purpose because its "primary purpose" is to transport water to Southern California water providers, and because only a small portion of the water will be used by AZRC.  CBD Motion, pp. 23:21-24:3.  And CBD claims that the 2015 Determination applied the "incidental use doctrine" to the Pipeline.  CBD Motion, pp. 22:26-23:5.  CBD's arguments are plagued by the same defect in the 2015 Determination—an application of the incorrect "originate or derive from" standard.

NPCA also relies on the erroneous "originates and derives from" standard—with a misleading twist.  NPCA claims that the October 2017 Letter fails to identify the standard it is applying.  NPCA Motion, pp. 21:8-12, 22:15-19.  NPCA supports this argument by noting that the 2017 Letter "explicitly rejected the 'originates or derives from' standard from the 2011 M-Opinion," and then claims, despite BLM's explicit reliance on the 2017 M-Opinion, that BLM did not explain what test it was applying.  *Id.*  As explained above, the 2011 M-Opinion did not contemplate an "originates or derives from" standard and it did not mention the word "originate" with respect to railroad purposes.  The 2011 M-Opinion adopted the "furthers a railroad purpose" standard.  AR 8038.  The October 2017 Letter's alternative interpretation specifically states that it is applying the "furthers a railroad purpose" standard on three separate occasions.  AR 5-6.

originate, or issue from the railroad purpose."), 2270 (The Project is "driven by the need for groundwater capture and use, and not driven by or for railroad purposes.").

CADIZ, INC. AND CADIZ REAL ESTATE, LLC'S OPPOSITION TO MOTIONS FOR SUMMARY JUDGMENT

BROWNSTEIN HYATT FARBER SCHRECK, LLP
2049 Century Park East, Suite 3550
Los Angeles, CA 90067

1    For all these reasons, Plaintiffs' allegations that the October 2017 Letter

2    represents an APA violation lack support.  The October 2017 Letter meets all of the

3    requirements for a change in position based on the record in this case and

4    applicable case law.  The October 2017 Letter corrects a misapplication of the law

5    by analyzing the evidence in the record and using the correct legal standard

6    articulated in the 2017 M-Opinion.

## VII.   <u>NO FLPMA PERMIT IS REQUIRED</u>

8    As discussed above, the October 2017 Letter properly concludes the Pipeline

9    is within the scope of the ARZC ROW.  Because the Pipeline is within the scope of

10   the ARZC ROW, no permit or authorization from BLM under the FLPMA is

11   required.  FLPMA expressly preserves existing 1875 Act ROWs and the rights

12   granted therein.  43 U.S.C. §1769(a) ("Nothing in this subchapter shall have the

13   effect of terminating any right-of-way or right-of-use heretofore issued, granted, or

14   permitted."); 43 C.F.R. § 2801.6(a)(3); *see also W. Watersheds Project v. Matejko*,

15   468 F.3d 1099, 1104 (9th Cir. 2006) (recognizing that when passing FLPMA,

16   "Congress specifically chose to preserve vested rights").[12]  Neither Plaintiff appears

17   to argue that a FLPMA permit is required if the Court upholds the October 2017

18   Letter.

## VIII.   <u>NO NEPA REVIEW IS REQUIRED</u>

20   BLM's issuance of the October 2017 Letter did not trigger review under the

21   NEPA.  The October 2017 Letter determined that no federal approval is required

22   for the construction and operation of the Pipeline.  As explained in the Federal

23   Defendants' and Cadiz's Motions, no environmental review under NEPA is

24   required in such circumstances.  Cadiz Motion, pp. 22:19-23:13; Federal

25   Defendants' Memorandum in Support of Motion for Summary Judgment, pp.

26   24:23-25:19.

---

[12]   CBD fails to mention this express preservation of rights in its description of FLPMA.  CBD Motion, pp. 4:21-5:15.

BROWNSTEIN HYATT FARBER SCHRECK, LLP
2049 Century Park East, Suite 3550
Los Angeles, CA 90067

1    Environmental review is required under NEPA where (1) there is a major

2    Federal action and (2) the action may significantly affect the environment.  42

3    U.S.C. § 4332(C).  As Cadiz explained in its Motion, the October 2017 Letter,

4    which only determined whether BLM had authority to act, not whether it should

5    exercise such authority, did not constitute a major federal action and, as such, no

6    environmental review is required.  Cadiz Motion, pp. 22:19-23:13.

7    Plaintiffs offer no authority that might compel a different conclusion.  NPCA

8    simply cites to the Interior Department Manual which states that an environmental

9    impact statement is normally required for pipeline right-of-way grants.  NPCA

10   Motion, p. 25:1-5.  This guidance does not apply here because no new right-of-way

11   grant is being issued.  If the Pipeline falls within the scope of the ARZC ROW,

12   neither a FLPMA permit, nor compliance with NEPA, is required.

13   CBD ignores the lack of a major federal action by BLM when it argues that

14   an environmental impact statement should be prepared because the Pipeline "may

15   have a significant impact on the environment" and because the October 2017 Letter

16   alters the *status quo*.  CBD Motion, pp. 24:26-25:25.  The only case cited by CBD

17   in support of its argument, *Pit River Tribe v. U.S. Forest Serv.*, involved the

18   issuance of a lease extension for a geothermal plant—a major federal action.  *See*

19   469 F.3d 768, 783-84 (9th Cir. 2006).

20   Bypassing the major federal action requirement, both Plaintiffs jump to

21   assertions about the environmental impacts of the Project and the Pipeline.  *See,*

22   *e.g.,* CBD Motion, pp. 8:3-15, 12:24-13:8, 25:6-17; NPCA Motion, pp. 1:11-15,

23   2:23-3:10.  These assertions are not pertinent to defining the scope of an 1875 Act

24   ROW.  The purpose of the 1875 Act was to open the western United States "to

25   settlement and [] enhancing the value of those public lands through or near which

26   such railroads might be constructed."  *United States v. Denver & Rio Grande Ry.*

27

28

1  *Co.*, 150 U.S. 1, 8, 14 (1893).  The 1875 Act was not environmental legislation.[13]

2         In sum, BLM was not required to conduct environmental review under

3  NEPA when it issued the October 2017 Letter.

4  **IX.    CONCLUSION**

5         For all the reasons in Cadiz's and Federal Defendants' papers in this matter,

6  Cadiz and Federal Defendants are entitled to judgment in their favor on all claims

7  brought by Plaintiffs.

8  Dated: May 10, 2019                BROWNSTEIN HYATT FARBER SCHRECK,
                                       LLP
9
                                       By:    */s/   Diane C. De Felice*
10                                            LAWRENCE J. JENSEN
                                              DIANE C. DE FELICE
11                                            CHRISTOPHER R. GUILLEN
                                              Attorneys for Intervening-Defendants
12                                            CADIZ, INC. AND CADIZ REAL ESTATE,
                                              LLC
13

14

15

16  19198542

17

18

19

20

21

22

23

24

25  _____

26  [13]     Cadiz's Motion at pages 4-5 demonstrates that Plaintiffs' claims the
    Pipeline will impact the environment are unfounded.  The environmental impacts of
27  the Project, including the Pipeline, have been reviewed in an environmental impact
    report under the California Environmental Quality Act.  And the environmental
28  impact report was upheld against challenges by NPCA and CBD.  *See also* Cadiz's
    Statement of Genuine Disputes filed concurrently herewith.

CADIZ, INC. AND CADIZ REAL ESTATE, LLC'S OPPOSITION TO MOTIONS FOR
SUMMARY JUDGMENT

BROWNSTEIN HYATT FARBER SCHRECK, LLP
2049 Century Park East, Suite 3550
Los Angeles, CA 90067